Sharon T. Hritz (265105)
KELLER ROHRBACK L.L.P.
610 Anacapa Street
Santa Barbara, CA 93101
Tel: (805) 456-1496
Fax: (805) 456-1497
shritz@kellerrohrback.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Gretchen S. Obrist
KELLER ROHRBACK L.L.P.
1201 Third Ave., Ste 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
gobrist@kellerrohrback.com

***Attorneys for Plaintiff***
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
AT SAN DIEGO

| | |
|---|---|
| DIANNA MONTEZ, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHASE HOME FINANCE LLC and JPMORGAN CHASE, N.A.,<br><br>Defendants. | No. **'11 CV0530 JLS  WMC**<br><br>**CLASS ACTION COMPLAINT**<br><br>1. UNLAWFUL BUSINESS PRACTICES—UNFAIR COMPETITION LAW (Bus. & Prof. Code §§ 17200, *et seq.*)<br><br>2. UNFAIR BUSINESS PRACTICES—UNFAIR COMPETITION LAW (Bus. & Prof. Code §§ 17200, *et seq.*)<br><br>3. FRAUDULENT BUSINESS PRACTICES—UNFAIR COMPETITION LAW (Bus. & Prof. Code §§ 17200, *et seq.*)<br><br>4. UNFAIR DEBT COLLECTION PRACTICES (Cal. Civ. Code §§ 1788, *et seq.*) |

|  |  |
|---|---|
| | ) |
| | ) 5. BREACH OF CONTRACT AND |
| | ) BREACH OF THE DUTY OF GOOD FAITH |
| | ) AND FAIR DEALING (Direct Contracts) |
| | ) |
| | ) 6. BREACH OF CONTRACT AND |
| | ) BREACH OF THE DUTY OF GOOD FAITH |
| | ) AND FAIR DEALING (Third Party |
| | ) Beneficiary) |
| | ) |
| | ) 7. PROMISSORY ESTOPPEL |
| | ) |
| | ) 8. UNJUST ENRICHMENT |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |

Plaintiff Dianna Montez, individually and on behalf of all others similarly situated, alleges the following based upon information and belief, and upon the investigation of counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I.   INTRODUCTION

1.      This class action is brought by Plaintiff ("Class Representative") individually and on behalf of all mortgagors in the State of California whose home mortgage loans are or were serviced by Chase Home Finance LLC or JPMorgan Chase Bank, N.A. and who (a) have attempted to obtain permanent loan modifications from Chase Home Finance LLC or JPMorgan Chase Bank, N.A. through the Home Affordable Modification Program ("HAMP") or similar loan modification programs; and (b) have made payments pursuant to a HAMP Trial Period Plan ("TPP") or any similar temporary modification agreement offered by Defendants.[1]

---

[1] Plaintiff reserves the right to amend the class definition at the appropriate time should it be necessary based on facts learned in discovery.

2.      As set forth in more detail *infra*, Plaintiff seeks to represent a statewide class, and bring common law and statutory claims for unlawful, unfair, and/or fraudulent business practices in violation of California Business & Professions Code, § 17200, *et seq*., (California Unfair Competition Law ("UCL")); violation of the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788.2(c); breach of contract; breach of the duty of good faith and fair dealing; promissory estoppel; and unjust enrichment.

3.      Plaintiff has endured a breathtaking array of unfair, deceptive, and misleading practices and breaches imposed on her by Defendant Chase Home Finance LLC and its parent company Defendant JPMorgan Chase, N.A.[2] over the past two years, as she has tried to meet constantly shifting demands with respect to her attempts to obtain a mortgage loan modification. Chase has strung Plaintiff along, repeatedly requesting documentation that Plaintiff had already provided, and promising an illusory permanent loan modification or "workout solution" that Chase apparently never intended to grant. While leading Plaintiff on with the promise of a loan modification or other "permanent" solution, Chase continued to demand and accept monthly mortgage payments, under the false premise that these payments supported Plaintiff's efforts to obtain a modification, obtain an alternative permanent solution, and/or avoid active foreclosure proceedings. Had Plaintiff been aware that Chase never intended to modify her loan as promised, she would have sold her home at the outset, forgoing the entire modification process.

4.      Plaintiff's experience is unfortunately not unique. It is merely illustrative of Chase's standard practices, which have damaged not only Plaintiff, but the entire Class of California mortgagors Plaintiff seeks to represent. Plaintiff is but one of many mortgagors ensnared by Chase's systemic and intentional unlawful behavior.

---

[2] Hereinafter, Chase Home Finance LLC and JPMorgan Chase Bank, N.A. will be collectively referred to as "Chase."

5.      Among other things, Chase, in bad faith, instructs mortgagors to stop making mortgage payments under the false pretense that doing so will not hurt credit scores and is necessary for them to attain a loan modification; fails to grant promised permanent HAMP or non-HAMP loan modifications following temporary modified payment plans; fails to take reasonable steps to work with eligible mortgagors to establish permanent HAMP or non-HAMP modifications; misrepresents the status of loan modification applications; repeatedly requests duplicative financial information; erects artificial obstacles in the evaluation process to obstruct, delay, and/or prevent permanent loan modifications; fails to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed; fails to keep accurate records of HAMP applicants' scores on standard Net Present Value ("NPV") tests; fails to provide account information requested by mortgagors; fails to provide adequate explanations of fees charged to mortgagors; charges excessive, unlawful, and unreasonable fees; inexplicably and arbitrarily increases mortgagor debt obligations; fails to properly apply mortgagor payments in whole or in part; causes improper interest and other fees to accrue; breaches HAMP TPPs or other temporary modification agreements, and unlawfully proceeds with foreclosures based on mortgagors' failure to meet impossible and shifting demands.

## II.     JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

7.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1367 in that Plaintiff and the Class are intended third-party beneficiaries to a contract between JPMorgan Chase, N.A. and the United States through its Financial Agent

Fannie Mae that was entered into pursuant to and under the direction of the Troubled Asset Relief Program ("TARP").  12 U.S.C. § 5201, *et seq*.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and (c).  Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do substantial business in the State of California and within this Federal Judicial District, receive substantial compensation and profits from the servicing of home mortgage loans in this District, have made material omissions and misrepresentations, breached contracts and/or other promises, and engaged in unlawful practices in this District, so as to subject them to personal jurisdiction in this District.  Plaintiff resides in this District, and the property for which Chase Home Finance LLC is the mortgage loan servicer is in this District.

9.     This Court has personal jurisdiction over the Defendants to this action because Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do substantial business in the State of California.

### III.   PARTIES

10.     Plaintiff Dianna Montez resides in San Diego, California.  Her home mortgage loan for property located in California was originally held by Washington Mutual, and, on information and belief, was transferred to Chase in the fall of 2008, when Washington Mutual's U.S. banking subsidiary was purchased by Chase.

11.     Defendant Chase Home Finance LLC is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  Chase Home Finance LLC is a Delaware corporation, and is a wholly-owned subsidiary of JPMorgan Chase Bank, N.A.

1

2    12.    Defendant JPMorgan Chase Bank, N.A. is a national banking association with

3   corporate headquarters located at 270 Park Avenue, New York, NY 10017.  JPMorgan Chase

4   Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co.  On information and belief,

5   JPMorgan Chase Bank, N.A. directed, controlled, formulated, and/or participated in Defendant

6   Chase Home Finance's loan servicing activities in California and is jointly and severally liable

7   for Chase Home Finance's unlawful activity.

8

9                          **IV.    FACTUAL BACKGROUND**

10  **A.    Mortgage Loan Servicers Profit from Delayed Loan Modifications.**

11    13.    Over the past several years, the United States housing market has been in crisis.

12  A Congressional oversight panel in 2009 noted that one in eight U.S. mortgages was currently in

13  foreclosure or default.  Press Release, Congressional Oversight Panel (Oct. 9, 2009).[3]  In 2010

14  alone, a record 2.9 million homes, or one out of every forty-five, received a foreclosure filing.

15  And the forecast for 2011 is worse, with "lenders poised to take back more homes this year than

16  any other since the U.S. housing meltdown began in 2006."  Janna Herron, *Housing Woes Not*

17  *Over for State, Nation*, Seattle Times, Jan. 14, 2011, at A13.  Economists predict that interest

18  rate resets on the riskiest of lending products—adjustable rate mortgages—will not peak until

19  sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and*

20  *Financial Crisis*, Working Paper No. 573.2 at 9, fig. 30.[4]

21

22    14.    California has been severely impacted by this crisis.  In 2010, "[m]ore than *half a*

23  *million* California homes were involved in some stage of foreclosure," which, incredibly, was

24

25  _____

26  [3] *Available at* http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited
    Jan. 6, 2011).
    [4] *Available at* http://papers.ssrn.com/so13/papers.cmf?abstract_id=1458413 (citing study by
    Credit Suisse showing monthly mortgage rate resets).

less than the "peak year" of the crisis in California, in 2009.  Alejandro Lazo, *House Seizures by Banks Decline in State*, The Los Angeles Times, Jan. 13, 2011, at A1 (emphasis added).

15.     Unlike early in the foreclosure crisis, when risky loans and a crashing housing market were driving the delinquency rate, today many homeowners are struggling to make their payments because of the weak economy.  According to a senior vice president at RealtyTrac, a company that specializes in housing market research, "We've actually had a sea change in what's causing foreclosures, from the overheated home prices and bad loans to a second wave of foreclosures actually caused by unemployment and economic displacement . . . ."  Alex Viega, *Foreclosure Activity Up Across Most US Metro Areas*, The Associated Press, Jan. 27, 2011, Business News.

16.     Recently, all 50 state attorneys general and numerous federal agencies have joined forces in an investigation into the foreclosure practices of mortgage loan servicers like Chase.  They are now pressing for a deal with the nation's five largest banks—including Chase—to address governmental concerns over servicing abuses.  Nelson D. Schwartz & David Streitfeld, *Mortgage Modification Overhaul Sought by States*, N.Y. Times, Mar. 4, 2011; *see also* Nelson D. Schwartz, *Foreclosure Deal Near, State Officials Say*, N.Y. Times, Mar. 7, 2011.  Expressing the sentiment of the governmental entities involved, the Attorney General of Arizona, for example, recently remarked:

> What I'm most angry about is the simultaneous modifications and foreclosures. . . . We need to look for a stipulated judgment in all 50 states, that if someone is in modification, they can't be foreclosed.

Margaret Cronin Fisk, *Arizona Attorney General Seeks Changes to Home-Loan Modification Process,* BLOOMBERG (Oct. 28, 2010 9:23 AM).[5]

---

[5] *Available at* http://www.bloomberg.com/news/2010-10-28/arizona-attorney-general-seeks-changes-to-home-loan-modification-process.html.

17.     Against this backdrop, mortgage loan servicers have taken advantage of struggling homeowners to boost their profits.  Testimony before the United States Senate Committee on Banking, Housing, & Urban Affairs outlines the misleading and harmful business practices that abound in the mortgage servicing industry.  According to one expert, the "core problem" is "servicers' failure to service loans, account for payments, limit fees to reasonable and necessary ones, and provide loan modifications where appropriate and necessary to restore loans to performing status."  *Problems in Mortgage Servicing From Modification to Foreclosure: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 111th Cong., at 3 (Nov. 16, 2010) (written testimony of Diane E. Thompson, National Consumer Law Center) [hereinafter Testimony of Diane E. Thompson].[6]

18.     In February of 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable ("MHA") program.  In an effort to stem the foreclosure crisis, the HAMP was created by the U.S. Treasury Department, as part of the MHA.  The HAMP "lowers [mortgagors'] monthly payment[s] to 31 percent of [their] verified monthly gross (pre-tax) income to make [their] payments more affordable."[7]  While not the only vehicle for modifications, HAMP has been increasingly used by servicers since 2009.

19.     Yet, as a recently released ProPublica study makes clear, HAMP has been a failure in many ways, largely due to servicer abuses.  Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown*, Mar. 8, 2011 [hereinafter

---

[6] *Available at* http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c1fac0f6-5ac5-4ae5-85cc-e2220255dfd9.

[7] Home Affordable Modification Program, http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx, (last visited Mar. 3, 2011).

Pierce et al., *Meltdown*].[8]  Indeed, the "average rate of [mortgage] modifications in the past two years is not significantly different than the rate before HAMP launched."  *Id.*  When HAMP was launched in April 2009, applicants waited many months for modifications—well beyond the three months contemplated under the program.  *Id.*  As of December 2010, two million homeowners have had their HAMP applications rejected: "1.3 million were denied even a trial modification and about 700,000 more had their trials cancelled."  *Id.*

20.  Since HAMP's inception through November 2010, the number of trial modifications cancelled by participating servicers like Chase has vastly exceeded the number of conversions to permanent modifications.  During this period, of the approximately 1.4 million trial modifications started, roughly 729,000 were cancelled and roughly 550,000 trials were converted to permanent modifications.  Troubled Asset Relief Program: Status of Programs and Implementation of GAO Recommendations, Jan. 12, 2011, GAO-11-74, at 35.

21.  Central to the failure of HAMP and other loan modification programs are arbitrary roadblocks erected by servicers to prevent modifications from proceeding to completion.  According to ProPublica, "[m]ore than half of [temporary payment plan] trials were canceled, most of the time *despite* the fact that the homeowner had made all of the payments."  Pierce et al., *Meltdown* (emphasis added).  And in nearly *one quarter* of modification rejections, servicers cited "missing" or "incomplete" documents as the reason for the denial.  *Id.* (analyzing Treasury Department data).  ProPublica estimates that almost half a million homeowners may have been rejected because of "lost" documents.

22.  Foremost among mortgage loan servicer abuses is their failure to provide eligible borrowers with permanent—whether HAMP or non-HAMP—loan modifications.  Testimony of

---

[8] *Available at* http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown#chances.

Diane E. Thompson at 3.  Servicers often overstate restrictions imposed by the investors in mortgage-backed securities when denying modifications, thereby harming both the mortgagor and the investor, while the servicers increase their income.  *Id.* at 8.  Indeed, "modifications, short sales and deeds in lieu" are "generally better outcomes for both homeowners and investors" than foreclosures.  Pierce et al., *Meltdown*.

23.     Servicers are increasingly offering what they prefer—temporary "repayment plans" instead of permanent modifications.  Interminable repayment plans harm homeowners who are left with no finality, no permanent modification of loan terms, and no new underwriting. *Id.*  Chase has done just this to Plaintiff and the proposed Class.

24.     Operating under a "deny and delay" model, servicers give mortgagors the runaround, erecting endless barriers, stringing them along, forcing them to submit the same paperwork repeatedly, returning or refusing to accept payments, and otherwise thwarting mortgagors' sincere efforts to obtain permanent modifications.  Testimony of Diane E. Thompson, at 9-13 (describing examples of how servicers drag out the mortgage modification process).  The objective of these tactics is simple: profit.  "During delay, fees and interest accrue."  *Id.* at 11.  Foreclosure-related fees racked up during protracted modification processes skyrocket servicer profits when they eventually foreclose, because servicers get to take the accrued fees—including fees for property inspections, purported attorneys' fees and costs, and late fees, among others—off the top of the foreclosure proceeds before investors get their share. *Id.* at 19-36.

25.     While a delayed foreclosure is often the result after a long modification application process, servicers strive for a "sweet spot" where they can stretch out a delinquency "without either a modification or a foreclosure," maximizing their fees.  *Id.* at 21.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**B.     Chase's Impact on Mortgagors is Significant.**

26.     Chase Home Finance LLC is a loan servicer operated by JPMorgan Chase Bank, N.A.  As of November 18, 2010, Chase was servicer for over nine million loans with a total value of $1.2 trillion.  *Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. On Insurance, Housing, and Community Opportunity*, 111th Cong., Panel Two (Nov. 18, 2010) (written testimony of Stephanie Murdick, head of the "Office of Consumer Practices" at Chase).

27.     On information and belief, Chase has a significant servicing presence in California.  Along with having retail bank locations throughout the state, Chase maintains sixteen "Homeownership Centers" throughout the state of California, where, according to Chase's website, "struggling customers can . . . meet face to face with loan advisors to talk about their situation."[9]

28.     Yet, Chase has modified less than a quarter of mortgages of "seriously delinquent" borrowers; the vast majority of the balance of such mortgages are "unresolved" with neither a modification nor a foreclosure.  Pierce et al., *Meltdown* (analyzing Moody's data on 300,000 subprime loans more than three months behind, all of which currently sit in mortgage-backed securities).  Indeed, Moody's data reveals that "[t]he *worst* [servicer] was JPMorgan Chase, where the average modification occurred 11 months after the borrower fell behind."  *Id.* (emphasis added).

29.     Chase and its affiliates have denied modifications, cancelled modification trial periods, and left mortgagors in limbo at a rate of approximately 57% according to Treasury Department data.  And this alarming statistic does not even account for situations where Chase has not reported application response data.  *Id.*

[9] *See* https://www.chase.com/chf/mortgage/hrm_centers.

**C.     Chase's Participation in the Home Affordable Modification Program (HAMP).**

30.     On July 31, 2009, Michael R. Zarro, Jr., Senior Vice President of JPMorgan Chase Bank, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government.  Ex. 1 (Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008); *see also* Ex. 2 (Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement executed on March 24, 2010).  By entering into the SPA, Chase covenanted that all services would be performed in compliance with all applicable federal, state, and local laws, specifically including state laws designed to prevent unfair, discriminatory, or predatory lending practices.  Exs. 1 & 2 at "Financial Instrument" ¶ 5(b).  Chase also covenanted that it would perform services in accordance with the "practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances," as well as "use qualified individuals with suitable training, education, experience and skills to perform" services.  *Id.* ¶ 5(d).

31.     The SPA mandates that a participating servicer follow all guidelines, procedures, and directives issued as a part of the HAMP.  According to the first supplemental directive ("SD") issued under the HAMP, participating servicers "will use a uniform loan modification process to provide a borrower with sustainable monthly payments."  Home Affordable Modification Program, Supplemental Directive 09-01, 4/6/2009, SD 09-01, at 1 [hereinafter HAMP SD].[10]  *See also* MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES 11 (ver. 3.0, Dec. 2010) [hereinafter MHA HANDBOOK].

---

[10] All Supplemental Directives are available at https://www.hmpadmin.com/portal/programs/ guidance.jsp (last visited March 11, 2011).

32.     As a participating servicer, Chase is required to evaluate all loans that are 60 or more days delinquent or appear to be at risk of imminent default, to determine which loans meet the HAMP eligibility criteria.  HAMP SD 09-01 at 4.  Chase is also required to consider a HAMP modification if, after receiving hardship information from a borrower, "the servicer concludes a current borrower is in danger of imminent default . . ."  *Id.* at 13.  Servicers are required to suspend foreclosure proceedings during HAMP evaluations and during trial modification periods.  *Id.* at 14.  Finally,

> When discussing the HAMP, the servicer should provide the borrower with information designed to help them understand the modification terms that are being offered and the modification process.  Such communication should help minimize potential borrower confusion, foster good customer relations, and improve legal compliance and reduce other risks in connection with the transaction.  A servicer also must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions.

*Id.* at 13; *see also* MHA HANDBOOK at 45.

33.     Chase is also required to acknowledge in writing the receipt of borrowers' initial HAMP application packages within 10 business days and to include in their response a description of their evaluation, as well as a timeline for processing paperwork.  HAMP SD 09-07, 10/8/2009, at 1; *see also* MHA HANDBOOK at 47.  Beginning in March 2010, Chase was required to provide a toll-free number in all communications with borrowers that would allow them to reach a representative capable of providing specific details about the HAMP modification process.  HAMP SD 10-02 3/24/2010, at 4; *see also* MHA HANDBOOK at 45.

34.     Chase was further required to offer permanent modifications to certain qualified buyers—without discretion.  HAMP SD 09-01, 4/6/2009, at 4; *see also* MHA HANDBOOK at 77. The HAMP servicer's Handbook clearly defines the process that servicers must follow to

evaluate loans for modification.  Servicers are required to use a standardized Net Present Value ("NPV") test that compares the NPV result for a modification to the NPV result for no modification.  A positive NPV indicates that a modified loan is more valuable to the investor than if the loan is not modified.  In the case of a positive NPV, HAMP rules *require* the servicer to offer the borrower a mortgage modification.  MHA HANDBOOK at 73.

35.     By signing the SPA, Chase was legally bound to comply with HAMP guidelines—that were designed to benefit mortgagors such as Plaintiff and the proposed Class—including those guidelines requiring Chase to: (1) timely identify loans facing default, (2) timely evaluate such loans by applying a standardize NPV, and (3) offer permanent modifications for all loans with a positive NPV.  *Id.*  Clearly, Chase fails to live up to its promise, choosing instead to maximize its own profits.

36.     In the event Chase determins that a loan being considered for modification does not have a positive NPV, HAMP guidelines require Chase to "send a Non-Approval Notice and consider the borrower for other foreclosure preventions options, including alternative modification programs, DILs, and short sale programs."  MHA HANDBOOK at 73.

37.     Additionally, Chase is required to retain all HAMP-related documentation for each loan serviced for a period of seven years from the receipt or creation of such documentation, including:  (a) all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up; (b) all documents and information related to the monthly payments during and after the trial period, as well as incentive payment

calculations and such other required documents; (c) detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification under the HAMP was denied.  Chase's Records must also be retained to document the reason(s) for a trial modification failure; (d) if a HAMP modification is not pursued when the NPV result is "negative," documentation of Chase's consideration of other foreclosure prevention options; and (e) if a borrower under a HAMP modification lost good standing, documentation of Chase's consideration of the borrower for other loss mitigation alternatives.  HAMP SD 09-01 4/6/2009, at 13-14; *see also* MHA HANDBOOK at 25-26.

38.     Chase routinely fails to meet its obligations under its HAMP contract with the federal government—obligations that were incurred for the benefit of mortgagors such as Plaintiff and the proposed Class—by, *inter alia*, failing to diligently attempt to implement permanent modifications for eligible mortgagors, keeping inadequate records, failing to disclose accurate information to mortgagors, charging unreasonable fees without explanation, violating federal and state laws, and leaving mortgagors in limbo regarding the status of their loans.

**D.     Chase Benefits From Extracting as Many TPP or Other Temporary Plan Payments as Possible from Borrowers in Distress.**

39.     Chase stands to profit substantially by extracting as many trial or temporary payments as possible from borrowers in distress.  Borrowers who qualify to participate in HAMP are borrowers who are in default or are at risk of imminent default.  These borrowers are not able to pay their monthly mortgage payments in full.  Thus, Chase has two choices: invite the borrower to apply for HAMP (or another loan modification program), or foreclose.  By the terms of its SPA, Chase is required to consider all eligible mortgagors for a modification.  However,

beyond mere compliance with the terms of the SPA, Chase has its own financial reasons for inviting struggling mortgagers to apply for a modification and make trial payments.

40.     While Chase receives $1,000 from the U.S. Government for each HAMP modification it processes, it stands to make significantly more money by collecting fees and interest on loans that are past due, in default or otherwise troubled.   Based on this unfortunate economic reality, Chase devised a scheme, under the guise of HAMP, to take advantage of the very mortgagors it has been tasked to assist by impermissibly delaying loan modifications in order to collect excessive fees on troubled mortgages.

41.     According to a report published by the National Consumer Law Center, a servicer's primary source of income is a "monthly servicing fee, [which is] a fixed percentage of the unpaid principal balance of the loans in the pool" of loans that is being serviced.  DIANNE E. THOMPSON, NAT'L CONSUMER LAW CTR, WHY SERVICERS FORECLOSE WHEN THEY SHOULD MODIFY AND OTHER PUZZLES OF SERVICER BEHAVIOR vi (2009) [hereinafter THOMPSON, PUZZLES].  Therefore, there is a significant incentive for a servicer like Chase to delay foreclosure as long as a mortgagor is making payments in any amount.  As the report explains,

> [t]he monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable on the long term. In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees.

*Id.*  Thus, by stringing a mortgagor along in a drawn out modification process, Chase can maintain its fees without ever having to actually modify.  If, in the end, Chase is forced to modify the loan by, for example, the involvement of a regulator, *see infra* ¶ 114, Chase still profits substantially, as accrued fees and interest are added onto the principal of the loan,

1    increasing the servicing pool and therefore the servicing fee.

2         42.    Additional incentives for Chase to string along borrowers abound.  For example,

3    Chase may be required to repurchase loans from the investors in order to permanently modify the

4    loans, presenting a substantial cost and lost revenue that Chase can avoid by keeping loans in a

5    state of constant default until it eventually forecloses.  THOMPSON, PUZZLES, at 9.  Further, Chase

6    may collect not only fees purportedly related to foreclosure, but also late fees, processing fees, or

7    other sums that are added to the principal loan amount, increasing the unpaid balances in

8    mortgage pools, and thereby increasing monthly servicing fees.  *Id.* at vi.  Finally, entering into

9    permanent modifications with borrowers may delay a servicer's ability to recover advances it is

10   required to make to investors of the unpaid principal and interest payment of a non-performing

11   loan.  The servicer's right to recover expenses from an investor in a loan modification, rather

12   than a foreclosure, may well be less clear and less generous.  *Id.*  Servicers get paid before

13   investors, and servicers like Chase have every incentive to leverage this reality to their own

14   benefit, to the detriment of mortgagors and investors alike.  *See The Worsening Foreclosure*

15   *Crisis: Is It Time to Reconsider Bankruptcy Reform?: Hearing Before the Subcomm. on*

16   *Administrative Oversight and the Courts*, 111th Cong., at 15 (July 23, 2009) (written Testimony

17   of Alys Cohen).

18        43.    Furthermore, under California's non-judicial foreclosure rules, if Chase elects to

19   foreclose—such as by sending notices of default, posting foreclosure notices, scheduling trustee

20   sales, notifying mortgagors of trustee sales it has scheduled, or otherwise notifying mortgagors

21   of its intent to pursue foreclosure—the distressed borrower has no legal obligation to make

22   payments on the loan, and Chase has no legal ability to collect any such payments.  Thus, it is in

23   Chase's best interest to invite borrowers to participate in HAMP or other modification programs,

1  allowing Chase to continue its servicing relationship with the borrower to increase the amount of

2  money it can collect, particularly where a mortgagor may owe more than the house could be sold

3  for in a foreclosure sale.  This natural incentive to participate in HAMP may suggest one reason

4  the HAMP program should be effective.

5      44.    However, many loan servicers, including Chase, have found that they can increase

6  their profits by abusing the HAMP application process and misleading borrowers, rather than

7  genuinely offering eligible borrowers permanent modifications.  Meanwhile, Chase profits from

8  double tracking mortgagors—initiating and actively pursuing foreclosure while simultaneously

9  collecting payments from mortgagors pursuant to illusory promises of forbearance, permanent

10  modifications, or "permanent workout solutions."

11      45.    Once Chase has elected its option to foreclose by initiating proceedings,

12  mortgagors must rely on Chase's assurances that the sales are "suspended," "postponed," or

13  otherwise "on hold."  Mortgagors are completely at the mercy of Chase and have no way of

14  independently verifying or enforcing these promises.  Instead, mortgagors must meet Chase's

15  demands to continue making payments under temporary payment plans in hopes of forbearance,

16  receiving a modification, or securing an alternative "permanent workout solution."

17      46.    Under this scheme, Chase never intends to provide the majority of applicants a

18  loan modification.  Rather, Chase's goal is to keep loans in default and arrears for as long as

19  possible before ultimately foreclosing to maximize its fees and the payments it can extract from

20  distressed mortgagors.  This is precisely what Chase accomplishes by inviting borrowers to

21  participate in HAMP (or other loan modification programs) and then encouraging them to

22  continue making TPP or other temporary payments when Chase has no intention to comply with

23  HAMP requirements and/or offer permanent modifications, as Plaintiff Dianna Montez's

1   experience exemplifies.

2   **E.    Chase Intentionally Misleads Borrowers by Stating that it Will Evaluate Borrowers**
3   **for Eligibility and Offer Permanent Modifications to Qualifying Borrowers,**
    **Without the Intent to Do So.**

4           47.     On information and belief, Chase sends variations of the same form contracts to

5   each borrower that seeks a loan modification.  The agreements typically promise the borrower

6   that if:  (1) his/her representations about his/her financial state continue be true, and (2) he/she

7   complies with the terms of the of the temporary payment plan, and (3) he/she provides all

8   required documentations, and (4) the Lender determines he/she qualifies, then "the Lender will

9   send [him/her] a Modification Agreement . . . for . . . signature which will modify [his/her] Loan

10  Documents as necessary to reflect this new payment amount and waive any unpaid late charges

11  accrued to date."  *See* Exs. 3 & 4.  These contracts are identified as a "HAMP TPP," leaving no

12  doubt that Chase is promising to evaluate the borrower's application pursuant to HAMP

13  guidelines.  Chase also utilizes non-HAMP temporary payment agreements with similar terms

14  that indicate that evaluation for a "permanent workout solution" will occur if the mortgagor

15  makes the specified payments.

16          48.     On information and belief, Chase sends the same form cover letters to every

17  borrower receiving a HAMP TPP.  The "Trial Period Cover Letter" states in its first paragraph

18  that "If you qualify under the federal government's Home Affordable Modification Program and

19  comply with the terms of the Trial Period Plan, we *will modify your mortgage loan and you can*

20  *avoid foreclosure*."  *See* Ex. 5 (emphasis added).  In other instances, Chase makes repeated

21  assurances, both in writing and verbally, that "permanent" modifications or "workout solutions"

22  will be forthcoming and that foreclosure will not proceed.  Because Chase fails not only to

23  comply with the terms of its contract with the federal government under HAMP, but also fails to

make a good faith effort at compliance with its own promises to borrowers, Chase intentionally misleads borrowers who rely on Chase's promises when they sign TPPs or other agreements, and then comply with the terms thereof, perform under the contracts, and provide valuable consideration to Chase for which Plaintiff and the Class received nothing in return except harassment, frustration, requests for more documentation, and requests for more payments.

**F.      Plaintiff's Attempts to Secure Permanent Loan Modification Were Repeatedly Thwarted by Chase's Misleading Practices.**

49.     Plaintiff Dianna Montez has lived in her home in San Diego, California for nearly 22 years.

50.     In 2005 she was approached by Washington Mutual with an offer to refinance her home mortgage loan.  She accepted Washington Mutual's offer, transferring her debt and the servicing rights thereof to Washington Mutual.  Her mortgage loan payments varied, but as of January 2009 were $2,300.05.

51.     In the fall of 2008, Washington Mutual was taken over by the Federal Deposit Insurance Corporation when it became apparent that it would not be able to meet its obligations, largely due to Washington Mutual's expansion of its high-risk subprime mortgage loan origination and securitization activities.  It was promptly resold to JPMorgan Chase & Co.  As a result of this deal, the servicing rights of Ms. Montez's mortgage loan were acquired by JPMorgan Chase Bank, N.A.

52.     In February of 2009, Ms. Montez's husband lost his job.  At this time, Ms. Montez maintained very good credit and did not want to jeopardize her credit standing by falling behind on her mortgage payments.  While she very much wanted to keep her long-time home, she recognized that if she would not be able to continue making payments at the current level, she may have to sell her house.

53.     While still current on her payments and hoping to avoid losing her home, Ms. Montez phoned Chase (which at that time was still operating as Washington Mutual) to inquire about a loan modification in February 2009.  She was instructed to complete an application and was told that she would be contacted by a "work-out specialist"—purportedly someone who could guide her through the modification process—within 21 days.  Pursuant to this conversation, Ms. Montez visited the local Chase branch, located at 13275 Black Mountain Rd., San Diego, CA, and faxed her completed "Borrowers Assistance Form" that had been provided by Chase in her earlier conversation, along with several supporting documents including a hardship letter, two months bank statements, and 2008 tax forms.  Chase confirmed receipt of her fax.

54.     So began Ms. Montez's two-year ordeal trying to get a loan modification from Chase.

55.     Between July 2009 and February 2010, Ms. Montez received at least four different temporary payment plans and was forced to restart the application process several times.  To this day, her request for a modification remains unresolved.  The payment plans typically consisted of three trial plan payments, which Chase assured Ms. Montez would be followed by a permanent loan modification.  Chase assured Ms. Montez that it would not take her house.

56.     On information and belief the various temporary payment plans and related documents that Chase sent to Ms. Montez for signature are standard forms—the terms of which were drafted entirely by Chase—that Chase used and continues to use repeatedly with mortgagors in the Class.

57.     Despite Chase's representations that compliance with its "plans" or "agreements" would reduce Ms. Montez's total arrearages, her compliance has apparently only increased them and allowed Chase to assess unrestrained fees to inflate her purported obligations, with no end in sight.  *Compare* Ex. 6 (Notice of Collection Activity dated June 1, 2009) *with* Ex. 7 (Notice of Default and Election to Sell as of July 13, 2009) (illustrating several thousand dollar increase in a matter of weeks).

58.     As described more fully below, relying on Chase's repeated verbal representations that compliance with these plans would lead to a permanently modified loan, Ms. Montez made every effort to meet Chase's ever evolving requirements, and sought clarification and/or adjustments from Chase when appropriate.  Ms. Montez made all of the required payments under the third payment plan Chase offered her, until it was superseded by the fourth one.  Ms. Montez also made all of the required payments under the fourth payment plan Chase offered her, and continued to make many additional payments under that same plan in good faith. During this time, Ms. Montez received multiple verbal assurances from Chase representatives who told her that if she would continue on, send additional documentation, and generally cooperate, she would at last receive the modification she had been promised many months before.  She has yet to receive that modification.  The fourth payment plan stated that compliance would operate to stall foreclosure.  Chase nevertheless actively pursued foreclosure and a sale is scheduled in a matter of days.

59.     Chase has sent Ms. Montez multiple default notices and started and pursued foreclosure proceedings against Ms. Montez, scheduling a Trustee's Sale at least twice, with many more informal—and unwritten—"postponements."  The notices contain confusing

information about the amount Ms. Montez purportedly owes:

> (a) June 1, 2009, claiming amount due of $4,909.52 (Notice of Collection Activity), *see* Ex. 6;

> (b) July 13, 2009, claiming amount due of $8,464.29 (Notice of Default and Election to Sell Under Deed of Trust), *see* Ex. 7;

> (c) August 31, 2009, claiming total amount due of $489,906.22 (Payoff Statement), *see* Ex. 8;

> (d) January 2010, claiming total amount due of $499,865.08 (Notice of Trustee's Sale), *see* Ex. 9; and

> (e) January 2011, claiming total amount due of $499,865.08 (Notice of Trustee's Sale), *see* Ex. 10.

The arrearages in these documents bear little relation to Ms. Montez's payment history. They increase dramatically over very short periods during which she is making payments, *compare* (a) *with* (b), and despite making payments during the intervening year, Ms. Montez appears not to have gained a single cent of progress between January 2010 and January 2011, *compare* (d) *with* (e). No one at Chase has ever explained how they arrived at these figures, and the state of her account at Chase remains unclear to Ms. Montez.

### 1.     The Runaround.

60.     In early February of 2009, Ms. Montez asked her financial planner to help her obtain a loan modification. Ms. Montez and her financial planner called Chase together several times a week to ascertain the status of Ms. Montez's mortgage and application for a modification. They had trouble obtaining any information because they were frequently placed on hold for long periods of time and only rarely were able to speak to the same Chase representative twice.

61.     In March of 2009, Ms. Montez sent Chase additional documentation at Chase's request. Believing that she would receive a new payment amount on a modified basis, Ms.

1

2

Montez stopped her pending March mortgage payment and waited for instructions on her new

payment amount.

3

4

62.     On March 30, 2009, having not been contacted about her modification

5

application, Ms. Montez called Chase.  She spoke with a Chase employee who identified herself

6

as "Jackie" and who refused to provide a last name, an employee ID number, or her direct phone

7

line.  Jackie told Ms. Montez that Chase could not locate her documents.  Jackie told Ms. Montez

8

that things were disorganized due to the transition from WaMu to Chase, and asked for patience.

9

10

63.     After insisting that she had already faxed the correct documentation to Chase, and

11

that Chase had confirmed receipt of her documentation, Ms. Montez again faxed the same

12

documentation to the number Jackie provided.  *See* Ex. 11 and 12 (HAMP applications).  While

13

this was the first time Ms. Montez was asked to resend documentation that Chase had previously

14

acknowledged receiving, it would not be the last.  Over the next year and a half, Ms. Montez

15

would fax documentation to Chase dozens of times.  Much of that documentation was

16

duplicative of previous transmittals.

17

64.     In April 2009, two months after originally applying for a modification, Ms.

18

19

Montez was again informed that Chase had lost her paperwork.  A Chase employee who

20

identified herself as "Vickie" in the "back office" told Ms. Montez that in order to obtain a

21

modification, she would have to fall behind on her payments so that she would "move up on the

22

list to get help."  Ms. Montez objected to this idea, as she was afraid it would hurt her credit, but

23

Vickie told her that she would not be reported to a credit bureau.  Ms. Montez's financial

24

planner, who was also on the call, had the same objections as Ms. Montez, but he too was told

25

that the best course of action would be for Ms. Montez to stop making her mortgage payments.

26

1

2      65.     Throughout May and June of 2009, Ms. Montez continued to pursue a

3  modification.  She repeatedly contacted Chase, making dozens of phone calls, but found it

4  impossible to speak with anyone who was familiar with her file.  As directed in her April 2009

5  conversations with Chase employees, Ms. Montez did not make her monthly mortgage payments

6  during this time period.  She repeatedly faxed in more documents and continuously called Chase

7

8  to check on the status of her modification application.

9      66.     On or about June 6, 2009, Ms. Montez received a "Notice of Collection Activity"

10  dated June 1, 2009 from WaMu, informing her that she had failed to make payments on her

11  mortgage.  The letter listed a total amount due of $4,909.52—including $248.57 in "Late

12  Charges" and $60.85" in "Outstanding Fees."  *See* Ex. 6.

13

14      67.     Ms. Montez called Chase on or about June 6, 2009 to inquire about the Notice,

15  and was told that she should expect a workout call that week, between June 8 and June 12, 2009.

16      68.     On or about June 10, 2009, Ms. Montez spoke with a Chase employee who

17  identified herself as "Rachel," ID#8147 in "Loss Mitigation."  Rachel explained that there had

18  been an error with Ms. Montez's paperwork, but that she could see on her computer screen that

19  Chase had everything necessary to process the modification.  Rachel said that the application

20  was in process and they were still waiting for a negotiator to be assigned.

21

22      69.     On or about June 11, 2009, Ms. Montez spoke with a Chase employee who

23  identified herself as "Tamitha" in the "Loan Mitigation" department, who told her that her

24  account should be scheduled for a negotiator within three days, and that she should call back

25  next week to find out the name of the negotiator.

26

CLASS ACTION COMPLAINT - 25

1

2        70.      On or about June 15, 2009, Ms. Montez received a letter from Chase dated June 8,

3   2009 that directly contradicted what Ms. Montez had been told by Chase employee Rachel just

4   five days earlier.  The letter stated "we are canceling your request for a loan workout because

5   Incomplete Application [*sic*]."  *See* Ex. 13.  The letter continued, "we have no choice but to

6   continue with the normal default servicing activities commenced on this loan before your

7   workout request was submitted."  *Id.*  Furthermore, despite previous guarantees to the contrary

8   by multiple Chase employees, the letter informed Ms. Montez that, "WE HAVE TOLD A

9   CREDIT BUREAU ABOUT A LATE PAYMENT, MISSED PAYMENT OR OTHER

10  DEFAULT ON YOUR ACCOUNT.  THIS INFORMATION MAY BE REFLECTED IN

11  YOUR CREDIT REPORT."  *Id.*

12        71.      Following receipt of this letter, Ms. Montez immediately contacted Chase.  She

13  talked to a Chase employee who identified himself as "Phillip," ID#Z263478, who said it was a

14  "mistake" and that Chase would "fix it."  Ms. Montez was told to "ignore" the letter, and that it

15  was sent out automatically and did not reflect the status of her modification.

16        72.      In that same phone conversation with Phillip, Ms. Montez and her financial

17  planner were told that it is Chase's policy to advise customers who are seeking a modification to

18  stop making payments.  Phillip also said that he could see that Ms. Montez had called multiple

19  times, and that she had faxed her documentation multiple times.  He confirmed that none of her

20  paperwork had been lost, and told Ms. Montez and her financial planner that he would personally

21  take care of her application, and that she did not have to send in a "fifth packet."  He said a

22  negotiator should have been assigned by then, and volunteered that he had never seen paperwork

23  "handled so poorly."  Following this conversation, however, Ms. Montez never spoke with

1   Phillip again, as the phone number he provided did not work.

2       73.     Ms. Montez spoke with a Chase representative who identified herself as "Mary

3   Ela," ID#2259841 on July 2, 2009, who claimed she was adding to the notes in Ms. Montez's

4   file that all paperwork had been received numerous times and that everything was in order.

5   Mary Ela told Ms. Montez that sending her file to "Mitigation Foreclosure" had been a mistake

6   that never should have happened.  Mary Ela promised to "escalate" the modification process that

7   Ms. Montez had started in March.

8       74.     Ms. Montez received a letter from Chase dated July 6, 2009 announcing a "local

9   event" at which she could meet in person with "specialists" from Chase.  *See* Ex. 14.  Ms.

10  Montez called the number on the letter to arrange a meeting.

11      75.     California Reconveyance Company sent Ms. Montez a "Notice of Default and

12  Election to Sell Under Deed of Trust," with an amount due as of July 13, 2009.  *See* Ex. 7.  The

13  Notice informed Ms. Montez that she owed $8,464.29—nearly double the $4,909.52 she was

14  told she owed a few weeks earlier on June 1, 2009.  *See* Ex. 6.

15      76.     Chase sent Ms. Montez a letter dated July 15, 2009 that requested an IRS Form

16  4506-T, her tax return, and more pay stubs.  *See* Ex. 15.  Ms. Montez sent the information,

17  perplexed as to why she had not previously received this request.

18      77.     With assistance from a counselor at Auritron solutions, which specializes in

19  assisting struggling homeowners, Ms. Montez was able to arrange a conference call with a

20  representative from the Chase Home Lending Executive Office in July of 2009.  During the July

21  21, 2009 conference call, Ms. Montez spoke with Chase employee Sharon Cannon, who said that

22  she could see the multiple efforts Ms. Montez had made to obtain a modification.  Ms. Cannon

23  told Ms. Montez that she was going to investigate why Ms. Montez's modification application

was being delayed.  Ms. Montez was told that her negotiator was "Ms. Dudley."

78.     Shortly after this conversation, and five months after she originally applied for a modification, Ms. Montez received a "Trial Period Cover Letter."  *See* Ex. 16.  Also included was a "Home Affordable Modification Trial Period Plan" [hereinafter "TPP"], the first of several she would eventually receive.  *See* Ex. 3.

79.     The Trial Period Cover Letter employs clearly contractual terms at the outset: "*To accept this offer*, and see if you qualify for a Home Affordable Modification, send the 5 items listed below to JPMORGAN CHASE BANK, NA, SUCCESSOR TO WASHINGTON MUTUAL BANK, no later than AUGUST 20, 2009."  *Id.* at 2 (emphasis added).  Ex. 16.   It continues, "[i]f the trial period payments are made in amounts *different* from the amount stated your loan may not be modified," thus clearly implying that if trial period payments *are* made in amounts the same as listed in the TPP, the loan *will* be modified.  *Id.* (italics added).

80.     The July 2009 TPP states that "[i]f I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender *will* provide me with a Home Affordable Modification Agreement ("Modification Agreement").  Ex. 3.

81.     The "Trial Period Cover Letter" contains assurances that there "are *no fees* under the Home Affordable Modification program" and that "[i]f you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period."  Ex. 16 (emphasis added).  On information and belief, Chase charged and collected fees in connection with its mortgage modification scheme.

82.     The "Trial Period Cover Letter" states that it "may take *up to 30 days* for us to receive and review your documents."  *Id.*  The document also states that "[a]s long as you

comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started." *Id.* In addition, the letter states that "your trial period payments will be applied to your existing loan according to the terms of your loan documents." *Id.* On information and belief, Chase violated each and every one of these assurances with respect to Plaintiff and the proposed Class—by delaying review well over 30 days, starting and continuing foreclosure proceedings, and utilizing "suspense" accounts in lieu of properly applying payments to mortgagor accounts.

83.     The July 2009 TPP includes payment coupons labeled "Trial Period Payment #1," "Trial Period Payment #2," "Trial Period Payment #3," and "Trial Period Payment #4 (Modification Continuation Payment)." *See* Ex. 3. Notably, the inclusion of the fourth coupon and its reference to "continuation" suggests that a fourth payment beyond the three required would extend the modification agreement and all of its terms beyond three months, without further written modification of the agreement. Plaintiff and the Class received countless verbal promises outside of the terms of written TPPs that induced them to make such "continuation" or similar extra payments that were not explicitly outlined in their written materials.

84.     The July 2009 TPP required three monthly payments of $2,325.00 on August 1, September 1, and October 1, 2009, which would serve as an "estimate" of the payments to be made under a final modification. Ex. 3. These payments were $25 *more* than Ms. Montez was required to pay at that time under her 2005 loan from WaMu, and unaffordable considering Ms. Montez's financial situation. In light of the unreasonable specifications of the TPP, Ms. Montez immediately contacted Chase. Frustrated that she had yet to make contact with her "negotiator" "Ms. Dudley," Ms. Montez inquired about who could help her. A Chase employee who identified herself as "Candice" informed Ms. Montez that "Richard Pena" was her new

"negotiator."  In addition, Candice instructed Ms. Montez to *decline* the July 2009 TPP offer because it did not meet the 31% of income criteria that was standard for HAMP modifications. Candice claimed that she would email Richard Pena and he would arrange a new offer.  Ms. Montez wrote "This option is not affordable." on the July 2009 TPP and signed and dated it July 25, 2009.  *Id.*  Candice also requested that Ms. Montez send in the same documentation that she had sent in at least six times since March 2009, as well as additional documents, which Ms. Montez sent.

85.   At this point, worried that Chase might take her home despite their many assurances to the contrary, Ms. Montez contacted her Congressional Representative, Brain Bilbray, in order to inform him of Chase's misconduct regarding her mortgage loan.  A meeting was arranged with Congressman Bilbray's assistant, Mark Schaefer, who recommended that Ms. Montez file a complaint with the Treasury Department.  Shortly after the meeting, Ms. Montez filed a complaint online, and Congressman Bilbray sent a letter dated August 14, 2009 to John Hardage, the Congressional Liaison for the Office of the Comptroller of the Currency ("OCC"), the independent bureau of the Department of Treasury in charge of regulating and supervising national banks.  *See* Ex. 17.  Ms. Montez also contacted the OCC directly later that month.

86.   On or about August 13, 2009, Ms. Montez contacted Chase's "Loan Mitigation Department" requesting to speak to her "negotiator."  Her request was refused.  Instead she talked to a Chase employee who identified herself as "Christy Sullivan."  Ms. Sullivan told Ms. Montez that she would email the "negotiator," she advised Ms. Montez to decline the TPP offer, and asked for more documents.

87.   A Chase employee who identified herself as "Deanine Picarello" informed Ms. Montez in late August 2009 that Ms. Montez's "negotiator" had emailed her regarding Ms.

Montez's July 2009 TPP, saying that Ms. Montez would have to "let the 90 day trial period lapse before Chase would consider any other loan options." The negotiator also conveyed, via Ms. Picarello, a "warning" to Ms. Montez that if she failed to make the $2,325.00 payments, she would not be eligible for a modification. Faced with this contradictory information, Ms. Montez was at a loss to understand what to do. Since March 2009, Ms. Montez had yet to speak directly with her elusive "negotiator."

88.    In late August 2009, Ms. Montez began receiving harassing daily phone calls from Chase "specialists" who asked the same questions repeatedly. Each "specialist" would state that there were no notes referencing prior phone calls or Ms. Montez's requests to rework her loan. On August 24, 2009, a "specialist" named "Harold" told Ms. Montez that her documentation had been received and scanned, and that he would email her "negotiator" "Shanikki Dudley" so that her file could be expedited. Nevertheless, Harold informed Ms. Montez that her file might sit for three months before anyone at Chase would take the time to look at it.

89.    Following her conversation with Harold, Ms. Montez continued to receive daily harassing phone calls from Chase "specialists" asking her the same questions over and over.

90.    On or about August 31, 2009, Ms. Montez received a WaMu "Payoff Statement." *See* Ex. 8. The Payoff Statement lists various fees, including $339.76 in "Late Charges," a "Recoverable Balance" of $21.70, $82.55 in "Other Outstanding Fees," a "Payoff Statement Fee" of $30.00, and a "Reconveyance Fee" of $45.00.

91.    Ms. Montez received a second TPP in September of 2009, which specifies three payments of $2,170, approximately $130 less than the monthly payment due without a modification, to be paid on October 1, November 1, and December 1, 2009. *See* Ex. 18.

1

2

92.      This TPP contains all of the standard form terms described *supra* with respect to the July 2009 TPP.

3

4

93.      Concerned that this plan was barely an improvement on her current payment, Ms. Montez contacted Chase employee "Sharon Cannon," who told her to decline the offer as it still did not come close to the 31% of income benchmark set by the HAMP.  Ms. Cannon advised that she would talk to Ms. Montez's "negotiator" and get back to her, that her foreclosure had been "suspended," and "not to worry."

5

6

7

8

9

10

94.      In November of 2009, Ms. Montez received her third TPP, along with another "Trial Period Cover Letter."  *See* Exs. 4 (TPP) and 5 (Trial Period Cover Letter).  These documents contain all of the standard form terms described *supra* with respect to the July 2009 TPP.

11

12

13

14

95.      The November 2009 TPP called for three payments of $1,612.00, beginning on December 1, 2009.  *See* Ex. 4.  Upon receipt of this plan, Ms. Montez was instructed by Ms. Cannon not to make the payments as they were still not 31% of her income.  *Id.*  Ms. Montez hesitantly followed these instructions and continued to contact various Chase offices in an attempt to attain a loan modification.

15

16

17

18

19

20

96.      In a letter dated November 20, 2009, Chase wrote: "Your Making Home Affordable Modification Trial Plan is at Risk."  *See* Ex. 19.  Ms. Montez contacted Sharon Cannon, who told Ms. Montez that she did not understand why the negotiator was not returning Ms. Cannon's calls or emails.  Ms. Cannon assured Ms. Montez that everything was fine and that she was "in a Trial Plan Status" and that she would "continue to try to fix this."  *Id.*

21

22

23

24

25

26

97.      On December 28, 2009, Ms. Montez received a "Notice of Expiration" from Chase stating that "the Trial Plan Offer through the Making Home Affordable Loan Modification

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

program ('MHA') for the above-referenced account has expired" because "[y]ou have failed to make all the required trial period payments within the designated time period." *See* Ex. 20. Notably, the letter did *not* indicate that she had "failed to send in all the required documentation." *Id.*

98.     Upon receipt of this Notice, Ms. Montez immediately contacted Chase employee Sharon Cannon, who informed her that her previous instructions for Ms. Montez not to make the TPP payments had been incorrect.  Ms. Cannon told Ms. Montez to ignore the notice, and that it was not too late for her to begin making payments under the November 2009 TPP.  Ms. Cannon relayed that Ms. Montez's "negotiator" "Ashley" said it would still be alright to send in payments.

99.     Pursuant to this conversation, on December 28, 2009, and again on January 7, 2010, Ms. Montez made payments of $1,612.00, as set forth in the November TPP, and as instructed by Chase employee Sharon Cannon.  Her third payment under that plan was to be due February 1, 2010.

100.     Ms. Montez received a letter dated December 30, 2009 that said that Chase had "not received all documents necessary to complete your request for a modification" and that Ms. Montez had to submit two paystubs and another IRS Form 4506-T.  *See* Ex. 21.  This directly contradicted the December 28, 2009 letter that explicitly did not indicate failure to send documentation.  *Compare* Ex. 20 (box *not* checked for failure to send documentation).

101.     On or about January 19, 2010, Ms. Montez found a Notice of Trustee Sale taped to her door, stating that the foreclosure sale would occur in on February 9, 2010.  *See* Ex. 9.

102.     Upon finding the Notice of Trustee Sale, Ms. Montez immediately contacted Chase, and was told by Sharon Cannon that the foreclosure would be "suspended" as long as she

was actively pursuing a modification, stating in an email "Ms Montez, as long as the process is in place you do not have to worry about the sale . . . ."  *See* Ex. 22 (email from S. Cannon to D. Montez dated Jan. 25, 2010).  Ms. Montez also talked to Chase employees identified as "Kelly," "Audrey," and "Marilyn" regarding the Notice of Trustee Sale, who assured her she was in review for a modification, not foreclosure.  "Marilyn" also told Ms. Montez on January 25, 2010 that the auction of her house had been postponed, that Chase would honor her new TPP, and that Chase would be offering a permanent modification.  *Id.* (email from D. Montez to S. Cannon dated Jan. 25, 2010).

103.   Ms. Montez then received a letter dated January 23, 2010 telling her she had been "approved for a Trial Plan Agreement," and that if she complied, Chase would "consider a permanent workout solution."  Ex. 23.  A fourth temporary payment plan was enclosed.  *See* Ex. 24.  This plan, called a "Trial Plan Agreement," specified three monthly payments of $1,554.36, beginning on March 1, 2010.  The "Trial Plan Agreement" states that foreclosure activity would "resume" if the payments are *not* made on time, clearly indicating that forbearance will result if they *are* made on time.  *Id.*  The document also states that "[i]f all payments are made as scheduled, we *will* reevaluate your application for assistance and determine if we are able to offer you a permanent workout solution to bring your loan current."  *Id.* (emphasis added).

104.   Ms. Montez then received a letter dated January 28, 2010, stating that her "MODIFICATION IS AT RISK OF DECLINE" and that she had missed a trial period plan payment, but "due to a recent special extension issued by the Department of Treasury, you have one last opportunity to maintain your eligibility for a modification."  The letter requests two more payments of $1,612.00, directly contradicting the new Trial Plan Agreement that Ms. Montez had received only days earlier, requesting payments of $1,554.36 beginning on March 1,

2010.  *See* Ex. 25.

105.    Moreover, as noted above, Ms. Montez had already made *two* of the three $1,612.00 payments from the prior TPP, not just the one for which Chase appeared to be giving her credit.  Her third payment would be due February 1, 2010—after the date of the January 28, 2010 letter.

106.    Ms. Montez contacted Chase and confirmed that, despite all of the confusing and contradictory correspondence she had received, she should indeed pay on the newer plan, with payments of $1,554.36.

107.    On February 3, 2010, Chase employee Sharon Cannon emailed Ms. Montez and said, "They will not send anything in writing, but the [foreclosure] sale has been suspended because you were approved for a trial modification."  Ex. 26 (email from S. Cannon to D. Montez dated Feb. 3, 2010).

108.    Ms. Montez, relying on the terms set forth in the fourth payment plan—the Trial Plan Agreement—as well as assurances by Chase employees, and expecting that her performance under this contract would result in (a) forbearance of foreclosure proceedings and (b) genuine consideration of her modification application after making the three specified payments, signed the agreement on February 8, 2010 and faxed it to Chase on February 10, 2010. *See* Ex. 24.

109.    Ms. Montez made the three initial payments required by the fourth payment plan, and continued to make payments of $1,554.36 for *seven months*.  Throughout this time period, she frequently contacted Chase to inquire about the status of her modification.  She occasionally was told to send more documentation, all of which she had previously sent.  She received additional confusing correspondence telling her that she had failed to make payments that she

had in fact made.  *See, e.g.*, Ex. 27 (Mar. 9, 2010 "Notice of Expiration" from Chase regarding purportedly missed payments).

110.    Ms. Montez's home was also in foreclosure during these seven months.  Although the foreclosure had been "suspended indefinitely," according to an email from Chase employee Sharon Cannon, *see* Ex. 28 (email from S. Cannon to D. Montez dated April 19, 2010), this was cold comfort to Ms. Montez as she waited for a modification and wondered when foreclosure proceedings would resume.

111.    Thus, as much as seventeen months after her original modification application, Ms. Montez still had no idea whether or not she would be able to keep her home.

112.    On July 9, 2010, Ms. Montez printed out a copy of Chase employee Sharon Cannon's assurance from April 19, 2010 that her foreclosure had been permanently suspended and wrote a note on it requesting that Chase process her permanent modification because she had fully complied with her last temporary payment agreement, *see* Ex. 24, and had been waiting for 16 months to receive a final modification.  Ex. 29.

113.    On August 13, 2010, Ms. Montez received a letter stating that Chase could not "continue to review" her request for a loan modification because she had "not provided all of the documentation we requested."  Ex. 30.  The letter requested "[p]roof of payment of homeowners association fees," a "completed 4506T-EZ" IRS document, and two months of bank statements.  Ms. Montez was bewildered by this request, given the many assurances that her file was complete and the fact that she had been making regular payments for many months.

114.    Apparently due to the intervention of the OCC, *see* Ex. 31 (letter from OCC Customer Assistance Group to D. Montez dated Oct. 20, 2010 referencing a modification agreement that Chase had sent to Ms. Montez), Ms. Montez received—in late September of 2010

(nineteen months after she originally applied for a modification)—a "Loan Modification Agreement" from Chase purportedly effective November 1, 2010.

115.    The agreement and cover letter dated September 22, 2010 specified a new principal balance of $497,789.47, an interest rate of 4.375%, a balloon payment of $290,188.86 due on August 1, 2035, and monthly principal and interest payments of $2,201.43—*almost $400 more than her prior principal and interest payment*.  Including insurance and taxes, her total monthly payment would be $2686.71, fully $1,132.35 more than the payments she had been making pursuant to the February 2010 agreement, and over half of her household's monthly income.  *See* Ex. 32.

116.    The new principal balance was over $17,000 more than the prior principal balance.  The new principal balance purportedly included $20,801.11 in "Interest" and a "Recoverable Balance, Foreclosure/Bankruptcy Costs (If applicable)" of $1,990.66.  None of these charges were explained.

117.    Not only was the modification clearly unaffordable for Ms. Montez, but Chase knew it.  According to a letter dated September 21, 2010 that compared the prior loan terms to the modified terms, the interest rate had increased from 3.663% to 4.375%, and the principal and interest portion of the monthly payment had increased from $1,823.85 to $2,201.43.  *See* Ex. 33. Despite numerous assurances from Chase employees that it would do just the opposite, Chase apparently *intended* to make Ms. Montez's loan significantly less affordable.

118.    Ms. Montez enlisted the help of her local Chase branch Vice President Chris McCallum, who called Chase's mortgage division with her.  They were told "too bad, if she can't afford it, take it or leave it.  Or she can sell her house."

119.    Fearing that she would lose her home if she declined the modification offer, Ms. Montez signed the agreement on October 2, 2010, indicated that she was doing so "under duress," and returned it to Chase.  *See* Ex. 32.

120.    Having spent eighteen months being disappointed that she was not receiving the benefit of her bargains with Chase, Ms. Montez saw no purpose in funneling many more thousands of dollars to Chase only to receive nothing in return, and she stopped making payments in October 2010.

121.    Ms. Montez continued to pursue a reasonable modification in October 2010 and November 2010, continued to send in documentation requested by Chase.  Nevertheless, today she finds herself caught in the same endless cycle, unsure when and if she will ever receive the modification, forbearance of foreclosure, and/or opportunity for a "permanent workout solution to bring [her] loan current" *see* Ex. 24, that Chase has repeatedly promised.

        **2.    The Process Continues.**

122.    In January, February, and March of 2011, Ms. Montez has faced threats of foreclosure and continual requests for documentation that she had already provided on numerous occasions.

123.    In early January, 2011, Ms. Montez found another Notice of Trustee's Sale on her door, scheduling a foreclosure sale for February 3, 2011.  *See* Ex. 10.

124.    In a letter dated January 3, 2011, Chase asked for paystubs, tax returns, and a new loan modification application.  *See* Ex. 34.  Ms. Montez provided these materials on January 10, 2011.

1

2      125.    In a letter dated January 26, 2011, Chase asked for a batch of new documents,

3  including an entire set of loan modification application materials.  *See* Ex. 35.  On instructions

4  from Chase Ms. Montez has reapplied for a modification, sending in the same documentation she

5  has already faxed to Chase countless times.

6      126.    In January, Ms. Montez was assured by a Chase employee who identified herself

7  as "Cathy" in the "Home Executive Office" that all of Ms. Montez's paperwork was in order and

8  had been received.

9      127.    With the help of the OCC, Ms. Montez managed to have the February foreclosure

10  sale postponed from February 3, 2011 to March 21, 2011.

11

12      128.    Ms. Montez has received several more notices that Chase is missing

13  documentation that Ms. Montez has already faxed to Chase.  In short, Ms. Montez continues to

14  be tormented by Chase's misleading practices.

15

16      129.    In a letter January 31, 2011, Chase informed Ms. Montez that the "executive

17  specialist assigned to your issue" is "Hillary Riley Jr" and that he could be reached at (800) 695-

18  7695, extension 6524.  *See* Ex. 36.  Upon dialing this phone number and entering the extension,

19  the recording says that the "number is not in service."  Ms. Montez was unable to contact Mr.

20  Riley without a phone number.  Instead, she called other numbers and asked to be transferred to

21  Mr. Riley's voicemail and left him several messages, to which she received no response.

22

23      130.    In a letter dated February 28, 2011, which Ms. Montez received in early March,

24  Chase wrote to "confirm receipt" of Ms. Montez's "recently submitted request for a

25  modification."  Incredibly, the letter informed Ms. Montez that she needed to send in a new

26  hardship letter and "the required documentation of your income."  Ex. 37.  The letter also stated

CLASS ACTION COMPLAINT - 39

1

that Chase would "not sell" her house "at a foreclosure sale."

2

131.    On March 9, 2011, Chase posted a note on Ms. Montez's door saying she needed

3

to contact the bank's "Homeowners Assistance Department."  Ex. 38.

4

132.    On March 14, 2011, Ms. Montez was informed by a Chase representative who

5

identified himself as "Michael James" that the foreclosure sale is still scheduled for March 21.

6

Mr. James also said that Ms. Montez's file notes said that there was a paystub missing from her

7

file.

8

133.    Ms. Montez has only recently learned—in a phone call on March 15, 2011 with—

9

Chase employee "Hillary Riley"—that the March 21, 2011 foreclosure sale has been

10

"postponed."  Mr. Riley also said that Ms. Montez's file was "in underwriting" and that the

11

confirmation of the foreclosure postponement should be available in writing on Thursday March

12

17, 2011—just two business days before the scheduled sale.  Mr. Riley could not explain why his

13

phone number had been incorrect on prior correspondence.  He apologized for the delay and

14

confusion in processing Ms. Montez's application.

15

134.    On March 16 and 17, 2011, in multiple phone conversations with Chase

16

representatives, Ms. Montez was assured that the foreclosure sale scheduled for Monday, March

17

21, 2011 had been postponed.  However, as of the close of business on March 16, 2011, the

18

Trustee, California Reconveyance Company, had yet to receive from Chase any instructions to

19

cancel the sale.  The sale remains on the calendar maintained by LPS Agency Sales & Posting

20

(www.lpsasap.com) as of the date of filing this Complaint.

21

135.    Even if Chase actually does come through with a permanent modification, a true

22

forbearance in its pursuit of foreclosure, or a "permanent workout solution" for Ms. Montez after

23

two years of this aggravating, stressful, and needlessly complicated chain of events, it will not

24

25

26

give back to Ms. Montez what she has lost.  Because of Chase's mishandling of Ms. Montez's modification application, its breaches, broken promises, fraudulent, unfair, and unlawful business practices, and other violations of the law, Ms. Montez has lost sleep, peace of mind, time, trust, money, and any benefits of the bargains she made with Chase to stop them from threatening to take her house, to figure out a way to bring her loan current, and to receive a permanent modification.

**G.     Chase Has Profited from Plaintiff's Misfortune, Compliance, and Desire to Keep Her House.**

136.    Ms. Montez approached Chase for help as a responsible borrower who foresaw difficulty making future payments and with a desire to do the right thing.  Knowing that Ms. Montez has been desperately trying to keep her house, and having *instructed* her to stop making her mortgage payments so she would "move up on the list," Chase has fully leveraged its upper hand.  It has done the same thing to countless other members of the proposed Class.

137.    It has been over two years since Ms. Montez first applied for a modification to her home mortgage loan.  Today she remains unsure whether or not she will be able to obtain a reasonable modification and keep her home.  Furthermore, despite the fact that Chase assured Ms. Montez that her credit would not be affected by any delinquency incurred in pursuit of a modification, the opposite has happened, and her credit score has decreased substantially as a result of Chase's misleading practices.

138.    Chase has continually failed to identify what information was purportedly missing from Ms. Montez's application materials for the past two years.  Indeed, Ms. Montez has no idea what information could have been be missing from her application during the many months and years she has waited for a permanent modification and repeatedly sent documentation to Chase.

1     Rather, the "missing" or "incomplete" document explanation appears to be a pretext for the

2     denials and delays in processing her application, which enabled Chase to collect scores of

3     documents, waste her time, subject her to unnecessary stress, and reap thousands of dollars from

4     her over the course of many frustrating months.

5            139.   Throughout this process, Chase has made a habit of sending Ms. Montez

6     confusing and poorly explained documentation regarding her debt and the fees Chase is

7     charging.  For example, in a June 1, 2009 letter, Chase claimed that Ms. Montez owed $248.57

8     in late charges, and $60.85 in "Outstanding Fees."  By August 31, 2009 Ms. Montez supposedly

9     owed $339.76 in "Late Charges," $82.55 in "Other Outstanding Fees," along with a $30.00

10    "Payoff Statement Fee" and a $45.00 "Reconveyance Fee."  *See* Exs. 6 & 8.  Ms. Montez was

11    typically told by Chase employees to ignore these letters (which she did, as at that time she had

12    no reason to believe that Chase was misleading her), and no clear explanation of these fees was

13    ever given to Ms. Montez.  On information and belief, Chase's representations that it would not

14    charge her any fees for a modification were false and misleading.  Moreover, Chase charged and

15    collected fees that it was not entitled to collect and/or that were unreasonable or excessive.

16           140.   Furthermore, Chase's assessment of Ms. Montez's debt varied wildly.  From June

17    1, 2009 to July 13, 2009, the amount Ms. Montez was supposedly behind jumped from $4,909.52

18    (which included the fees described above) to $8,464.29—an increase in arrearage of $3,554.77.

19    *See* Exs. 6 & 7.  In a period of less than one month, Ms. Montez's supposed arrearage jumped by

20    over one and a half monthly payments.  By the time Chase offered Ms. Montez an unreasonable

21    final modification, in September 2010, Chase was claiming Ms. Montez had accumulated at least

22    $17,000 of additional debt, which they added to the principal balance of Ms. Montez's loan.  *See*

23    Ex. 32.  As described *supra* ¶ 41, this additional principal increases Chase's servicing pool and

therefore its servicing revenue.  It will also grossly inflate the amount of interest Chase will be able to collect from Ms. Montez.

141.    On information and belief, Chase has misapplied and mismanaged Ms. Montez's payments, utilizing "suspense" accounts and other mechanisms to increase its own profits and delay crediting Ms. Montez's account with the payments she was making.

142.    Had Ms. Montez known that the process for obtaining a modification would have stretched past two years she may have pursued other options, including selling her house.  Now, however, because she has poured thousands more dollars into her home—even as her budget has tightened—and because she has had her credit score wrecked, her options are limited.  She can (a) refuse to make payments altogether, unless and until Chase modifies her loan, increasing the risk that she would lose her home, including the thousands of dollars she has poured into it since the beginning of the modification process; or (b) continue making payments as directed by Chase, risking the loss of thousands of more dollars, and perhaps the eventual loss of her home despite such payments.  She is at the complete mercy of Chase, who is profiting off of her misfortune.

143.    Ms. Montez has not been given any explanation as to why she did not receive a permanent modification years ago.  Instead Chase has collected payments from her unlawfully and in direct contravention of Chase's election to begin foreclosure proceedings by sending a default notice.  Accordingly, payments made to Chase as a result of its loan modification scheme were improperly collected.

144.    Had Ms. Montez known that Chase did not intend to modify her loan, and would continue pursuing foreclosure, Ms. Montez would never have paid Chase or provided any other consideration in exchange for promises to modify her loan and forbear its foreclosure

1    proceedings.

2        145.   Ms. Montez's experiences illustrate painfully well Chase's pattern of deceptive,

3    misleading, unfair, fraudulent, unlawful business practices that have been experienced by all

4    members of the proposed Class of California mortgagors Plaintiff seeks to represent.  While the

5    timing and sequence of phone calls, emails, letters, and numerous modification agreements and

6    other promises may vary slightly among Class members, the underlying conduct is the same.

7    Chase has devised a fraudulent scheme to drag out the mortgage modification process to

8    maximize its profits.  This unlawful conduct preys on the most vulnerable homeowners in their

9    time of greatest stress, anxiety and desperation.  The chasm between Chase's authority to make

10   loan modifications and "permanent workout solutions" succeed and mortgagors' paltry

11   bargaining power couldn't be greater.

12

13                              **V.   CLASS ACTION ALLEGATIONS**

14       146.   Plaintiff brings this action on behalf of herself and all other persons similarly

15   situated, under Federal Rule of Civil Procedure 23.  The Class that Plaintiff seeks to represent is

16   defined as follows:

17

18           All mortgagors in the State of California whose home mortgage loans are or were
             serviced by Chase Home Finance LLC or JPMorgan Chase Bank, N.A. and who
19           (a) have attempted to obtain permanent loan modifications from Chase Home
             Finance LLC or JPMorgan Chase Bank, N.A. through the Home Affordable
20           Modification Program ("HAMP") or similar loan modification programs; and (b)
             have made payments pursuant to a HAMP Trial Period Plan ("TPP") or any
21           similar temporary modification agreement offered by Defendants.

22

23       147.   Excluded from the proposed Classes are (i) Chase Home Finance LLC, any entity

24   in which Chase Home Finance LLC has a controlling interest, and Chase Home Finance LLC's

25   officers, directors, legal representatives, predecessors, successors, and assigns; (ii) JPMorgan

26   Chase Bank, N.A., any entity in which JPMorgan Chase Bank, N.A. has a controlling interest,

1 and JPMorgan Chase Bank, N.A.'s officers, directors, legal representatives, predecessors,

2 successors, and assigns; (iii) the judicial officers to whom this case is assigned; and (iv) any

3 member of the immediate families of excluded persons.

4     148.   Plaintiff reserves the right to modify or amend the Class definition at or before the

5 time Plaintiff briefs the issue of class certification.

6     149.   **Numerosity/Impracticability of Joinder:**  The proposed Class consists of

7 hundreds if not thousands of persons throughout the State of California, making individual

8 joinder of all proposed members of the Class impractical.  The precise number of members can

9 be ascertained through discovery, which will include Defendants' records, information that was

10 or should have been reported to the State of California by Defendants, and similar sources.

11
12     150.   **Commonality and Predominance:**  All members of the proposed Class share a

13 united interest in the fair, just, and consistent determination of the questions of law and fact

14 necessary to the adjudication of Defendants' liability, which predominate over questions

15 affecting only individual members.  All members of the proposed Class share a common interest

16 in the determination of all factual and legal issues pertinent to Defendants' liability.  All

17 members of the proposed Class also share a common interest in the disgorgement and restitution

18 of revenue unjustly obtained by Defendants.

19
20     151.   Plaintiff's causes of action are set forth more fully below.  In summary, Plaintiff

21 seeks to represent a class for claims relating to violation of California Business & Professions

22 Code, § 17200, *et seq*., (California Unfair Competition Law ("UCL")); violation of the Rosenthal

23 Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788.2(c); breach of

24 contract; breach of the duty of good faith and fair dealing; promissory estoppel; and unjust

25 enrichment.

26

CLASS ACTION COMPLAINT - 45

152.   The key common liability questions include:

A.     Whether and when Defendants engaged in a pattern or practice of bad faith negotiations with mortgagors seeking home mortgage loan modifications;

B.     Whether and when Defendants knew or should have known that mortgagors would be damaged and/or Defendants would be enriched by Defendants' loan modification practices;

C.     Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiff and members of the Class regarding their home mortgage loan modification practices;

D.     Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiff and the Class regarding fees charged to mortgagors engaged in HAMP TPPs or other temporary modification agreements, or fees otherwise charged to mortgagor accounts;

E.     Whether Defendants omitted and concealed material facts in communications and disclosures to Plaintiff and the Class regarding the status of their loan modification applications;

F.     Whether Defendants requested and accepted payments under HAMP TPPs or other temporary modification programs as a condition for promised permanent loan modifications, without any intention to permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications;

G.     Whether Defendants misrepresented to mortgagors seeking modifications the terms of and the balances of the loans being serviced, including arrearages;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

H.      Whether Defendants improperly applied mortgage payments to accounts, failed to acknowledge receipt of payments, and/or held mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

I.      Whether Defendants improperly initiated, caused to be initiated, or pursued existing foreclosure proceedings against mortgagors who were attempting to obtain modifications;

J.      Whether Defendants' conduct violated California's Unfair Competition Laws;

K.      Whether Defendants' conduct violated the Rosenthal Fair Debt Collection Practices Act;

L.      Whether Defendants routinely breached contracts with mortgagors;

M.      Whether Defendants routinely breached Chase's contract with the Federal National Mortgage Association ("Fannie Mae"), under which Plaintiff and the members of the Class are intended beneficiaries;

N.      Whether Defendants promised permanent home mortgage loan modifications to mortgagors, inducing their reasonable and detrimental reliance;

O.      Whether Defendants were unjustly enriched at the expense of Plaintiff and the proposed Class Members;

P.      Whether Defendants' practices warrant equitable, injunctive, and/or monetary relief; and

Q.      Whether a class, and/or other subclasses, is superior, within the requirements of Rule 23(b)(3), on Plaintiff's claims.

153.    The proposed Classes are also united on fundamental questions regarding their members' entitlement to damages and equitable relief, including:

A.    Whether members of the proposed Class are entitled to damages and/or equitable relief based on their payments to Defendants and related harm and costs incurred as a result of doing business with Defendants;

B.    If members of the proposed Class are so entitled, what is the appropriate scope, extent and measure of damages and equitable relief that should be awarded;

C.    Whether the degree of reprehensibility of Defendants' conduct warrants the imposition of punitive or exemplary damages under applicable, controlling authority; and

D.    Whether members of the proposed Class are entitled to attorneys' fees, pre- and post-judgment interest, and costs of suit.

154.    **Typicality:**  Plaintiff's claims and defenses are typical of the claims and defenses of the proposed Class because Defendants uniformly misrepresented their intent with respect to home mortgage loan modifications, as well as fees charged to mortgagors, the status of loan modification applications, and the balances of the loans being serviced.  Defendants uniformly and actively suppressed, concealed, and failed to disclose the material risks associated with their protracted loan modifications and foreclosure proceedings.  Defendants' uniform conduct deprived Plaintiff and all members of the proposed Class of their ability to make an informed decision about whether to negotiate with Defendants or pursue other alternatives instead. Plaintiff, like all members of the Class, requested and/or applied for a permanent loan modification with Chase, made payments pursuant to "Trial Period Plans" and other temporary modification agreements, and suffered losses due to Defendants' misconduct.  Plaintiff, like all

1    members of the Class, has experienced these injuries and remains exposed to the likelihood of

2    further illegal conduct by Defendants; nor have her ongoing injuries been remedied or

3    compensated.

4          155.    **Adequacy:**  Plaintiff and her counsel will fairly and adequately assert and protect

5    the interests of all members of the proposed Class.  Plaintiff is committed to the vigorous

6    prosecution of this action and has retained counsel who are competent and experienced in

7    complex class action litigation, including consumer litigation.  Plaintiff has no interests adverse

8    to those of any absent members of the Class with respect to the key common issues of

9    Defendants' home mortgage loan modification practices, fees, deficient disclosures, and

10   breaches.

11         156.    Class certification is proper under Fed. R. Civ. P. 23(b)(1)(A), because the

12   prosecution of separate actions by individual Class Members would create a risk of inconsistent

13   or varying adjudications with respect to individual members of the Classes and establish

14   incompatible standards of conduct for Defendants.

15         157.    Class certification is proper under Fed. R. Civ. P. 23(b)(1)(B) because the

16   prosecution of separate actions by individual Class Members would create a risk of adjudications

17   with respect to individual Class Members which would, as a practical matter, be dispositive of

18   the interest of the other members not parties to these adjudications and/or substantially impair

19   their ability to protect these interests.

20         158.    Class certification is proper under Fed. R. Civ. P. 23(b)(3) because common

21   issues of law and fact predominate over any questions affecting only individual members of the

22   Class, and a class action is superior to other available methods for the fair and efficient

23   adjudication of this controversy.

159.    Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Class to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under Rule 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

160.    The need for Class-wide notice presents no barrier to certification because notice can be effectively disseminated to the proposed Classes by techniques commonly used in consumer class actions.  Notice may be provided to proposed Class Members under the requirements of Fed. R. Civ. P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first class mail that this Court determines best comports with modern Fed. R. Civ. P. 23(c)(2) class notice form, content, and dissemination techniques, as used in other consumer cases and as recommended by the Manual for Complex Litigation, 4th and the Federal Judicial Center.

## VI.   CAUSES OF ACTION

161.    Plaintiff brings each of the following Causes of Action on her own behalf and on behalf of each member of the Class described above, against Defendant Chase Home Finance LLC and Defendant JPMorgan Chase Bank, N.A.  When greater details regarding the conduct of each Defendant become known, Plaintiff will amend this Complaint, as necessary.

## COUNT 1

**("Unlawful" Business Practices in Violation of the Unfair Competition Law ("UCL")
Bus. & Prof. Code §§ 17200, *et seq.*)**

162.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

1

2

163.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

164.    A business act or practice is "unlawful" if it violates any established state or federal law.

165.    Defendants have violated, and continue to violate the "unlawful" prong of the UCL by breaching Chase's agreement with Fannie Mae of which the Plaintiff and class are intended beneficiaries.  Defendants further violate the unlawful prong of the UCL by violating the Rosenthal Fair Debt Collection Practices Act Cal. Civ. Code § 1788.2(c).  Defendants have also breached direct contracts with Plaintiffs and the proposed Class and have breached their duties of good faith and fair dealing, as well as engaged in other common law violations (promissory estoppel and unjust enrichment).  Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq*.

166.    Through their unlawful acts and practices, Defendants have obtained, and continue to unfairly obtain, money from Plaintiff and members of the Class.  As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff and all Class members, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  In addition, Plaintiff requests that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiff and the Class in the course of its scheme.  Otherwise, Plaintiff and the class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**COUNT 2**

**("Unfair" Business Practices in Violation of the Unfair Competition Law ("UCL")**
**Bus. & Prof. Code §§ 17200, *et seq*.)**

167.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

168.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

169.    A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

170.    Defendants have and continue to violate the "unfair" prong of the UCL by inviting Plaintiff and Class members to participate in loan modification programs, taking their trial payments without the intention of permanently modifying their loans.  Among other things, Chase Home Finance LLC and JPMorgan Chase Bank, N.A., have, in bad faith, failed to grant promised permanent loan modifications to qualifying applicants following such applicants' compliant participation in temporary payment plans or other temporary modification agreements; failed to take reasonable steps to work with eligible mortgagors to establish permanent modifications; misrepresented the status of loan modification applications; repeatedly requested duplicative financial information; erected artificial obstacles in the modification evaluation process to obstruct, delay, and/or prevent permanent loan modifications; failed to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and

1  amounts owed; failed to keep accurate records of applicants' scores on standard NPV tests; failed

2  to provide account information requested by mortgagors; failed to provide adequate explanations

3  of fees charged to mortgagors; charged excessive, unlawful, and unreasonable fees; inexplicably

4  and arbitrarily increased mortgagor debt obligations; failed to properly apply mortgagor

5  payments in whole or in part; rejected payments entirely without justification; caused improper

6  interest and other fees to accrue; breached modification agreements, and unlawfully proceeded

7  with foreclosures based on mortgagors' failure to meet impossible and shifting demands.[11]

8

9      171.    The gravity of the harm to members of the Class resulting from such unfair acts

10 and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for

11 engaging in such deceptive acts and practices.

12     172.    By committing the acts and practices alleged above, Defendants have engaged,

13 and continue to be engaged, in unfair business practices within the meaning of California

14 Business and Professions Code §§ 17200, *et seq*.

15     173.    Through its unfair acts and practices, Defendants have obtained, and continue to

16 unfairly obtain, money from members of the Class.  As such, Plaintiff requests that this Court

17 cause Defendants to restore this money to Plaintiff and all Class members, and to enjoin

18 Defendants from continuing to violate the Unfair Competition Law as discussed herein.  In

19 addition, Plaintiff requests that this Court cause Chase to refund all excessive and unlawful fees

20 or other charges assessed to Plaintiff and the Class in the course of its scheme.  Otherwise,

21 Plaintiff and the class may be irreparably harmed and/or denied an effective and complete

22 remedy if such an order is not granted.

23

24

25

26

---

[11] Plaintiff does not seek to state a claim asserting a private right of action under HAMP.  Rather, Plaintiff's causes of action reference the relevant terms of the HAMP in conjunction with other underlying claims, *e.g.*, UCL violations.

1

## COUNT 3

2

**("Fraudulent" Business Practices in Violation of the Unfair Competition Law ("UCL")**
**Bus. & Prof. Code §§ 17200,** *et seq.***)**

3

4        174.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and

5   restates them as if they were fully written herein.

6        175.    The UCL defines unfair business competition to include any "unlawful, unfair or

7   fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

8   Cal. Bus. & Prof. Code § 17200.

9

10       176.    A business act or practice is "fraudulent" under the Unfair Competition Law if it

11  actually deceives or is likely to deceive members of the consuming public.

12       177.    Defendants' acts and practices as described herein have deceived and/or are likely

13  to deceive members of the public.  Specifically, Defendants invited Plaintiff to participate in a

14  loan modification program, promising that if Plaintiff complied with the terms of the various

15  payment plans and otherwise qualified, Chase would permanently modify her loan or make

16  available an alternative "permanent workout solution," enabling her to avoid foreclosure.

17  Plaintiff relied on these representations in forgoing other options and instead entering the trial

18  program and making trial payments and has suffered monetary loss as a result.  These statements

19  not only deceived Plaintiff but are also likely to deceive a reasonable, similarly situated person

20  into believing the same.

21

22       178.    As a result of the conduct described above, Chase has been, and will continue to

23  be, unjustly enriched at the expense of Plaintiff and members of the proposed class.

24       179.    Through its unfair acts and practices, Chase has improperly obtained, and

25  continues to improperly obtain, money from members of the class.  As such, Plaintiff requests

26

1  that this Court cause Chase to permanently modify her loan terms pursuant to the HAMP

2  guidelines or restore the money that has been paid by Plaintiff and all Class members pursuant to

3  this scheme, and to enjoin Defendants from continuing to violate the Unfair Competition Law as

4  discussed herein.  In addition, Plaintiff requests that this Court cause Chase to refund all

5  excessive and unlawful fees or other charges assessed to Plaintiff and the Class in the course of

6  its scheme.  Otherwise, the Plaintiff and the class may be irreparably harmed and/or denied an

7  effective and complete remedy if such an order is not granted.

### COUNT 4

### (Unfair Debt Collection Practices
### Cal. Civ. Code §§ 1788, *et seq.*)

180.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

181.    Defendants are "debt collectors" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act").  *See* Cal. Civ. Code §1788.2(c).

182.    Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiff's and the Class's mortgage debt, as alleged herein. *See* Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. §1692(e).

183.    The Rosenthal Act allows for class actions to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA").  *See* Cal. Civ. Code § 1788.17; *Gonzales v. Arrow Financial Services*, LLC, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

1

2      184.    Plaintiff and the Class have suffered damages and harm as a result of Chase's

3  unfair debt collection practices, including irreparable harm to their credit and the amounts paid

4  under the trial plans.

5

6                                    **COUNT 5**

7          **(Breach of Contract / Breach of the Duty of Good Faith and Fair
                        Dealing (Direct Contracts))**

8
       185.    Plaintiff repeats and realleges each and every allegation contained above as if
9
   fully set forth herein.
10
       186.    The "Trial Payment Plans" and other written agreements pursuant to which
11
   Plaintiff and members of the Class made payments and gave other valuable consideration
12
   constitute valid offers.
13

14     187.    By executing the "Trial Payment Plans" or other forms and returning them to

15  Defendants, along with supporting documentation and "down payments," Plaintiff and members

16  of the Class accepted Defendants' offers.

17
       188.    Alternatively, return of "Trial Payment Plans" or other forms by Plaintiff and
18
   members of the Class to Defendants constitute valid offers.  Acceptance of these offers occurred
19
   when Defendants accepted payments from Plaintiff and members of the Class as specified in
20
   these documents.
21

22     189.    The payments made by Plaintiff and members of the class pursuant to "Trial

23  Payment Plans" or other forms, constitute consideration.  By making these payments, Plaintiff

24  and the members of the Class gave up the ability to pursue other means of saving their homes

25  from foreclosure.

26

190.    The documentation of current income, legal representations about current personal circumstances, and other provision of requested information to Defendants by Plaintiff and members of the Class constitute consideration.  By undertaking these measures, Plaintiff and members of the class spent valuable time and effort that could have otherwise been spent on other endeavors.

191.    Plaintiff and members of the Class thereby formed valid contracts with Defendants.

192.    To the extent that contracts with Plaintiff and members of the Class were subject to conditions subsequent, providing Defendants with the opportunity to review the documentation submitted by Plaintiff and the Class, this condition was waived by Defendants and/or Defendants are estopped from asserting it as a defense to Plaintiff's claims.

193.    Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

A.    misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

B.    failing to offer Plaintiff and the Class permanent loan modifications, including but not limited to modifications under HAMP;

C.    requesting and accepting payments under TPPs or other temporary programs as a condition for promised permanent loan modifications, offers of the opportunity to obtain a "permanent workout solution," and/or promises of foreclosure forbearance, without any intention to permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications, provide a

"permanent workout solution," or cease foreclosure activity;

D.      requesting and accepting payments beyond the term specified under the TPPs or other temporary programs as a condition for promised modifications, "permanent workout solutions," and/or promises of foreclosure forbearance;

E.      collecting unreasonable and/or inadequately disclosed fees, interest, or other charges;

F.      misrepresenting the terms of and the balances of the loans being serviced;

G.      improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

H.      pursuing foreclosure (either by initiating or continuing existing proceedings) against mortgagors in a temporary modification program;

I.      failing to provide written notices required by HAMP;

J.      failing to provide explanations of fees assessed to mortgagors assessed under temporary modification programs;

K.      failing to retain, employ, and supervise adequately trained staff; and/or

L.      deliberately acting to delay, prolong, or otherwise frustrate the loan modification process, including but not limited to routinely demanding information already in Defendants' files, making inaccurate calculations and determinations of the eligibility of Plaintiff and members of the Class for loan modifications, and failing to follow through on written and implied promises.

194.     Plaintiff and members of the Class have demonstrated their willingness to perform under the contracts.

195.     Plaintiff and members of the Class have suffered harm, including financial harm and psychological stress, and are threatened with additional harm as a direct and proximate result of Defendants' breaches.  By making payments under temporary modification programs and by continuing to make mortgage payments thereafter, Plaintiff and members of the Class forgo other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling or renting the homes.

196.     Many members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

### COUNT 6

**(Breach of Contract / Breach of the Duty of Good Faith and Fair
Dealing (Third Party Beneficiary Theory))**

197.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

198.     Chase's Servicer Participation Agreement ("SPA") for the Home Affordable Modification Program, as well as the explicitly incorporated HAMP program documentation, constitute a contract for which Plaintiff and the Class are intended beneficiaries, and under which Chase has undertaken duties to act for the benefit of Plaintiff and the Class.

199.     By entering into the SPA and accepting valuable consideration from the U.S. Treasury, Chase covenanted to administer its contractual obligations with principles of good faith and fair dealing.

200.     Defendants have breached these contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting payments and fees.

201.     Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

     A.     misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

     B.     failing to offer Plaintiff and the Class permanent loan modifications, including but not limited to modifications under HAMP;

     C.     requesting and accepting payments under TPPs or other temporary programs as a condition for promised permanent loan modifications, offers of the opportunity to obtain a "permanent workout solution," and/or promises of foreclosure forbearance, without any intention to permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications, provide a "permanent workout solution," or cease foreclosure activity;

     D.     requesting and accepting payments beyond the term specified under the TPPs or other temporary programs as a condition for promised modifications, "permanent workout solutions," and/or promises of foreclosure forbearance;

1

2          E.      collecting unreasonable and/or inadequately disclosed fees, interest, or

3   other charges;

4          F.      misrepresenting the terms of and the balances of the loans being serviced;

5          G.      improperly applying mortgage payments to accounts, failing to

6   acknowledge receipt of payments, and/or holding mortgage payments in "suspense,"

7   resulting in escalated debt obligations, including additional fees, interest, and other

8   charges;

9          H.      pursuing foreclosure (either by initiating or continuing existing

10   proceedings) against mortgagors in a temporary modification program;

11          I.      failing to provide written notices required by HAMP;

12          J.      failing to provide explanations of fees assessed to mortgagors assessed

13   under temporary modification programs;

14          K.      failing to retain, employ, and supervise adequately trained staff; and/or

15          L.      deliberately acting to delay, prolong, or otherwise frustrate the loan

16   modification process, including but not limited to routinely demanding information

17   already in Defendants' files, making inaccurate calculations and determinations of the

18   eligibility of Plaintiff and members of the Class for loan modifications, and failing to

19   follow through on written and implied promises.

20          202.    Plaintiff and members of the Class have suffered harm, including financial harm

21   and psychological stress, and are threatened with additional harm as a direct and proximate result

22   of Defendants' breaches.  By making payments under temporary modification programs and by

23   continuing to make mortgage payments thereafter, Plaintiff and members of the Class forgo other

1   remedies that might be pursued to save their homes, such as restructuring their debt under the

2   bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling or

3   renting the homes.

4        203.   Many members of the Class have been further harmed by the foreclosure of their

5   homes after making payments under temporary modification programs that they would not have

6   made had they known that Defendants would refuse to permanently modify their loans and/or

7   foreclose in any event.

8

9                                    **COUNT 7**

10                              **(Promissory Estoppel)**

11       204.   Plaintiff repeats and realleges each and every allegation contained above as if

12   fully set forth herein.

13       205.   Defendants made representations to Plaintiff and members of the Class that if they

14   performed under TPPs or other temporary modification program arrangements, including under

15   HAMP, that they would receive a permanent loan modification.

16

17       206.   Defendants intended to induce Plaintiff and members of the Class to rely on these

18   representations and make both down payments and subsequent monthly payments under the

19   TPPs or other temporary modification agreements.

20       207.   Plaintiff and members of the class did in fact reasonably rely on Defendants'

21   representations, by submitting payments, as well as documentation requested by Defendants.

22

23       208.   Reliance by Plaintiff and members of the Class was reasonable.

24       209.   Reliance by Plaintiff and members of the Class was to their detriment.  Plaintiff

25   and members of the Class have yet to receive permanent loan modifications, have lost

26   opportunities to fund other strategies to deal with their default and avoid foreclosure, have faced

financial burdens and psychological stress, and have given up valuable time and effort to meet Defendants' demands.

210.    Many members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

## COUNT 8

### (Unjust Enrichment)

211.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

212.    At all times relevant hereto, Defendants serviced residential mortgage loans in California.

213.    Plaintiff and the members of the Class conferred upon Defendants, without knowledge of the unlawful or deceptive pattern and practice in which Defendants were engaged, mortgage payments, including fees, interest, and other charges, benefits that were non-gratuitous. These benefits were beyond that to which Defendants are or were entitled.  Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and the members of the Class even though Plaintiff and the members of the Class were not receiving the quality of or fairness in mortgage loan servicing that had been represented by Defendants, or that reasonable mortgagors would have expected.  Defendants induced mortgagors, including Plaintiff and members of the Class, to continue making mortgage payments and to continue negotiating for permanent modifications that Defendants had no intention granting.  Accordingly, Defendants made promises of permanent loan modifications that were illusory.  Further, Defendants have

prolonged modification processes to generate revenue for themselves, and delayed foreclosures until the time at which such action would produce optimum, or at least increased, profits to Defendants.  Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and the members of the Class under these circumstances is unjust and inequitable.

214.    Accordingly, Plaintiff and the members of the Class are entitled to, and hereby seek, disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, in a manner established by the Court and available under applicable law.

215.    Plaintiff and the members of the proposed Class are entitled to the imposition of a constructive trust upon Defendants such that Defendants' enrichment, benefit and ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit of Plaintiff and members of the proposed Class.

### VII.   PRAYER FOR RELIEF

216.    WHEREFORE, Plaintiff, for herself and all others similarly situated, respectfully requests that this Court enter a judgment against Chase Home Finance LLC and JPMorgan Chase Bank, N.A. and in favor of Plaintiff and the Class, and grant the following relief:

A.       Determine that this action may be maintained as a class action, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate; that the Court designate and appoint the named Plaintiff to serve as Class Representative, designate and appoint the undersigned counsel and Keller Rohrback L.L.P. as Class Counsel, and designate and appoint Keller Rohrback L.L.P. as Lead Class Counsel;

B.       Enjoin Defendants from engaging in fraudulent, unlawful, or unfair business practices in the course of servicing residential mortgage loans;

1

2          C.      Enjoin Defendants from ignoring or failing to process loan modification

3   applications and instead proceeding with non-modification procedures that are premised

4   upon their deceptive, fraudulent, unlawful, misleading, or unfair business practices in the

5   course of servicing residential mortgage loans;

6          D.      Declare the conduct of Defendants as alleged herein to be an unlawful

7   

8   violation of the UCL;

9          E.      Declare the conduct of Defendants as alleged herein to be an unlawful

10  violation of the Rosenthal Act;

11         F.      Require Defendants to submit to outside audits and oversight, paid for by

12  

13  Defendants, on a regular basis to ensure that their mortgage loan modification procedures

14  are fair and reasonable, and that mortgagors receive adequate disclosures;

15         G.      Order Defendants to adopt and enforce a policy that requires appropriate

16  training of their employees and agents regarding their duties with respect to loan

17  modifications, including under HAMP;

18         H.      Award damages to Plaintiff and members of the Class for all payments

19  

20  made pursuant to Defendants' unlawful practices, including unreasonable fees, interest,

21  or other charges paid;

22         I.      Require Defendants to adjust the accounts of Plaintiff and members of the

23  Class to eliminate any accrued fees, interest, or other charges that were unlawfully

24  assessed and currently constitute debts owed by Plaintiff and members of the Class;

25         J.      Declare the acts and practices of Defendants described above to constitute

26  breach of contract and a breach of the duty of good faith and fair dealing;

K.      Order specific performance of Defendants' contractual obligations to Plaintiff and the members of the Class, together with other relief required under contract;

L.      Order specific performance of Chase's contractual obligations to the Federal National Mortgage Association ("Fannie Mae") under the SPA, for which Plaintiff and the members of the Class are intended beneficiaries, together with other relief required under contract;

M.      Require Defendants to review and process all applications for residential loan modifications in a timely manner and without the delay and increased expense routinely imposed by Defendants on Plaintiff and members of the Class;

N.      Require Defendants to offer permanent modifications to all eligible members of the Class under contract or under the doctrine of promissory estoppel;

O.      Require Defendants to disgorge, to Plaintiff and members of the Class, all revenue earned as a result of their unlawful acts and practices and protracted loan modification negotiations;

P.      Award costs to Plaintiff and members of the Class for any fees or expenses incurred in wiring payments to Defendants under any temporary provisional modification plan or for any payments that were improperly rejected by Defendants;

Q.      Grant Plaintiff and members of the Class awards of actual, statutory, and/or compensatory, damages in such amount to be determined at trial and as provided by applicable law, to include but not be limited to payments made under "TPPs" or other temporary modification programs, as well as associated fees, interest, or other charges;

R.      Grant Plaintiff and members of the Class awards of punitive and/or exemplary damages as provided by applicable law, including due to Defendants'

oppressive, fraudulent, and/or malicious conduct in servicing mortgage loans;

S.      Grant Class Members their costs of suit, including reasonable attorneys' fees, costs, and expenses as provided by law;

T.      Grant Class Members both pre-judgment and post-judgment interest as provided by law;

U.      Determine that Defendants are jointly and severally liable for the conduct alleged herein; and

V.      Grant Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## VIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 17th day of March, 2011.

                        KELLER ROHRBACK L.L.P.

                        By: s/ Sharon T. Hritz
                                Sharon T. Hritz (265105)
                                KELLER ROHRBACK L.L.P.
                                610 Anacapa Street
                                Santa Barbara, CA  93101
                                Tel:  (805) 456-1496
                                Fax:  (805) 456-1497
                                Email: shritz@kellerrohrback.com

                                Lynn Lincoln Sarko
                                Gretchen Freeman Cappio
                                Gretchen S. Obrist
                                KELLER ROHRBACK, L.L.P.
                                1201 Third Ave., Ste 3200
                                Seattle, WA  98101
                                Tel: (206) 623-1900
                                Fax: (206) 623-3384
                                Email: lsarko@kellerrohrback.com

CLASS ACTION COMPLAINT - 67

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

gcappio@kellerrohrback.com
gobrist@kellerrohrback.com

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
10680 West Pico Boulevard, Suite 280
Los Angeles, CA 90064
Tel:  (310) 836-6000
Fax:  (310) 836-6010
E-mail: service@braunlawgroup.com

***Attorneys for Plaintiff***

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DIANNA MONTEZ, individually and on behalf of all others similarly situated

## DEFENDANTS

CHASE HOME FINANCE LLC and JP MORGAN CHASE, N.A.

**(b)** County of Residence of First Listed Plaintiff  San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Middlesex, NJ
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Sharon T. Hritz, Keller Rohrback LLP, 610 Anacapa St, Santa Barbara, CA 93101, (805) 456-1496

Attorneys (If Known)

**'11CV0530 JLS  WMC**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability |  | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332

Brief description of cause:
Consumer Protection and Contract

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 5,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____  DOCKET NUMBER _____

DATE  03/17/2011

SIGNATURE OF ATTORNEY OF RECORD  s/ Sharon T. Hritz

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____