Sharon T. Hritz (265105)
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
Tel: (805) 456-1496
Fax: (805) 456-1497
shritz@kellerrohrback.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Gretchen S. Obrist
KELLER ROHRBACK L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
gobrist@kellerrohrback.com

***Attorneys for Plaintiffs***
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
AT SAN DIEGO

| | |
|---|---|
| DIANNA MONTEZ, DANIEL WARE, and MICHAEL SABOUHI, on behalf of themselves and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CHASE HOME FINANCE LLC and JPMORGAN CHASE BANK, N.A., <br><br> Defendants. | ) No. 11-cv-0530-JLS-WMC <br> ) <br> ) **AMENDED CLASS ACTION** <br> ) **COMPLAINT** <br> ) <br> ) 1. UNLAWFUL BUSINESS PRACTICES— <br> ) UNFAIR COMPETITION LAW (Bus. & Prof. <br> ) Code §§ 17200, *et seq.*) <br> ) <br> ) 2. UNFAIR BUSINESS PRACTICES— <br> ) UNFAIR COMPETITION LAW (Bus. & Prof. <br> ) Code §§ 17200, *et seq.*) <br> ) <br> ) 3. FRAUDULENT BUSINESS <br> ) PRACTICES—UNFAIR COMPETITION <br> ) LAW (Bus. & Prof. Code §§ 17200, *et seq.*) <br> ) <br> ) 4. UNFAIR DEBT COLLECTION <br> ) PRACTICES (Cal. Civ. Code §§ 1788, *et seq.*) |

)
) 5.  VIOLATION OF THE CONSUMERS
) LEGAL REMEDIES ACT (Cal. Civil Code §
) 1750, *et seq.*)
)
) 6. BREACH OF CONTRACT AND
) BREACH OF THE DUTY OF GOOD FAITH
) AND FAIR DEALING (Direct Contracts)
)
) 7. BREACH OF CONTRACT AND
) BREACH OF THE DUTY OF GOOD FAITH
) AND FAIR DEALING (Third Party
) Beneficiary)
)
) 8. PROMISSORY ESTOPPEL
)
) 9. UNJUST ENRICHMENT
)
) **JURY TRIAL DEMANDED**
)

1

2

<u>**TABLE OF CONTENTS**</u>

I.     INTRODUCTION .................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 4

III.   PARTIES .............................................................................................. 5

IV.   FACTS .................................................................................................. 6

      A.    Mortgage Loan Servicers Profit from Delayed Loan Modifications. ................... 6

      B.    Chase's Impact on Mortgagors is Significant. .................................. 10

      C.    Federal Regulators Have Recently Found that Chase Has Engaged in Mortgage Servicing Abuses. ........................................................... 11

      D.    Chase Participates in the Home Affordable Modification Program (HAMP). ............................................................................................ 13

      E.    Chase Benefits From Extracting as Many TPP or Other Temporary Plan Payments as Possible from Borrowers in Distress. ...................... 17

      F.    Chase Intentionally Misleads Borrowers by Stating that it Will Timely Evaluate Borrowers for Eligibility and Offer Permanent Modifications to Qualifying Borrowers, Without the Intent to Do So. ....................................................................................................... 20

      G.    Plaintiffs and Members of the Proposed Class Have Been Subjected to Chase's Common Course of Conduct. .......................... 22

      H.    Chase's Common Course of Conduct is a Result of Uniform Policies and Practices. ....................................................................... 25

      I.    Plaintiff Dianna Montez's Attempts to Secure Permanent Loan Modification Were Repeatedly Thwarted by Chase's Misleading Practices. .......................................................................................... 27

            1.    The Runaround. ............................................................... 30

            2.    The Process Continues. ..................................................... 42

            3.    Chase Has Profited from Ms. Montez's Misfortune, Compliance, and Desire to Keep Her House. .......................... 44

      J.    Plaintiff Daniel Ware's Attempts to Secure a Loan Modification Were Thwarted by Chase. ................................................................. 47

1               1.     The Runaround..................................................................... 48

2               2.     The Process Continues........................................................... 53

3               3.     Chase Has Profited from Mr. Ware's Misfortune,
4                      Compliance, and Desire to Keep His House........................... 55

5      K.     Plaintiff Michael Sabouhi's Attempts to Obtain a Modification
                  From Chase Cost Him His Home. ........................................ 57

6               1.     The Runaround..................................................................... 58
7

8               2.     The Foreclosure. .................................................................. 60

9               3.     The Aftermath. .................................................................... 64

10             4.     Chase Has Profited from Mr. Sabouhi's Misfortune,
                  Compliance, and Desire to Keep His House........................... 64

11  V.    CLASS ACTION ALLEGATIONS ........................................... 66

12  VI.   CAUSES OF ACTION ............................................................ 72

13  VII.  PRAYER FOR RELIEF ........................................................... 97

14  VIII. JURY TRIAL DEMANDED................................................... 101

1    Plaintiffs Dianna Montez, Daniel Ware, and Michael Sabouhi, individually and on behalf

2 of all others similarly situated, allege the following based upon information and belief, and upon

3 the investigation of counsel.  Plaintiffs believe that substantial additional evidentiary support will

4 exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

6    1.    This class action is brought by Plaintiffs ("Class Representatives") individually

7 and on behalf of all mortgagors in the State of California whose home mortgage loans are or

8 were serviced by Chase Home Finance LLC or JPMorgan Chase Bank, N.A. and who (a) have

9 attempted to obtain permanent loan modifications from Chase Home Finance LLC or JPMorgan

10 Chase Bank, N.A.; and (b) have made payments pursuant to a Forbearance Plan, a Repayment

11 Plan, a Reduced Payment Plan, a Home Affordable Modification Program ("HAMP") Trial

12 Period Plan ("TPP"), a "HAMP" or "CHAMP" Loan Modification Agreement, any Chase

13 proprietary modification plan, or any other plan offered by Defendants as a means to permanent

14 home loan modification.[1]

15    2.    As set forth in more detail *infra*, Plaintiffs seek to represent a statewide class, and

16 bring common law and statutory claims for unlawful, unfair, and/or fraudulent business practices

17 in violation of California Business & Professions Code, § 17200, *et seq.*, (California Unfair

18 Competition Law ("UCL")); violation of the Rosenthal Fair Debt Collection Practices Act (the

19 "Rosenthal Act"), Cal. Civ. Code § 1788.2(c); violation of the Consumers Legal Remedies Act

20 ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; breach of contract; breach of the duty of good faith

21 and fair dealing; promissory estoppel; and unjust enrichment.

22    3.    Plaintiffs have endured a breathtaking array of deceptive and misleading practices

23 and breaches imposed on them by Defendant Chase Home Finance LLC and its parent company

24 Defendant JPMorgan Chase Bank, N.A.[2] over the past several years, as they have tried to save

25 their homes from foreclosure and meet constantly shifting demands with respect to their attempts

---

[1] Plaintiffs reserve the right to amend the class definition at the appropriate time should it be
necessary based on facts learned in discovery.

[2] Hereinafter Chase Home Finance LLC and JPMorgan Chase Bank, N.A. will be collectively
referred to as "Chase."

to obtain mortgage loan modifications.  Chase has strung Plaintiffs along, repeatedly requesting documentation that Plaintiffs had already provided, and promising illusory permanent loan modifications or "workout solutions" that Chase apparently never intended to timely grant. While leading Plaintiffs on with the promise of a loan modification and a timely review of application materials, Chase continued to demand and accept monthly mortgage payments, under the false premise that these payments supported Plaintiffs' efforts to obtain a timely and affordable modification, achieve an alternative permanent solution, and/or avoid active foreclosure proceedings.  Had Plaintiffs been aware that Chase never intended to timely modify their loans as promised, or that they would face excessively inflated debt obligations after a delayed modification process, they would have pursued other avenues to save their homes from foreclosure and would have proceeded differently in deciding how to allocate their precious resources.

4.     Through its protracted loan modification process, Chase racked up excessive fees without adequate explanation or justification and, over an extended period of time, consequently inflated Plaintiffs' debt by thousands of dollars that Chase is not entitled to collect.  While holding the threat of foreclosure over Plaintiffs' heads, Chase engaged in serial bad faith negotiations, dragging out the modification process and unjustly inflating its own profits.

5.     Plaintiffs' experiences are unfortunately not unique.  They are merely illustrative of Chase's standard practices, which have damaged not only Plaintiffs, but the entire Class of California mortgagors Plaintiffs seek to represent.  Plaintiffs are but three of many mortgagors ensnared by Chase's systemic unlawful behavior.

6.     Among other things, Chase, in bad faith:

A.     instructs mortgagors to stop making mortgage payments under the false pretense that doing so will not hurt credit scores and is necessary for them to attain a loan modification;

B.     presents mortgagors with packages of information, documents, and promises that offer to (a) forbear on foreclosure proceedings, and (b) provide mortgagors with an opportunity to obtain a permanent loan modification ("forbearance/modification

offer packages");

C.      fails to grant promised permanent HAMP or non-HAMP loan modifications following temporary modified payment plans and acceptance of forbearance/modification offer packages by mortgagors;

D.      fails to take reasonable steps to work with eligible mortgagors to establish permanent HAMP or non-HAMP modifications;

E.      steers mortgagors into temporary modified payment plans with illusory promises to modify—increasing profits to Chase through a pattern and practice that is driven by employee bonus incentives rather than genuine efforts to move mortgagors into timely permanent mortgage modifications;

F.      leads mortgagors to reasonably believe that Chase will permanently modify their mortgage loans if they submit requested documentation, make payments pursuant to forbearance/modification offer packages, and/or successfully complete those plans;

G.      misrepresents the status of loan modification applications;

H.      misrepresents the status of mortgagor accounts;

I.       repeatedly requests duplicative financial information or other documentation;

J.       erects artificial obstacles in the evaluation process to obstruct, delay, and/or prevent permanent loan modifications;

K.      fails to retain, employ, and supervise adequately trained staff;

L.      fails to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

M.      fails to properly calculate Net Present Value ("NPV") test scores;

N.      fails to keep accurate records of HAMP applicants' scores on NPV tests;

O.      fails or refuses to provide account information requested by mortgagors;

P.      fails or refuses to provide adequate explanations of fees charged to mortgagors;

Q.      charges excessive, unlawful, and unreasonable fees and/or interest;

R.      fails to properly disclose and/or conceals fees and other charges;

S.      inexplicably or arbitrarily increases mortgagor debt obligations;

T.      fails to properly apply mortgagor payments in whole or in part;

U.      rejects payments or refuses to withdraw payments without justification or explanation;

V.      causes improper interest and other fees to accrue;

W.      breaches forbearance/modification offer packages that have been accepted by mortgagors and followed by mortgagors' performance; and

X.      unlawfully proceeds with foreclosures based on mortgagors' failure to meet impossible and shifting demands.

## II.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

8.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1367 in that Plaintiffs and the Class are intended third-party beneficiaries to a contract between JPMorgan Chase, N.A. and the United States through its Financial Agent Fannie Mae that was entered into pursuant to and under the direction of the Troubled Asset Relief Program ("TARP").  12 U.S.C. § 5201, *et seq.*

9.      Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and (c).  Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do substantial business in the State of California and within this Federal Judicial District, receive substantial compensation and profits from the servicing of home mortgage loans in this District, have made material omissions and misrepresentations, breached contracts and/or other promises, and engaged in unlawful practices in this District, so as to subject them to personal jurisdiction in this District.  Plaintiff Dianna Montez resides in this District, and her property for which Chase is the mortgage loan servicer is in this District.  Plaintiffs Daniel Ware and Michael Sabouhi reside in California and their

1    properties for which Chase is or was the mortgage loan servicer are in California.

2        10.     This Court has personal jurisdiction over the Defendants to this action because

3    Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do and/or did substantial business

4    in the State of California.

### III.   PARTIES

6        11.     Plaintiff Dianna Montez resides in San Diego, California.  Her home mortgage

7    loan for property located in California was originally held by Washington Mutual, and, on

8    information and belief, was transferred to Chase in the fall of 2008, when Washington Mutual's

9    U.S. banking subsidiary was purchased by Chase.

10       12.     Plaintiff Daniel Ware resides in Visalia, California.  His home mortgage loan for

11    property located in California was originally held by Washington Mutual, and, on information

12    and belief, was transferred to Chase in the fall of 2008, when Washington Mutual's U.S. banking

13    subsidiary was purchased by Chase.

14       13.     Plaintiff Michael Sabouhi resides in Rancho Cucamonga, California.  His home

15    mortgage loan for property located in California was originated by Chase in 2002.

16       14.     Defendant Chase Home Finance LLC is a mortgage bank and home mortgage

17    loan servicer, servicing mortgages on behalf of lenders and investors, including pooled

18    mortgage-backed securities.  Chase Home Finance LLC is a Delaware corporation and during the

19    time period relevant to this action was a wholly-owned subsidiary of JPMorgan Chase Bank,

20    N.A.  On information and belief, on May 1, 2011, after the commencement of this action, Chase

21    Home Finance LLC was merged into Defendant JPMorgan Chase Bank, N.A, making JPMorgan

22    Chase Bank, N.A. the successor by merger to Chase Home Finance LLC.

23       15.     Defendant JPMorgan Chase Bank, N.A. is a national banking association with

24    corporate headquarters located at 270 Park Avenue, New York, NY 10017.  JPMorgan Chase

25    Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co. ("JPMC").  On information

26    and belief, JPMorgan Chase Bank, N.A. directed, controlled, formulated, and/or participated in

27    Defendant Chase Home Finance's loan servicing activities in California and is jointly and

28    severally liable for Chase Home Finance's unlawful activity.  In addition, because of the merger

of Chase Home Finance LLC into JPMorgan Chase Bank, N.A., Defendant JPMorgan Chase Bank, N.A. is the successor in interest to Defendant Chase Home Finance LLC.

## IV.   FACTS

**A.     Mortgage Loan Servicers Profit from Delayed Loan Modifications.**

16.     Over the past several years, the United States housing market has been in crisis. A Congressional oversight panel in 2009 noted that one in eight U.S. mortgages was currently in foreclosure or default.  Press Release, Congressional Oversight Panel (Oct. 9, 2009).[3]  In 2010 alone, a record 2.9 million homes, or one out of every forty-five, received a foreclosure filing. And the forecast for 2011 is worse, with "lenders poised to take back more homes this year than any other since the U.S. housing meltdown began in 2006."  Janna Herron, *Housing Woes Not Over for State, Nation*, Seattle Times, Jan. 14, 2011, at A13.  Economists predict that interest rate resets on the riskiest of lending products—adjustable rate mortgages—will not peak until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, fig. 30.[4]

17.     California has been severely impacted by this crisis.  In 2010, "[m]ore than *half a million* California homes were involved in some stage of foreclosure," which, incredibly, was less than the "peak year" of the crisis in California, in 2009.  Alejandro Lazo, *House Seizures by Banks Decline in State*, The Los Angeles Times, Jan. 13, 2011, at A1 (emphasis added). Moreover, it is projected that between 2009 and 2012, a total of 2 million California homes will enter the foreclosure process.  Press Release, State of California Department of Justice, Office of the Attorney General, *Attorney General Kamala D. Harris Announces Creation of Mortgage Fraud Strike Force to Protect Homeowners*, May 23, 2011 [hereinafter Strike Force Press Release].[5]

18.     Unlike early in the foreclosure crisis, when risky loans and a crashing housing

---

[3] *Available at* http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited Jan. 6, 2011).
[4] *Available at* http://papers.ssrn.com/so13/papers.cmf?abstract_id=1458413 (citing study by Credit Suisse showing monthly mortgage rate resets).
[5]  *Available at* http://oag.ca.gov/news/press_release?id=2090 (last visited May 25, 2011).

market were driving the delinquency rate, today many homeowners are struggling to make their payments because of the weak economy.  According to a senior vice president at RealtyTrac, a company that specializes in housing market research, "We've actually had a sea change in what's causing foreclosures, from the overheated home prices and bad loans to a second wave of foreclosures actually caused by unemployment and economic displacement . . . ."  Alex Viega, *Foreclosure Activity Up Across Most US Metro Areas*, The Associated Press, Jan. 27, 2011, Business News.

19.    Recently, all 50 states' attorneys general and numerous federal agencies began an investigation into the foreclosure practices of mortgage loan servicers like Chase.  The state attorneys general have pressed for a deal with the nation's five largest banks—including Chase—to address governmental concerns over servicing abuses.  Nelson D. Schwartz & David Streitfeld, *Mortgage Modification Overhaul Sought by States*, N.Y. Times, Mar. 4, 2011; *see also* Nelson D. Schwartz, *Foreclosure Deal Near, State Officials Say*, N.Y. Times, Mar. 7, 2011.  Expressing the sentiment of the governmental entities involved, the Attorney General of Arizona, for example, recently remarked:

> What I'm most angry about is the simultaneous modifications and foreclosures. . . . We need to look for a stipulated judgment in all 50 states, that if someone is in modification, they can't be foreclosed.

Margaret Cronin Fisk, *Arizona Attorney General Seeks Changes to Home-Loan Modification Process,* BLOOMBERG (Oct. 28, 2010 9:23 AM).[6]

20.    While nothing has yet come of these efforts, California's Attorney General joined this coalition and expressed concern about mortgage servicing abuses affecting California mortgagors, many of whom are caught up in foreclosure abuses while seeking loan modifications, and "called on all lenders in California to halt foreclosing on California homes until they can demonstrate that they are complying with state law."  Press Release, State of California Department of Justice, Office of the Attorney General, *California Joins Multi-State*

---

[6] *Available at* http://www.bloomberg.com/news/2010-10-28/arizona-attorney-general-seeks-changes-to-home-loan-modification-process.html.

1  *Coalition to Protect Homeowners Facing Foreclosure*, Oct. 13, 2010.[7]

2       21.    Moreover, California's Attorney General just announced her creation of a

3  "Mortgage Fraud Strike Force" to both criminally and civilly prosecute "violations at every step

4  of the mortgage process."  Strike Force Press Release.  One goal of these enforcement teams will

5  be to target consumer scams, including deceptive marketing and loan modification scams.  The

6  impact of mortgage modification abuses like those alleged here is clear:

7          "Californians in search of the American dream all too often found a protracted
        personal and legal nightmare," said Attorney General Harris.  "Families are losing

8          their homes, while those who perpetrated crimes and frauds against them walk
        free."

9  *Id.*

10       22.    Against this backdrop, mortgage loan servicers have taken advantage of

11  struggling homeowners to boost their profits.  Testimony before the United States Senate

12  Committee on Banking, Housing, & Urban Affairs outlines the misleading and harmful business

13  practices that abound in the mortgage servicing industry.  According to one expert, the "core

14  problem" is "servicers' failure to service loans, account for payments, limit fees to reasonable

15  and necessary ones, and provide loan modifications where appropriate and necessary to restore

16  loans to performing status."  *Problems in Mortgage Servicing From Modification to*

17  *Foreclosure: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 111th

18  Cong., at 3 (Nov. 16, 2010) (written testimony of Diane E. Thompson, National Consumer Law

19  Center) [hereinafter Testimony of Diane E. Thompson].[8]

20       23.    In February of 2009, the Secretary of the Treasury and the Director of the Federal

21  Housing Finance Agency announced the Making Home Affordable ("MHA") program.  In an

22  effort to stem the foreclosure crisis, the HAMP was created by the U.S. Treasury Department, as

23  part of the MHA.  The HAMP "lowers [mortgagors'] monthly payment[s] to 31 percent of [their]

24  verified monthly gross (pre-tax) income to make [their] payments more affordable."[9]  While not

---

[7] *Available at* http://oag.ca.gov/news/press_release?id=2002&p=3&y=2010.
[8] *Available at* http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c1fac0f6-5ac5-4ae5-85cc-e2220255dfd9.
[9] Home Affordable Modification Program, http://www.makinghomeaffordable.gov/programs/

the only vehicle for modifications, HAMP has been increasingly used by servicers since 2009.

24.    Servicers have engaged in widespread abuses, making both HAMP and proprietary modification programs a trap for many borrowers.  Foremost among mortgage loan servicer abuses is their failure to provide eligible borrowers with permanent—whether HAMP or non-HAMP—loan modifications.  Testimony of Diane E. Thompson at 3.  Servicers often overstate restrictions imposed by the investors in mortgage-backed securities when denying modifications, thereby harming both the mortgagor and the investor, while the servicers increase their income.  *Id.* at 8.  Indeed, "modifications, short sales and deeds in lieu" are "generally better outcomes for both homeowners and investors" than foreclosures.  Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown*, Mar. 8, 2011 [hereinafter Pierce et al., *Meltdown*].[10]

25.    Servicers are increasingly offering what they prefer—temporary "repayment plans" instead of permanent modifications.  Interminable repayment plans harm homeowners who are left with no finality, no permanent modification of loan terms, and no new underwriting. *Id.*  Chase has done just this to Plaintiffs and the proposed Class.  Chase benefits by keeping a hefty cash flow while refusing to actually modify the loans.  Chase employees benefit through large bonuses for steering mortgagors into "repayment" or "forbearance" plans, while promising—but not granting—affordable or timely permanent loan modifications.  Homeowners waste time and money relying on illusory promises and schemes that they cannot comprehend.

26.    Operating under a "deny and delay" model, servicers give mortgagors the runaround, erecting endless barriers, stringing them along, forcing them to submit the same paperwork repeatedly, returning or refusing to accept payments, and otherwise thwarting mortgagors' sincere efforts to obtain permanent modifications.  Testimony of Diane E. Thompson, at 9-13 (describing examples of how servicers drag out the mortgage modification process).  The objective of these tactics is simple: profit.  "During delay, fees and interest

---

lower-payments/Pages/hamp.aspx, (last visited Mar. 3, 2011).
[10] *Available at* http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown#chances.

accrue." *Id.* at 11. Foreclosure-related fees racked up during protracted modification processes skyrocket servicer profits when they eventually foreclose, because servicers get to take the accrued fees—including fees for property inspections, purported attorneys' fees and costs, and late fees, among others—off the top of the foreclosure proceeds before investors get their share. *Id.* at 19-36. Servicers' motivation to accrue fees is further increased by the fact that "servicer[s] often own[] a share in companies which can be billed for ancillary services during the foreclosure process, and charge[] above market rates on these services." National Mortgage Servicing Standards and Conflicts of Interest, 111th Cong., at 10 (May 12, 2011) (written testimony of Laurie Goodman, Senior Director at Amherst Securities Group).

27.    While a delayed foreclosure is often the result after a long modification application process, servicers strive for a "sweet spot" where they can stretch out a delinquency "without either a modification or a foreclosure," maximizing their fees. *Id.* at 21.

**B.    Chase's Impact on Mortgagors is Significant.**

28.    Throughout the time period relevant here, Chase Home Finance LLC was a loan servicer operated by JPMorgan Chase Bank, N.A. As of November 18, 2010, Chase was servicer for over nine million loans with a total value of $1.2 trillion. *Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. On Insurance, Housing, and Community Opportunity*, 111th Cong., Panel Two (Nov. 18, 2010) (written testimony of Stephanie Murdick, head of the "Office of Consumer Practices" at Chase). The Office of the Comptroller of the Currency ("OCC") recently found that Defendant JPMorgan Chase Bank, N.A. currently services a portfolio of 6.3 million residential mortgage loans, and between 2008 and 2010, the Bank's "foreclosure inventory grew substantially." *In the Matter of JPMorgan Chase Bank, N.A.*, AA-EC-11-15, Consent Order, at 2 (Dep't of the Treasury, Office of the Comptroller of the Currency, Apr. 13, 2011) [hereinafter "OCC Consent Order"].

29.    On information and belief, Chase has a significant servicing presence in California. Along with having retail bank locations throughout the state, Chase maintains sixteen "Homeownership Centers" throughout the state of California, where, according to

Chase's website, "struggling customers can . . . meet face to face with loan advisors to talk about their situation."[11]

30.     Yet, Chase has modified less than a quarter of mortgages of "seriously delinquent" borrowers; the vast majority of the balances of such mortgages are "unresolved" with neither a modification nor a foreclosure.  Pierce et al., *Meltdown* (analyzing Moody's data on 300,000 subprime loans more than three months behind, all of which currently sit in mortgage-backed securities).  Indeed, Moody's data reveals that "[t]he *worst* [servicer] was JPMorgan Chase, where the average modification occurred 11 months after the borrower fell behind."  *Id.* (emphasis added).

31.     Chase and its affiliates have denied modifications, cancelled modification trial periods, and left mortgagors in limbo at a rate of approximately 57% according to Treasury Department data.  And this alarming statistic does not even account for situations where Chase has not reported application response data.  *Id.*

32.     As described in detail below, Chase has violated core statutes in California intended to protect consumers, including mortgagors.  Moreover, Chase has breached its contract with the United States (Fannie Mae), as well as engaged in numerous common law breaches, enriching itself at the expense of mortgagors and even investors.

33.     Chase itself acknowledges that it massively mishandled foreclosures, including while mortgage modifications were pending.

> Jamie Dimon, chief executive of JPMorgan Chase, addressed the issue Tuesday at a banking conference in Washington.  "Some of the mistakes were egregious, and they're embarrassing," he said, according to Bloomberg News.  "But we made a mistake, and we're going to pay for that mistake."

David Streitfeld, *Servicers Said to Agree to Revamped Foreclosures*, N.Y. Times, Apr. 5, 2011.

## C.     Federal Regulators Have Recently Found that Chase Has Engaged in Mortgage Servicing Abuses.

34.     On April 13, 2011, the Federal Reserve and the OCC announced consent orders with JPMorgan Chase & Co., EMC Mortgage Corp., and JPMorgan Chase Bank, N.A.  *See* Press

---

[11] *See* https://www.chase.com/chf/mortgage/hrm_centers.

Release, Board of Governors of the Federal Reserve System, Press Release, Apr. 13, 2011;[12] Press Release, OCC, *OCC Takes Enforcement Action Against Eight Servicers for Unsafe and Unsound Foreclosure Practices*, Apr. 13, 2011.[13]

35.     The Federal Reserve's position is that JPMC engaged in "unsafe or unsound banking practices" when, among other things, it

> failed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities to ensure timely, effective and efficient communication with borrowers with respect to Loss Mitigation Activities and foreclosure activities; and full exploration of Loss Mitigation options or programs prior to completion of foreclosure activities.

*In the Matter of JPMorgan Chase & Co. et al*, 11-023-B-HC / 11-023-B-DEO, Consent Order, at 3 (Fed. Reserve Board Apr. 13, 2011) [hereinafter "Federal Reserve Consent Order"].[14]   The OCC made similar findings regarding "deficiencies and unsafe or unsound practices" by JPMorgan Chase, N.A.  OCC Consent Order, at 1.  In addition, the OCC found that, among other abuses, JPMorgan Chase, N.A. assessed "fees and expenses chargeable to the borrower" in connection with foreclosure proceedings without verifying the basis for such charges.  OCC Consent Order, at 2; *see also* Federal Reserve Consent Order, at 3.

36.     A key provision of the Federal Reserve Consent Order is that JPMC must ensure that illegal or "otherwise unreasonable" fees—such as unnecessary, unsubstantiated, excessive, or bogus fees for services that were never performed—assessed against mortgagors are detected. Federal Reserve Consent Order, at 9; *see also* OCC Consent Order, at 15-16 (requiring assessment of reasonableness of fees).

37.     In addition, both the Federal Reserve and the OCC have acknowledged that Chase pursued foreclosures "when an application for a loan modification or other Loss Mitigation was under consideration" or "when the loan was performing in accordance with a trial or permanent loan modification."  OCC Consent Order, at 16; *see also* Federal Reserve Consent Order, at 9. Moreover, as both the OCC and the Federal Reserve acknowledged, Chase mishandled loan

---

[12] *Available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm.
[13] *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.
[14] *Available at*
  http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a5.pdf.

modifications.  This is demonstrated by their requirement that Chase review whether

> Loss Mitigation Activities with respect to foreclosed loans were handled in
> accordance with the requirements of HAMP, and consistent with the policies and
> procedures applicable to the Bank's proprietary loan modifications or other loss
> mitigation program, such that each borrower had an adequate opportunity to apply
> for a Loss Mitigation option or program, any such application was handled
> properly, a final decision was made on a reasonable basis, and was communicated
> to the borrower before the foreclosure sale.

OCC Consent Order, at 16; *see also* Federal Reserve Consent Order, at 9-10.

38.     Though the head of Chase has said that Chase will "pay for [its] mistake" in

handling foreclosures, no compensation has been offered to Plaintiffs or the Class for the types

of damages set forth herein.

**D.     Chase Participates in the Home Affordable Modification Program (HAMP).**

39.     In bringing this case, *Plaintiffs do not seek to assert a private right of action*

*under HAMP.*  However, because Plaintiffs have brought a contract claim asserting third-party

beneficiary rights under Chase's contract with the federal government, and because some of the

many written documents that Chase uses in its larger mortgage modification scheme purport to

be sanctioned by and compliant with HAMP, Plaintiffs provide the following background on

Chase's participation in HAMP.

40.     On July 31, 2009, Michael R. Zarro, Jr., Senior Vice President of JPMorgan

Chase Bank, N.A., executed a Servicer Participation Agreement ("SPA") with the federal

government.  Ex. 1 (Commitment to Purchase Financial Instrument and Servicer Participation

Agreement for the Home Affordable Modification Program under the Emergency Economic

Stabilization Act of 2008); *see also* Ex. 2 (Amended and Restated Commitment to Purchase

Financial Instrument and Servicer Participation Agreement executed on March 24, 2010).  By

entering into the SPA, Chase covenanted that all services would be performed in compliance

with all applicable federal, state, and local laws, specifically including state laws designed to

prevent unfair, discriminatory, or predatory lending practices.  Exs. 1 & 2 at "Financial

Instrument" ¶ 5(b).  Chase also covenanted that it would perform services in accordance with the

"practices, high professional standards of care, and degree of attention used in a well-managed

operation, and no less than that which the Servicer exercises for itself under similar

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 13

1    circumstances," as well as "use qualified individuals with suitable training, education, experience

2    and skills to perform" services.  *Id.* ¶ 5(d).

3         41.    The SPA mandates that a participating servicer follow all guidelines, procedures,

4    and directives issued as a part of the HAMP.  According to the first supplemental directive

5    ("SD") issued under the HAMP, participating servicers "will use a uniform loan modification

6    process to provide a borrower with sustainable monthly payments."  Home Affordable

7    Modification Program, Supplemental Directive 09-01, 4/6/2009, SD 09-01, at 1 [hereinafter

8    HAMP SD].[15]  *See also* MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF

9    NON-GSE MORTGAGES 11 (ver. 3.0, Dec. 2010) [hereinafter MHA HANDBOOK]; *see also,*

10   *generally*, MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF NON-GSE

11   MORTGAGES (ver. 3.1, May 2011); MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR

12   SERVICERS OF NON-GSE MORTGAGES (ver. 3.2, June 2011).

13        42.    As a participating servicer, Chase is required to evaluate all loans that are 60 or

14   more days delinquent or appear to be *at risk* of imminent default, to determine which loans meet

15   the HAMP eligibility criteria.  HAMP SD 09-01 at 4.  Chase is also required to consider a

16   HAMP modification if, after receiving hardship information from a borrower, "the servicer

17   concludes a current borrower is in danger of imminent default . . ."  *Id.* at 13.  There is *no*

18   requirement of default status in order to be considered for a HAMP modification.  *Id.* at 3-4.

19   Servicers are required to suspend foreclosure proceedings during HAMP evaluations and during

20   trial modification periods.  *Id.* at 14.  Finally,

21            When discussing the HAMP, the servicer should provide the borrower with
             information designed to help them understand the modification terms that are
22           being offered and the modification process.  Such communication should help
             minimize potential borrower confusion, foster good customer relations, and
23           improve legal compliance and reduce other risks in connection with the
             transaction.  A servicer also must provide a borrower with clear and
24           understandable written information about the material terms, costs, and risks of
             the modified mortgage loan in a timely manner to enable borrowers to make
25           informed decisions.

26   *Id.* at 13; *see also* MHA HANDBOOK at 45.

27   _____

     [15] All Supplemental Directives are available at https://www.hmpadmin.com/portal/programs/
28      guidance.jsp (last visited March 11, 2011).

43.     Chase is also required to acknowledge in writing the receipt of borrowers' initial HAMP application packages within 10 business days and to include in their response a description of their evaluation, as well as a timeline for processing paperwork.  HAMP SD 09-07, 10/8/2009, at 1; *see also* MHA HANDBOOK at 47.  Beginning in March 2010, Chase was required to provide a toll-free number in all communications with borrowers that would allow them to reach a representative capable of providing specific details about the HAMP modification process.  HAMP SD 10-02 3/24/2010, at 4; *see also* MHA HANDBOOK at 45.

44.     Chase is further required to offer permanent modifications to certain qualified borrowers—without discretion.  HAMP SD 09-01, 4/6/2009, at 4; *see also* MHA HANDBOOK at 77.  The HAMP servicer's Handbook clearly defines the process that servicers must follow to evaluate loans for modification.  Servicers are required to use a standardized Net Present Value ("NPV") test that compares the NPV result for a modification to the NPV result for no modification.  A positive NPV indicates that a modified loan is more valuable to the investor than if the loan is not modified.  In the case of a positive NPV, HAMP rules *require* the servicer to offer the borrower a mortgage modification.  MHA HANDBOOK at 73.

45.     By signing the SPA, Chase was legally bound to comply with HAMP guidelines—that were designed to benefit mortgagors such as Plaintiffs and the proposed Class—including those guidelines requiring Chase to: (1) timely identify loans facing default, (2) timely evaluate such loans by applying a standardize NPV, and (3) offer permanent modifications for all loans with a positive NPV.  *Id.*  Repeatedly, Chase fails to live up to its promise, choosing instead to maximize its own profits.

46.     In the event Chase determines that a loan being considered for modification does not have a positive NPV, HAMP guidelines require Chase to "send a Non-Approval Notice and consider the borrower for other foreclosure preventions options, including alternative modification programs, DILs, and short sale programs."  MHA HANDBOOK at 73.

47.     Additionally, Chase is required to retain all HAMP-related documentation for each loan serviced for a period of seven years from the receipt or creation of such

documentation, including:  (a) all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up; (b) all documents and information related to the monthly payments during and after the trial period, as well as incentive payment calculations and such other required documents; (c) detailed records of borrower solicitations or borrower-initiated inquiries regarding HAMP, the outcome of the evaluation for modification under HAMP and specific justification with supporting details if the request for modification under HAMP was denied (Chase's Records must also be retained to document the reason(s) for a trial modification failure); (d) if a HAMP modification is not pursued when the NPV result is "negative," documentation of Chase's consideration of other foreclosure prevention options; and (e) if a borrower under a HAMP modification lost good standing, documentation of Chase's consideration of the borrower for other loss mitigation alternatives.  HAMP SD 09-01 4/6/2009, at 13-14; *see also* MHA HANDBOOK at 25-26.

48.     The Federal Reserve has recently explicitly acknowledged that Chase has "contractual obligations" with the Federal Housing Administration directly, as well as with mortgagors where "required by the Home Affordable Modification Program."  Federal Reserve Consent Order, at 5; *see also* OCC Consent Order, at 6.

49.     Yet, Chase routinely fails to meet its obligations under its HAMP contract with the federal government—obligations that were incurred for the benefit of mortgagors such as Plaintiffs and the proposed Class—by, *inter alia*, failing to diligently attempt to implement permanent modifications for eligible mortgagors, keeping inadequate records, failing to disclose accurate information to mortgagors, charging unreasonable fees without explanation, violating federal and state laws, and leaving mortgagors in limbo regarding the status of their loans.

50.     Chase further routinely fails to abide by the terms of its HAMP contracts with mortgagors, which incorporate the requirements of the program as definite terms.

51.     Chase receives $1,000 for each HAMP modification it processes.  MHA

1   HANDBOOK at 92.  While Chase has an incentive to profit from these taxpayer dollars, Chase has

2   devised a scheme to profit exponentially more from the very mortgagors it has been tasked to

3   assist in stringing along loan modifications to maximize fees and other revenue—and not

4   finalizing HAMP or any other (non-HAMP) loan modifications.

5   **E.      Chase Benefits From Extracting as Many TPP or Other Temporary Plan Payments**
    **as Possible from Borrowers in Distress.**

6          52.      Chase stands to profit substantially by extracting as many trial or temporary

7   payments as possible from borrowers in distress.  Borrowers who qualify to participate in HAMP

8   are borrowers who are in default or are at risk of imminent default.  These borrowers are not able

9   to pay their monthly mortgage payments in full.  Thus, Chase has two choices: invite the

10  borrower to apply for a loan modification or foreclose.  By the terms of its SPA, Chase is

11  required to consider all eligible mortgagors for a modification.  However, beyond mere

12  compliance with the terms of the SPA, Chase has its own financial reasons for inviting struggling

13  mortgagers to apply for a modification and make trial payments.

14         53.      While Chase receives $1,000 from the U.S. Government for each HAMP

15  modification it processes, it stands to make thousands more by collecting fees and interest on

16  loans that are past due, in default or otherwise troubled.   Based on this unfortunate economic

17  reality, Chase devised a scheme, many times (but not always) under the guise of HAMP, to take

18  advantage of the very mortgagors it has been tasked to assist by impermissibly delaying loan

19  modifications in order to collect excessive fees on troubled mortgages.  Chase also utilizes

20  various other non-HAMP "workout" options to lure borrowers into continuing to make payments

21  pursuant to various written materials it sends mortgagors as it promises forbearance, assistance,

22  and a modified loan.  Whether dangling a HAMP modification or some other proprietary

23  modification or payment plan in front of struggling homeowners, Chase has exploited growing

24  awareness of the HAMP program among mortgagors who believe that Chase invokes it as a

25  means to the end that Congress intended—assisting them in obtaining efficient and timely

26  modifications and keeping their homes.  Sadly, these mortgagors are mistaken.

27         54.      According to a report published by the National Consumer Law Center, a

28

servicer's primary source of income is a "monthly servicing fee, [which is] a fixed percentage of the unpaid principal balance of the loans in the pool" of loans that is being serviced. DIANNE E. THOMPSON, NAT'L CONSUMER LAW CTR, WHY SERVICERS FORECLOSE WHEN THEY SHOULD MODIFY AND OTHER PUZZLES OF SERVICER BEHAVIOR vi (2009) [hereinafter THOMPSON, PUZZLES]. Therefore, there is a significant incentive for a servicer like Chase to delay foreclosure as long as a mortgagor is making payments in *any* amount. As the report explains,

> [t]he monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable on the long term. In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees.

*Id.* Thus, by stringing a mortgagor along in a drawn out modification process, Chase can maintain its fees without ever having to actually modify. If, in the end, Chase is forced to modify the loan by, for example, the involvement of a regulator, Chase still profits substantially, as accrued fees and interest are added onto the principal of the loan, increasing the servicing pool and therefore the servicing fee.

55. Additional incentives for Chase to string along borrowers abound. For example, Chase may be required to repurchase loans from the investors in order to permanently modify the loans, presenting a substantial cost and lost revenue to Chase that Chase can avoid if it keeps loans in a state of constant default until it eventually forecloses. THOMPSON, PUZZLES, at 9. Further, Chase may collect not only fees purportedly related to foreclosure, but also late fees, processing fees, or other sums that are added to the principal loan amount, increasing the unpaid balances in mortgage pools, and thereby increasing monthly servicing fees. *Id.* at vi. Finally, entering into permanent modifications with borrowers may delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, may well be less clear and less generous. *Id.* Servicers get paid before investors, and servicers like Chase have every incentive to leverage this reality to their own benefit, to the detriment of mortgagors and investors alike. *See The Worsening*

*Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?: Hearing Before the Subcomm. on Administrative Oversight and the Courts*, 111th Cong., at 15 (July 23, 2009) (written Testimony of Alys Cohen).

56.     Furthermore, under California's non-judicial foreclosure rules, if Chase elects to foreclose—such as by sending notices of default, posting foreclosure notices, scheduling trustee sales, notifying mortgagors of trustee sales it has scheduled, or otherwise notifying mortgagors of its intent to pursue foreclosure—the distressed borrower has no legal obligation to make payments on the loan, and Chase has no legal ability to collect any such payments.

57.     Thus, it is in Chase's best interest to invite borrowers to participate in HAMP or other modification, forbearance, or repayment plans, allowing Chase to continue its servicing relationship with the borrower to increase the amount of money it can collect, particularly where a mortgagor may owe more than the house could be sold for in a foreclosure sale.  In theory, this natural incentive for Chase to participate in HAMP may suggest one reason the HAMP program should be effective.

58.     However, many loan servicers, including Chase, have found that they can increase their profits by abusing the HAMP application process and misleading borrowers, rather than genuinely offering eligible borrowers permanent modifications.  Meanwhile, Chase profits from double tracking mortgagors—initiating and actively pursuing foreclosure while simultaneously collecting payments from mortgagors pursuant to illusory promises of forbearance, permanent modifications, or other "permanent workout solutions."

59.     On information and belief, Chase's internal compensation scheme is directly tied to this process, incentivizing Chase employees to get mortgagors to keep sending payments by any means—the most effective being promises of loan modifications and forbearance, including when borrowers may not be eligible for modifications and Chase intends to foreclose in any event.

60.     Chase is gaming HAMP—using it as a carrot to entice mortgagors to keep making payments.  While Chase uses non-HAMP modification programs, forbearance plans, repayment plans, and other devices to accomplish this same goal, Chase's invocation of the well-known

federal program designed to *assist* struggling homeowners is particularly offensive.

61.    Once Chase has elected its option to foreclose by initiating proceedings, mortgagors must rely on Chase's assurances that the sales are "suspended," "postponed," or otherwise "on hold."  Mortgagors are completely at the mercy of Chase and have no way of independently verifying or enforcing these promises.  Instead, mortgagors must meet Chase's demands to continue making payments under trial period plans in hopes of forbearance, receiving a modification, or securing an alternative permanent "workout" solution.

62.    Under this scheme, Chase never intends to provide the majority of applicants a loan modification.  Rather, Chase's goal is to keep loans in default and arrears for as long as possible before ultimately foreclosing or offering long delayed permanent modifications to maximize its fees and the payments it can extract from distressed mortgagors.  This is precisely what Chase accomplishes by inviting borrowers to participate in HAMP (or other loan modification programs) and then encouraging them to continue making TPP or other temporary payments when Chase has no intention of complying with HAMP requirements and/or offering permanent modifications, as Plaintiffs' experiences exemplify.

**F.    Chase Intentionally Misleads Borrowers by Stating that it Will Timely Evaluate Borrowers for Eligibility and Offer Permanent Modifications to Qualifying Borrowers, Without the Intent to Do So.**

63.     Central to its protracted mortgage modification scheme, Chase routinely presents borrowers seeking modifications with the same or substantially similar forbearance/modification offer packages.  A single borrower may receive multiple offer packages in the course of seeking a loan modification.

64.    On information and belief, these forbearance/modification offer packages include any one or combination of the following standard form <u>written</u> materials—drafted *solely* by Chase.  These standard form written materials are routinely offered to mortgagors in conjunction with *repeated <u>verbal</u> promises* to timely review mortgagor loan modification applications and to help mortgagors obtain permanent loan modifications reducing the monthly payment amounts to make loans more affordable and avoid foreclosure:

A.    **"Forbearance Plans"** (temporary reductions in payments).  *See*, *e.g.*, Ex.

44 (listing available "workout options").  A "Forbearance Plan" is a "temporary reduction in your current payment to provide time for you to improve your financial circumstances."  *Id.*  On information and belief, Forbearance Plans purport to provide a short-term reduction in payments, a promise not to pursue foreclosure, and are routinely used as an enticement to obtain a permanent loan modification.

B.      **"Repayment Plans"** (temporary increases in payments to cure delinquencies over a short period of time).  *See*, *e.g.*, Ex. 44 (listing available "workout options").  "An agreement structured to cure the delinquency over a period of months while continuing to make contractual payments."  *Id.*  On information and belief, Repayment Plans purport to provide a means to repay an arrearage over a short period of time, include a promise not to pursue foreclosure, and are routinely used as an enticement to obtain a permanent loan modification.

C.      **"Reduced Payment Plans"**  On information and belief, Reduced Payment Plans promise a reduction in payments, contain a promise not to pursue foreclosure, and are routinely used as an enticement to obtain a permanent loan modification.

D.      **"Trial Period Plans" ("TPPs").**  TPPs typically promise the borrower that if: (1) his/her representations about his/her financial state continue be true, and (2) he/she complies with the terms of the of the trial period plan, and (3) he/she provides all required documentations, and (4) the Lender determines he/she qualifies, then "the Lender will send [him/her] a Modification Agreement . . . for . . . signature which will modify [his/her] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  *See* Ex. 3; *see also* Exs. 4, 18, 40, 52 (similar terms).  Many of these documents are identified as a "HAMP TPP," leaving no doubt that Chase is promising to evaluate the borrower's application pursuant to HAMP guidelines.  *See* Ex. 3.  Other versions of TPPs, however, are labeled as a "CHAMP" TPP or "Chase Trial Period Plan (TPP)," suggesting they are proprietary documents offered by Chase.  *See* Ex. 52.  Moreover, the Chase Trial Period Plan document purports to be, itself, a "Mortgage Modification."  *Id.*  On information and belief, TPPs and "Mortgage

Modifications" purport to provide a short-term reduction in payments, contain a promise not to pursue foreclosure, and are routinely used as an enticement to obtain a permanent loan modification.

E.    **"Trial Period Cover Letters."**  These are form cover letters sent to every borrower receiving a HAMP TPP.  The "Trial Period Cover Letter" states in its first paragraph that "If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we *will modify your mortgage loan and you can avoid foreclosure*."  *See* Ex. 5; *see also* Ex. 39(emphasis added).

F.    **"Loan Modification Agreements."**  On information and belief, Chase offers both "HAMP" and "CHAMP" Loan Modification Agreements.  *See, e.g.*, Ex. 32.

G.    **Other Proprietary—or non-HAMP—modification programs offered by Chase.**  Chase has full discretion and control over these programs and may utilize them at its option.

65.    On information and belief, Chase sends variations of the same forms or solicitations described above as part of its forbearance/modification offer packages to each borrower that seeks a loan modification.

**G.    Plaintiffs and Members of the Proposed Class Have Been Subjected to Chase's Common Course of Conduct.**

66.    Plaintiffs and members of the Class have each experienced the following common course of conduct by Chase:

A.    **Hardship and Default.**  Plaintiffs and members of the proposed Class have all experienced some form of hardship that has required them to (1) fall behind on their mortgage payments or (2) alert Chase that they may have difficulty making payments in the future before ever missing a payment, to which Chase routinely responds by *directing* mortgagors to become delinquent by intentionally missing payments.  In either scenario, Chase proceeds to take advantage of the mortgagor's default.

B.    **Forbearance/Modification Offer Packages.**  Chase's

forbearance/modification offer package consists of two parts: (1) <u>verbal</u> promises of an eventual permanent modification, promises that Chase will timely review and process loan modification applications, assurances of forbearance, solicitations to seek a modification, and representations that certain <u>written</u> materials are *part* of the modification process; and (2) <u>written</u> materials that engage mortgagors in Chase's scheme while reinforcing their reliance on the verbal part of the packages.  Plaintiffs and members of the proposed Class routinely receive one or more documents as part of Chase's forbearance/modification offer package.  Described more fully *supra*, these standard form written materials include:

      i.      Forbearance Plans;

      ii.     Repayment Plans;

      iii.    Reduced Payment Plans;

      iv.    Trial Period Plans (TPPs);

      v.     Trial Period Cover Letters;

      vi.    "HAMP" or "CHAMP" Loan Modification Agreements; and/or

      vii.   Other Proprietary (non-HAMP) Modifications offered by Chase.

      C.     **A Protracted Process.**  Plaintiffs and members of the proposed Class uniformly fail to obtain the relief they seek from Chase in a timely manner—and sometimes never.  Where Chase does eventually permanently modify a loan, Chase grossly delays modifications to the end of increasing its servicing fees by increasing principal balances, imposing late charges, and imposing other expenses.  Chase does this in contravention of its promises to borrowers that their applications will be reviewed in 90-120 days.  Chase pursues foreclosure and hangs foreclosure over mortgagors' heads as it drags them through the modification process.  Sometimes, Chase forecloses after months or years of engaging in the modification process on grounds that Chase knew or should have known at the outset, causing mortgagors to pour precious resources into a futile effort.

      D.     **"Lost" or Destroyed Documents.**  Plaintiffs and members of the

proposed Class have experienced a remarkably uniform pattern of repeatedly sending the same documents to Chase, receiving confirmation that documents are received and adequate, and then being told that the documents are lost, missing, incomplete, or otherwise defective.  This causes repeated provision of the same or similar documents by Plaintiffs and members of the proposed Class—a waste of their time, a drain on their resources, and a continual source of stress and frustration.

E. **Unexplained and/or Unreasonable Fees and Interest.**  Plaintiffs and members of the proposed Class have been charged late fees while they are making regular monthly payments, foreclosure related fees that are excessive and/or inadequately disclosed, and wholly unexplained "other" fees.  Plaintiffs and members of the proposed Class have also been persuaded to "agree" to pay unreasonable fees that only enrich Chase, such as fees for Western Union or telephone payments, which, on information and belief, further enrich Chase at the expense of mortgagors.  Plaintiffs and members of the proposed Class have been charged excessive interest on principal amounts for which Chase refused to apply payments in a timely manner, adding substantially to mortgagors' overall debt.

F. **Good Faith Performance and Compliance.**  In the face of constantly shifting demands, a confusing process, repeated phone calls with Chase representatives where they receive continual verbal assurances, and endless contradictions, Plaintiffs and members of the Class have in good faith sought to save their homes from foreclosure and obtain permanent loan modifications so that they can move on with their lives.  They have asked for help, followed up, and attempted to navigate Chase's impenetrable bureaucracy.  They have sent in countless payments requested by Chase.  They have sent in documents many times over.  Instead of doing what it promises, Chase has wasted hours of their time, inexplicably ignored their performance, accepted their regular and voluminous mortgage payments, and taken advantage of mortgagors who have almost zero bargaining power or leverage when compared with Chase.

67. Chase intentionally misleads borrowers when it fails to make a good faith effort at

timely or reasonable compliance with its own promises to borrowers, who accept, comply with, and rely on Chase's forbearance/modification offer packages.

68.    Borrowers rely on Chase's forbearance/modification offer packages when they sign TPPs, Forbearance Plans, Repayment Plans, Loan Modification Agreements, or other documents, and then comply with the terms thereof, perform under the contracts to modify, and provide valuable consideration to Chase for which Plaintiffs and the Class receive nothing in return except harassment, frustration, requests for more documentation, and requests for more payments.

**H.    Chase's Common Course of Conduct is a Result of Uniform Policies and Practices.**

69.    Chase sets mortgagors up for failure in the modification process and causes undue delay.  This delay is profitable to Chase and devastating to mortgagors.

70.    On information and belief, Chase loss mitigation and underwriting personnel are inadequately supervised and mismanaged.

71.    On information and belief, Chase routinely, and as a matter of policy, instructs borrowers—falsely—that they must fall behind on their mortgage payments in order to be eligible for a loan modification.

72.    On information and belief, Chase employees actively seek to promptly place mortgagors in Forbearance Plans, Repayment Plans, or other temporary payment plans while routinely promising that Chase will consider them for loan modifications, because both Chase and its employees stand to reap hefty profits when mortgagors continue making payments and/or start multiple new payment plans.  These profits include large bonuses to individual employees who bring in immediate payments pursuant to arrangements that allow Chase to charge fees and grow mortgagor debt while delaying permanent modifications or pursuing foreclosure.

73.    As part of its forbearance/modification offer packages, Chase makes repeated assurances, both in writing and verbally, that forbearance will continue and that permanent modifications will be forthcoming *in a timely manner*.  On information and belief, Chase employees routinely promise, pursuant to Chase policy, that review of mortgage modification applications will occur in 90-120 days.  Promises of timely review are routinely broken, and

mortgagors remain in modification holding patterns for many months or years.

74.     On information and belief, the verbal promises described herein are administered by Chase employees pursuant to scripts and written policies created and distributed by Chase that are designed to coach employees on how to uniformly respond to mortgagor inquiries and loan modification applications.

75.     On information and belief, Chase misleads mortgagors about the status of their applications and whether it has received or retained requested documentation.

76.     On information and belief, Chase was and is incapable of processing borrower applications in the promised timeframe.  To the extent that Chase lacks the capacity to deal with the influx of borrower documents it requests, Chase has refused to establish an appropriate infrastructure, hire adequate staff, properly train staff, and purchase sufficient equipment or technology to competently and efficiently manage borrower loan files and documentation. Chase has instead chosen to profit from the up-front savings this inadequacy provides, as well as from the additional cashflow from protracted modifications that result from Chase's structural failures.

77.     On information and belief, Chase's refusal to invest in infrastructure, staffing, and training includes a shortage of underwriters, poorly trained or untrained underwriters, a deficient and non-functional document management system, an inability to keep track of borrower faxes or communications, and the long-term use of a single fax machine to receive thousands of borrower documents from around the country.  Chase failed to organize and track documents, misplaced them, and allowed them to stagnate.  On information and belief, Chase had inadequate backup systems.  Chase failed to have enough underwriters to ensure that documents would not be out of date by the time underwriters saw them.

78.     On information and belief, Chase not only negligently handled mortgagor documents, frequently losing them or incompetently processing them, Chase also created an environment where intentional destruction of documents flourished.  On information and belief, underwriting employees tampered with file start dates, destroyed loan files, and pretended to lose documents.  On information and belief, Chase *intentionally destroyed or cancelled* thousands of

AMENDED CLASS ACTION COMPLAINT                                    (Case No. 11cv0530) Page - 26

mortgagor loan modification files, causing modification denials en masse and wreaking havoc on thousands of mortgagors' lives.

## I.   Plaintiff Dianna Montez's Attempts to Secure Permanent Loan Modification Were Repeatedly Thwarted by Chase's Misleading Practices.[16]

79.     Plaintiff Dianna Montez has lived in her home in San Diego, California for nearly 22 years.

80.     In 2005 she was approached by Washington Mutual with an offer to refinance her home mortgage loan.  She accepted Washington Mutual's offer, transferring her debt and the servicing rights thereof to Washington Mutual.  Her mortgage loan payments varied, but as of January 2009 were $2,300.05.

81.     In the fall of 2008, Washington Mutual was taken over by the Federal Deposit Insurance Corporation when it became apparent that it would not be able to meet its obligations, largely due to Washington Mutual's expansion of its high-risk subprime mortgage loan origination and securitization activities.  It was promptly resold to JPMorgan Chase & Co.  As a result of this deal, the servicing rights of Ms. Montez's mortgage loan were acquired by JPMorgan Chase Bank, N.A.

82.     In February of 2009, Ms. Montez's husband lost his job.  At this time, Ms. Montez maintained very good credit and did not want to jeopardize her credit standing by falling behind on her mortgage payments.  While she very much wanted to keep her long-time home, she recognized that if she would not be able to continue making payments at the current level, she may have to sell her house.

83.     While still current on her payments and hoping to avoid losing her home, Ms. Montez phoned Chase (which at that time was still operating as Washington Mutual) to inquire

---

[16] Ms. Montez does not concede the accuracy of the representations made by Chase with respect to the number of missed payments, the monetary figures, or purportedly missing documentation presented in any of Chase's documents described herein.  Moreover, Ms. Montez does not have complete records at this time, and Chase's records have proven unreliable, contradictory, and arbitrary.  Accordingly, Ms. Montez does not concede that she missed any particular payments, owed any particular debt, or failed to send any paperwork to Chase during the time period covered by this Amended Complaint.  Her allegations are based on the best records currently available to her and will be amended as necessary.

about a loan modification in February 2009.  She was instructed to complete an application and was told that she would be contacted by a "work-out specialist"—purportedly someone who could guide her through the modification process—within 21 days.  Pursuant to this conversation, Ms. Montez visited the local Chase branch, located at 13275 Black Mountain Rd., San Diego, CA, and faxed her completed "Borrowers Assistance Form" that had been provided by Chase in her earlier conversation, along with several supporting documents including a hardship letter, two months bank statements, and 2008 tax forms.  Chase confirmed receipt of her fax.

84.     So began Ms. Montez's two-year ordeal trying to get a loan modification from Chase.

85.      Between July 2009 and February 2010, Ms. Montez received at least four different temporary payment plans and was forced to restart the application process several times.  To this day, her request for a modification remains unresolved.  The payment plans typically consisted of three trial plan payments, which Chase assured Ms. Montez would be followed by a permanent loan modification.  Chase assured Ms. Montez that it would not take her house.

86.     On information and belief, the various temporary payment plans and related documents that Chase sent to Ms. Montez for signature are standard forms—the terms of which were drafted entirely by Chase—that Chase used and continues to use repeatedly with mortgagors in the Class.

87.     Despite Chase's representations that compliance with its "plans" or "agreements" would reduce Ms. Montez's total arrearages, her compliance has apparently only increased them and allowed Chase to assess unrestrained fees to inflate her purported obligations, with no end in sight.  Compare Ex. 6 (Notice of Collection Activity dated June 1, 2009) with Ex. 7 (Notice of Default and Election to Sell as of July 13, 2009) (illustrating several thousand dollar increase in a matter of weeks).

88.     As described more fully below, relying on Chase's repeated verbal representations that compliance with these plans would lead—in a timely manner—to a more

affordable and permanently modified loan, Ms. Montez made every effort to meet Chase's ever evolving requirements, and sought clarification and/or adjustments from Chase when appropriate.  Ms. Montez made all of the required payments under the third payment plan Chase offered her, until it was superseded by the fourth one.  Ms. Montez also made all of the required payments under the fourth payment plan Chase offered her, and continued to make many additional payments under that same plan in good faith.  During this time, Ms. Montez received multiple verbal assurances from Chase representatives who told her that if she would continue on, send additional documentation, and generally cooperate, she would at last receive the affordable modification she had been promised many months before.  She has yet to receive that modification, and the modification review process has been anything but timely.  The fourth payment plan stated that compliance would operate to stall foreclosure.  Chase nevertheless actively pursued foreclosure and a sale was scheduled until days before Ms. Montez initiated this lawsuit.

89.     Chase has sent Ms. Montez multiple default notices and started and pursued foreclosure proceedings against Ms. Montez, scheduling a Trustee's Sale at least twice, with many more informal—and unwritten—"postponements."  The notices contain confusing information about the amount Ms. Montez purportedly owes:

(a) June 1, 2009, claiming amount due of $4,909.52 (Notice of Collection Activity), *see* Ex. 6;

(b) July 13, 2009, claiming amount due of $8,464.29 (Notice of Default and Election to Sell Under Deed of Trust), *see* Ex. 7;

(c) August 31, 2009, claiming total amount due of $489,906.22 (Payoff Statement), *see* Ex. 8;

(d) January 2010, claiming total amount due of $499,865.08 (Notice of Trustee's Sale), *see* Ex. 9; and

(e) January 2011, claiming total amount due of $499,865.08 (Notice of Trustee's Sale), *see* Ex. 10.

The arrearages in these documents bear little relation to Ms. Montez's payment history.  They increase dramatically over very short periods during which she is making payments, *compare* (a) *with* (b), and despite making payments during the intervening year, Ms. Montez appears not to

have gained a single cent of progress between January 2010 and January 2011, *compare* (d) *with* (e).  No one at Chase has ever explained how they arrived at these figures, and the state of her account at Chase remains unclear to Ms. Montez.

### 1. The Runaround.

90.    In early February of 2009, Ms. Montez asked her financial planner to help her obtain a loan modification.  Ms. Montez and her financial planner called Chase together several times a week to ascertain the status of Ms. Montez's mortgage and application for a modification.  They had trouble obtaining any information because they were frequently placed on hold for long periods of time and only rarely were able to speak to the same Chase representative twice.

91.    In March of 2009, Ms. Montez sent Chase additional documentation at Chase's request.  Believing that she would receive a new payment amount on a modified basis, Ms. Montez stopped her pending March mortgage payment and waited for instructions on her new payment amount.

92.    On March 30, 2009, having not been contacted about her modification application, Ms. Montez called Chase.  She spoke with a Chase employee who identified herself as "Jackie" and who refused to provide a last name, an employee ID number, or her direct phone line.  Jackie told Ms. Montez that Chase could not locate her documents.  Jackie told Ms. Montez that things were disorganized due to the transition from WaMu to Chase, and asked for patience.

93.    After insisting that she had already faxed the correct documentation to Chase, and that Chase had confirmed receipt of her documentation, Ms. Montez again faxed the same documentation to the number Jackie provided.  *See* Ex. 11 and 12 (HAMP applications).  While this was the first time Ms. Montez was asked to resend documentation that Chase had previously acknowledged receiving, it would not be the last.  Over the next year and a half, Ms. Montez would fax documentation to Chase dozens of times.  Much of that documentation was duplicative of previous transmittals.

94.    In April 2009, two months after originally applying for a modification, Ms. Montez was again informed that Chase had lost her paperwork.  A Chase employee who

identified herself as "Vickie" in the "back office" told Ms. Montez that in order to obtain a modification, she would have to fall behind on her payments so that she would "move up on the list to get help." Ms. Montez objected to this idea, as she was afraid it would hurt her credit, but Vickie told her that she would not be reported to a credit bureau. Ms. Montez's financial planner, who was also on the call, had the same objections as Ms. Montez, but he too was told that the best course of action would be for Ms. Montez to stop making her mortgage payments.

95.     Throughout May and June of 2009, Ms. Montez continued to pursue a modification. She repeatedly contacted Chase, making dozens of phone calls, but found it impossible to speak with anyone who was familiar with her file. As directed in her April 2009 conversations with Chase employees, Ms. Montez did not make her monthly mortgage payments during this time period. She repeatedly faxed in more documents and continuously called Chase to check on the status of her modification application.

96.     On or about June 6, 2009, Ms. Montez received a "Notice of Collection Activity" dated June 1, 2009 from WaMu, informing her that she had failed to make payments on her mortgage. The letter listed a total amount due of $4,909.52—including $248.57 in "Late Charges" and $60.85" in "Outstanding Fees." *See* Ex. 6.

97.     Ms. Montez called Chase on or about June 6, 2009 to inquire about the Notice, and was told that she should expect a workout call that week, between June 8 and June 12, 2009.

98.     On or about June 10, 2009, Ms. Montez spoke with a Chase employee who identified herself as "Rachel," ID#8147 in "Loss Mitigation." Rachel explained that there had been an error with Ms. Montez's paperwork, but that she could see on her computer screen that Chase had everything necessary to process the modification. Rachel said that the application was in process and they were still waiting for a negotiator to be assigned.

99.     On or about June 11, 2009, Ms. Montez spoke with a Chase employee who identified herself as "Tamitha" in the "Loan Mitigation" department, who told her that her account should be scheduled for a negotiator within three days, and that she should call back next week to find out the name of the negotiator.

100.     On or about June 15, 2009, Ms. Montez received a letter from Chase dated June 8,

2009 that directly contradicted what Ms. Montez had been told by Chase employee Rachel just five days earlier. The letter stated "we are canceling your request for a loan workout because Incomplete Application [*sic*]." *See* Ex. 13. The letter continued, "we have no choice but to continue with the normal default servicing activities commenced on this loan before your workout request was submitted." *Id.* Furthermore, despite previous guarantees to the contrary by multiple Chase employees, the letter informed Ms. Montez that, "We have told a credit bureau about a late payment, missed payment or other default on your account. This information may be reflected in your credit report." *Id.* The letter further informed Ms. Montez that Chase is acting as a "debt collector." *Id.*

101.    Following receipt of this letter, Ms. Montez immediately contacted Chase. She talked to a Chase employee who identified himself as "Phillip," ID#Z263478, who said it was a "mistake" and that Chase would "fix it." Ms. Montez was told to "ignore" the letter, and that it was sent out automatically and did not reflect the status of her modification.

102.    In that same phone conversation with Phillip, Ms. Montez and her financial planner were told that it is Chase's policy to advise customers who are seeking a modification to stop making payments. Phillip also said that he could see that Ms. Montez had called multiple times, and that she had faxed her documentation multiple times. He confirmed that none of her paperwork had been lost, and told Ms. Montez and her financial planner that he would personally take care of her application, and that she did not have to send in a "fifth packet." He said a negotiator should have been assigned by then, and volunteered that he had never seen paperwork "handled so poorly." Following this conversation, however, Ms. Montez never spoke with Phillip again, as the phone number he provided did not work.

103.    Ms. Montez spoke with a Chase representative who identified herself as "Mary Ela," ID#2259841 on July 2, 2009, who claimed she was adding to the notes in Ms. Montez's file that all paperwork had been received numerous times and that everything was in order. Mary Ela told Ms. Montez that sending her file to "Mitigation Foreclosure" had been a mistake that never should have happened. Mary Ela promised to "escalate" the modification process that Ms. Montez had started in March and assured a timely review.

AMENDED CLASS ACTION COMPLAINT                                        (Case No. 11cv0530) Page - 32

104.     Ms. Montez received a letter from Chase dated July 6, 2009 announcing a "local event" at which she could meet in person with "specialists" from Chase.  *See* Ex. 14.  Ms. Montez called the number on the letter to arrange a meeting.

105.     California Reconveyance Company sent Ms. Montez a "Notice of Default and Election to Sell Under Deed of Trust," with an amount due as of July 13, 2009.  *See* Ex. 7.  The Notice informed Ms. Montez that she owed $8,464.29—nearly double the $4,909.52 she was told she owed a few weeks earlier on June 1, 2009.  *See* Ex. 6.

106.     Chase sent Ms. Montez a letter dated July 15, 2009 that requested an IRS Form 4506-T, her tax return, and more pay stubs.  *See* Ex. 15.  Ms. Montez sent the information, perplexed as to why she had not previously received this request.

107.     With assistance from a counselor at Auritron solutions, which specializes in assisting struggling homeowners, Ms. Montez was able to arrange a conference call with a representative from the Chase Home Lending Executive Office in July of 2009.  During the July 21, 2009 conference call, Ms. Montez spoke with Chase employee Sharon Cannon, who said that she could see the multiple efforts Ms. Montez had made to obtain a modification.  Ms. Cannon told Ms. Montez that she was going to investigate why Ms. Montez's modification application was being delayed.  Ms. Montez was told that her negotiator was "Ms. Dudley."

108.     Shortly after this conversation, and five months after she originally applied for a modification, Ms. Montez received a "Trial Period Cover Letter."  *See* Ex. 16.  Also included was a "Home Affordable Modification Trial Period Plan" [hereinafter "TPP"], the first of several she would eventually receive.  *See* Ex. 3.

109.     The Trial Period Cover Letter employs clearly contractual terms at the outset: "*To accept this offer*, and see if you qualify for a Home Affordable Modification, send the 5 items listed below to JPMORGAN CHASE BANK, NA, SUCCESSOR TO WASHINGTON MUTUAL BANK, no later than AUGUST 20, 2009."  *Id.* at 2 (emphasis added).  Ex. 16.  It continues, "[i]f the trial period payments are made in amounts *different* from the amount stated your loan may not be modified," thus clearly implying that if trial period payments *are* made in amounts the same as listed in the TPP, the loan *will* be modified.  *Id.* (italics added).

110.     The July 2009 TPP states that "[i]f I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender *will* provide me with a Home Affordable Modification Agreement ("Modification Agreement"). Ex. 3.

111.     The "Trial Period Cover Letter" contains assurances that there "are *no fees* under the Home Affordable Modification program" and that "[i]f you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period." Ex. 16 (emphasis added).  On information and belief, Chase charged and collected fees in connection with its mortgage modification scheme.

112.     The "Trial Period Cover Letter" states that it "may take *up to 30 days* for us to receive and review your documents." *Id.*  The document also states that "[a]s long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started." *Id.*  In addition, the letter states that "your trial period payments will be applied to your existing loan according to the terms of your loan documents." *Id.*  On information and belief, Chase violated each and every one of these assurances with respect to Plaintiffs and the proposed Class—by delaying review well over 30 days, starting and continuing foreclosure proceedings, and utilizing "suspense" accounts in lieu of properly applying payments to mortgagor accounts.

113.     The July 2009 TPP includes payment coupons labeled "Trial Period Payment #1," "Trial Period Payment #2," "Trial Period Payment #3," and "Trial Period Payment #4 (Modification Continuation Payment)." *See* Ex. 3.  Notably, the inclusion of the fourth coupon and its reference to "continuation" suggests that a fourth payment beyond the three required would extend the modification agreement and all of its terms beyond three months, without further written modification of the agreement.  Plaintiffs and the Class received countless verbal promises outside of the terms of written TPPs that induced them to make such "continuation" or similar extra payments that were not explicitly outlined in their written materials.

114.     The July 2009 TPP required three monthly payments of $2,325.00 on August 1, September 1, and October 1, 2009, which would serve as an "estimate" of the payments to be

made under a final modification.  Ex. 3.  These payments were $25 *more* than Ms. Montez was required to pay at that time under her 2005 loan from WaMu, and unaffordable considering Ms. Montez's financial situation.  In light of the unreasonable specifications of the TPP, Ms. Montez immediately contacted Chase.  Frustrated that she had yet to make contact with her "negotiator" "Ms. Dudley," Ms. Montez inquired about who could help her.  A Chase employee who identified herself as "Candice" informed Ms. Montez that "Richard Pena" was her new "negotiator."  In addition, Candice instructed Ms. Montez to *decline* the July 2009 TPP offer because it did not meet the 31% of income criteria that was standard for HAMP modifications. Candice claimed that she would email Richard Pena and he would arrange a new offer.  Ms. Montez wrote "This option is not affordable." on the July 2009 TPP and signed and dated it July 25, 2009.  *Id.*  Candice also requested that Ms. Montez send in the same documentation that she had sent in at least six times since March 2009, as well as additional documents, which Ms. Montez sent.

115.    At this point, worried that Chase might take her home despite their many assurances to the contrary, Ms. Montez contacted her Congressional Representative, Brain Bilbray, in order to inform him of Chase's misconduct regarding her mortgage loan.  A meeting was arranged with Congressman Bilbray's assistant, Mark Schaefer, who recommended that Ms. Montez file a complaint with the Treasury Department.  Shortly after the meeting, Ms. Montez filed a complaint online, and Congressman Bilbray sent a letter dated August 14, 2009 to John Hardage, the Congressional Liaison for the Office of the Comptroller of the Currency ("OCC"), the independent bureau of the Department of Treasury in charge of regulating and supervising national banks.  *See* Ex. 17.  Ms. Montez also contacted the OCC directly later that month.

116.    On or about August 13, 2009, Ms. Montez contacted Chase's "Loan Mitigation Department" requesting to speak to her "negotiator."  Her request was refused.  Instead she talked to a Chase employee who identified herself as "Christy Sullivan."  Ms. Sullivan told Ms. Montez that she would email the "negotiator," she advised Ms. Montez to decline the TPP offer, and asked for more documents.

117.    A Chase employee who identified herself as "Deanine Picarello" informed Ms.

1  Montez in late August 2009 that Ms. Montez's "negotiator" had emailed her regarding Ms.

2  Montez's July 2009 TPP, saying that Ms. Montez would have to "let the 90 day trial period lapse

3  before Chase would consider any other loan options." The negotiator also conveyed, via Ms.

4  Picarello, a "warning" to Ms. Montez that if she failed to make the $2,325.00 payments, she

5  would not be eligible for a modification. Faced with this contradictory information, Ms. Montez

6  was at a loss to understand what to do. Since March 2009, Ms. Montez had yet to speak directly

7  with her elusive "negotiator."

8      118.    In late August 2009, Ms. Montez began receiving harassing daily phone calls

9  from Chase "specialists" who asked the same questions repeatedly. Each "specialist" would

10  state that there were no notes referencing prior phone calls or Ms. Montez's requests to rework

11  her loan. On August 24, 2009, a "specialist" named "Harold" told Ms. Montez that her

12  documentation had been received and scanned, and that he would email her "negotiator"

13  "Shanikki Dudley" so that her file could be expedited. Nevertheless, Harold informed Ms.

14  Montez that her file might sit for three months before anyone at Chase would take the time to

15  look at it.

16      119.    Following her conversation with Harold, Ms. Montez continued to receive daily

17  harassing phone calls from Chase "specialists" asking her the same questions over and over.

18      120.    On or about August 31, 2009, Ms. Montez received a WaMu "Payoff Statement."

19  *See* Ex. 8. The Payoff Statement lists various fees, including $339.76 in "Late Charges," a

20  "Recoverable Balance" of $21.70, $82.55 in "Other Outstanding Fees," a "Payoff Statement

21  Fee" of $30.00, and a "Reconveyance Fee" of $45.00.

22      121.    Ms. Montez received a second TPP in September of 2009, which specifies three

23  payments of $2,170, approximately $130 less than the monthly payment due without a

24  modification, to be paid on October 1, November 1, and December 1, 2009. *See* Ex. 18.

25      122.    This TPP contains all of the standard form terms described *supra* with respect to

26  the July 2009 TPP.

27      123.    Concerned that this plan was barely an improvement on her current payment, Ms.

28  Montez contacted Chase employee "Sharon Cannon," who told her to decline the offer as it still

AMENDED CLASS ACTION COMPLAINT                        (Case No. 11cv0530) Page - 36

did not come close to the 31% of income benchmark set by the HAMP.  Ms. Cannon advised that she would talk to Ms. Montez's "negotiator" and get back to her, that her foreclosure had been "suspended," and "not to worry."

124.    In November of 2009, Ms. Montez received her third TPP, along with another "Trial Period Cover Letter."  *See* Exs. 4 (TPP) and 5 (Trial Period Cover Letter).  These documents contain all of the standard form terms described *supra* with respect to the July 2009 TPP.

125.    The November 2009 TPP called for three payments of $1,612.00, beginning on December 1, 2009.  *See* Ex. 4.  Upon receipt of this plan, Ms. Montez was instructed by Ms. Cannon not to make the payments as they were still not 31% of her income.  *Id.*  Ms. Montez hesitantly followed these instructions and continued to contact various Chase offices in an attempt to attain a loan modification.

126.    In a letter dated November 20, 2009, Chase wrote: "Your Making Home Affordable Modification Trial Plan is at Risk."  *See* Ex. 19 (also noting that Chase is a "debt collector").  Ms. Montez contacted Sharon Cannon, who told Ms. Montez that she did not understand why the negotiator was not returning Ms. Cannon's calls or emails.  Ms. Cannon assured Ms. Montez that everything was fine and that she was "in a Trial Plan Status" and that she would "continue to try to fix this."  *Id.*

127.    On December 28, 2009, Ms. Montez received a "Notice of Expiration" from Chase stating that "the Trial Plan Offer through the Making Home Affordable Loan Modification program ('MHA') for the above-referenced account has expired" because "[y]ou have failed to make all the required trial period payments within the designated time period."  *See* Ex. 20. Notably, the letter did *not* indicate that she had "failed to send in all the required documentation."  *Id.*

128.    Upon receipt of this Notice, Ms. Montez immediately contacted Chase employee Sharon Cannon, who informed her that her previous instructions for Ms. Montez not to make the TPP payments had been incorrect.  Ms. Cannon told Ms. Montez to ignore the notice, and that it was not too late for her to begin making payments under the November 2009 TPP.  Ms. Cannon

1  relayed that Ms. Montez's "negotiator" "Ashley" said it would still be alright to send in

2  payments.

3       129.   Pursuant to this conversation, on December 28, 2009, and again on January 7,

4  2010, Ms. Montez made payments of $1,612.00, as set forth in the November TPP, and as

5  instructed by Chase employee Sharon Cannon.  Her third payment under that plan was to be due

6  February 1, 2010.

7       130.   Ms. Montez received a letter dated December 30, 2009 that said that Chase had

8  "not received all documents necessary to complete your request for a modification" and that Ms.

9  Montez had to submit two paystubs and another IRS Form 4506-T.  *See* Ex. 21.  This directly

10 contradicted the December 28, 2009 letter that explicitly did not indicate failure to send

11 documentation.  *Compare* Ex. 20 (box *not* checked for failure to send documentation).

12      131.   On or about January 19, 2010, Ms. Montez found a Notice of Trustee Sale taped

13 to her door, stating that the foreclosure sale would occur in on February 9, 2010.  *See* Ex. 9.

14      132.   Upon finding the Notice of Trustee Sale, Ms. Montez immediately contacted

15 Chase, and was told by Sharon Cannon that the foreclosure would be "suspended" as long as she

16 was actively pursuing a modification, stating in an email "Ms Montez, as long as the process is

17 in place you do not have to worry about the sale . . . ."  *See* Ex. 22 (email from S. Cannon to D.

18 Montez dated Jan. 25, 2010).  Ms. Montez also talked to Chase employees identified as "Kelly,"

19 "Audrey," and "Marilyn" regarding the Notice of Trustee Sale, who assured her she was in

20 review for a modification, not foreclosure.  "Marilyn" also told Ms. Montez on January 25, 2010

21 that the auction of her house had been postponed, that Chase would honor her new TPP, and that

22 Chase would be offering a permanent modification.  *Id.* (email from D. Montez to S. Cannon

23 dated Jan. 25, 2010).

24      133.   Ms. Montez then received a letter dated January 23, 2010 telling her she had been

25 "approved for a Trial Plan Agreement," and that if she complied, Chase would "consider a

26 permanent workout solution."  Ex. 23. (also noting that Chase is a "debt collector").  A fourth

27 temporary payment plan was enclosed.  *See* Ex. 24.  This plan, called a "Trial Plan Agreement,"

28 specified three monthly payments of $1,554.36, beginning on March 1, 2010.  The "Trial Plan

Agreement" states that foreclosure activity would "resume" if the payments are *not* made on time, clearly indicating that forbearance will result if they *are* made on time. *Id.* The document also states that "[i]f all payments are made as scheduled, we *will* reevaluate your application for assistance and determine if we are able to offer you a permanent workout solution to bring your loan current." *Id.* (emphasis added).

134.    Ms. Montez then received a letter dated January 28, 2010, stating that her "MODIFICATION IS AT RISK OF DECLINE" and that she had missed a trial period plan payment, but "due to a recent special extension issued by the Department of Treasury, you have one last opportunity to maintain your eligibility for a modification." The letter requests two more payments of $1,612.00, directly contradicting the new Trial Plan Agreement that Ms. Montez had received only days earlier, requesting payments of $1,554.36 beginning on March 1, 2010. *See* Ex. 25.

135.    Moreover, as noted above, Ms. Montez had already made *two* of the three $1,612.00 payments from the prior TPP, not just the one for which Chase appeared to be giving her credit. Her third payment would be due February 1, 2010—after the date of the January 28, 2010 letter.

136.    Ms. Montez contacted Chase and confirmed that, despite all of the confusing and contradictory correspondence she had received, she should indeed pay on the newer plan, with payments of $1,554.36.

137.    On February 3, 2010, Chase employee Sharon Cannon emailed Ms. Montez and said, "They will not send anything in writing, but the [foreclosure] sale has been suspended because you were approved for a trial modification." Ex. 26 (email from S. Cannon to D. Montez dated Feb. 3, 2010).

138.    Ms. Montez, relying on the terms set forth in the fourth payment plan—the Trial Plan Agreement—as well as assurances by Chase employees, and expecting that her performance under this contract would result in (a) forbearance of foreclosure proceedings and (b) genuine consideration of her modification application after making the three specified payments, signed the agreement on February 8, 2010 and faxed it to Chase on February 10, 2010.

1    *See* Ex. 24.

2        139.    Ms. Montez made the three initial payments required by the fourth payment plan,

3    and continued to make payments of $1,554.36 for *seven months*.  Throughout this time period,

4    she frequently contacted Chase to inquire about the status of her modification.  She occasionally

5    was told to send more documentation, all of which she had previously sent.  She received

6    additional confusing correspondence telling her that she had failed to make payments that she

7    had in fact made.  *See, e.g.*, Ex. 27 (Mar. 9, 2010 "Notice of Expiration" from Chase regarding

8    purportedly missed payments).

9        140.    Ms. Montez's home was also in foreclosure during these seven months.  Although

10   the foreclosure had been "suspended indefinitely," according to an email from Chase employee

11   Sharon Cannon, *see* Ex. 28 (email from S. Cannon to D. Montez dated April 19, 2010), this was

12   cold comfort to Ms. Montez as she waited for a modification and wondered when foreclosure

13   proceedings would resume.

14       141.    Thus, as much as seventeen months after her original modification application,

15   Ms. Montez still had no idea whether or not she would be able to keep her home.

16       142.    On July 9, 2010, Ms. Montez printed out a copy of Chase employee Sharon

17   Cannon's assurance from April 19, 2010 that her foreclosure had been permanently suspended

18   and wrote a note on it requesting that Chase process her permanent modification because she had

19   fully complied with her last temporary payment agreement, *see* Ex. 24, and had been waiting for

20   16 months to receive a final modification.  Ex. 29.

21       143.    On August 13, 2010, Ms. Montez received a letter stating that Chase could not

22   "continue to review" her request for a loan modification because she had "not provided all of the

23   documentation we requested."  Ex. 30 (also noting that Chase is a "debt collector").  The letter

24   requested "[p]roof of payment of homeowners association fees," a "completed 4506T-EZ" IRS

25   document, and two months of bank statements.  Ms. Montez was bewildered by this request,

26   given the many assurances that her file was complete and the fact that she had been making

27   regular payments for many months.

28       144.    Apparently due to the intervention of the OCC, *see* Ex. 31 (letter from OCC

Customer Assistance Group to D. Montez dated Oct. 20, 2010 referencing a modification agreement that Chase had sent to Ms. Montez), Ms. Montez received—in late September of 2010 (nineteen months after she originally applied for a modification)—a "Loan Modification Agreement" from Chase purportedly effective November 1, 2010.

145.    The agreement and cover letter dated September 22, 2010 specified a new principal balance of $497,789.47, an interest rate of 4.375%, a balloon payment of $290,188.86 due on August 1, 2035, and monthly principal and interest payments of $2,201.43—*almost $400 more than her prior principal and interest payment*.  Including insurance and taxes, her total monthly payment would be $2686.71, fully *$1,132.35 more* than the payments she had been making pursuant to the February 2010 agreement, and over half of her household's monthly income. *See* Ex. 32.

146.    On information and belief, Chase's calculation of Ms. Montez's income was incorrect, misinformed, and incompetently performed.

147.    The new principal balance was over $17,000 more than the prior principal balance.  The new principal balance purportedly included $20,801.11 in "Interest" and a "Recoverable Balance, Foreclosure/Bankruptcy Costs (If applicable)" of $1,990.66.  None of these charges were explained.

148.    Not only was the modification clearly unaffordable for Ms. Montez, but Chase knew it.  According to a letter dated September 21, 2010 that compared the prior loan terms to the modified terms, the interest rate had increased from 3.663% to 4.375%, and the principal and interest portion of the monthly payment had increased from $1,823.85 to $2,201.43.  *See* Ex. 33. Despite numerous assurances from Chase employees that it would do just the opposite, Chase apparently *intended* to make Ms. Montez's loan significantly less affordable.

149.    Ms. Montez enlisted the help of her local Chase branch Vice President Chris McCallum, who called Chase's mortgage division with her.  They were told "too bad, if she can't afford it, take it or leave it.  Or she can sell her house."

150.    Fearing that she would lose her home if she declined the unaffordable and belated modification offer, Ms. Montez signed the agreement on October 2, 2010, indicated that she was

doing so "under duress," and returned it to Chase.  *See* Ex. 32.

151.    Having spent eighteen months being disappointed that she was not receiving the benefit of her bargains with Chase, Ms. Montez saw no purpose in funneling many more thousands of dollars to Chase only to receive nothing in return, and she stopped making payments in October 2010.

152.    Ms. Montez continued to pursue a reasonable modification in October 2010 and November 2010, continued to send in documentation requested by Chase, complying with Chase's every demand while Chase breached its promises of a timely review and assurances of an affordable loan modification.  Nevertheless, today she finds herself caught in the same endless cycle, unsure when and if she will ever receive the modification, forbearance of foreclosure, and/or opportunity for an affordable "permanent workout solution to bring [her] loan current" *see* Ex. 24, that Chase has repeatedly promised to provide in a timely manner.

**2.      The Process Continues.**

153.    In January, February, and March of 2011, Ms. Montez has faced threats of foreclosure and continual requests for documentation that she had already provided on numerous occasions.

154.    In early January, 2011, Ms. Montez found another Notice of Trustee's Sale on her door, scheduling a foreclosure sale for February 3, 2011.  *See* Ex. 10.

155.    In a letter dated January 3, 2011, Chase asked for paystubs, tax returns, and a new loan modification application.  *See* Ex. 34.  Ms. Montez provided these materials on January 10, 2011.

156.    In a letter dated January 26, 2011, Chase asked for a batch of new documents, including an entire set of loan modification application materials.  *See* Ex. 35 (also noting that Chase is a "debt collector").  On instructions from Chase Ms. Montez has reapplied for a modification, sending in the same documentation she has already faxed to Chase countless times.

157.    In January, Ms. Montez was assured by a Chase employee who identified herself as "Cathy" in the "Home Executive Office" that all of Ms. Montez's paperwork was in order and had been received.

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 42

158.    With the help of the OCC, Ms. Montez managed to have the February foreclosure sale postponed from February 3, 2011 to March 21, 2011.

159.    Ms. Montez has received several more notices that Chase is missing documentation that Ms. Montez has already faxed to Chase.  In short, Ms. Montez continues to be tormented by Chase's misleading practices.

160.    In a letter January 31, 2011, Chase informed Ms. Montez that the "executive specialist assigned to your issue" is "Hillary Riley Jr" and that he could be reached at (800) 695-7695, extension 6524.  *See* Ex. 36.  Upon dialing this phone number and entering the extension, the recording says that the "number is not in service."  Ms. Montez was unable to contact Mr. Riley without a phone number.  Instead, she called other numbers and asked to be transferred to Mr. Riley's voicemail and left him several messages, to which she received no response.

161.    In a letter dated February 28, 2011, which Ms. Montez received in early March, Chase wrote to "confirm receipt" of Ms. Montez's "recently submitted request for a modification."  Incredibly, the letter informed Ms. Montez that she needed to send in a new hardship letter and "the required documentation of your income."  Ex. 37 (also noting that Chase is a "debt collector").  The letter also stated that Chase would "not sell" her house "at a foreclosure sale."

162.    On March 9, 2011, Chase posted a note on Ms. Montez's door saying she needed to contact the bank's "Homeowners Assistance Department."  Ex. 38.

163.    On March 14, 2011, Ms. Montez was informed by a Chase representative who identified himself as "Michael James" that the foreclosure sale is still scheduled for March 21.  Mr. James also said that Ms. Montez's file notes said that there was a paystub missing from her file.

164.    Ms. Montez learned only shortly before initiating this lawsuit—in a phone call on March 15, 2011 with—Chase employee "Hillary Riley"—that the March 21, 2011 foreclosure sale had been "postponed."  Mr. Riley also said that Ms. Montez's file was "in underwriting" and that the confirmation of the foreclosure postponement should be available in writing on Thursday March 17, 2011—just two business days before the scheduled sale.  Mr. Riley could not explain

why his phone number had been incorrect on prior correspondence.  He apologized for the delay and confusion in processing Ms. Montez's application.

165.    On March 16 and 17, 2011, in multiple phone conversations with Chase representatives, Ms. Montez was assured that the foreclosure sale scheduled for Monday, March 21, 2011 had been postponed.  However, as of the close of business on March 16, 2011, the Trustee, California Reconveyance Company, had yet to receive from Chase any instructions to cancel the sale.  The sale remained on the calendar maintained by LPS Agency Sales & Posting (www.lpsasap.com) as of the date that Ms. Montez filed the original Complaint in this matter.

166.    On information and belief, Chase has failed to keep accurate records of Ms. Montez's account, has mishandled her documents, and has miscalculated her debt.

167.    Even if Chase actually does come through with a permanent modification, a true forbearance in its pursuit of foreclosure, or a "permanent workout solution" for Ms. Montez after two years of this aggravating, stressful, and needlessly complicated chain of events, it will not give back to Ms. Montez what she has lost.  Because of Chase's mishandling of Ms. Montez's modification application, its breaches, broken promises, fraudulent, unfair, and unlawful business practices, and other violations of the law, Ms. Montez has lost sleep, peace of mind, time, trust, money, and any benefits of the bargains she made with Chase to stop them from threatening to take her house, to figure out a way to bring her loan current, and to receive a permanent modification.

**3.    Chase Has Profited from Ms. Montez's Misfortune, Compliance, and Desire to Keep Her House.**

168.    Ms. Montez approached Chase for help as a responsible borrower who foresaw difficulty making future payments and with a desire to do the right thing.  Knowing that Ms. Montez has been desperately trying to keep her house, and having *instructed* her to stop making her mortgage payments so she would "move up on the list," Chase has fully leveraged its upper hand.  It has done the same thing to countless other members of the proposed Class.

169.    It has been over two years since Ms. Montez first applied for a modification to her home mortgage loan.  Today she remains unsure whether or not she will be able to obtain a

reasonable modification and keep her home.  Furthermore, despite the fact that Chase assured Ms. Montez that her credit would not be affected by any delinquency incurred in pursuit of a modification, the opposite has happened, and her credit score has decreased substantially as a result of Chase's misleading practices.

170.    Chase has continually failed to identify what information was purportedly missing from Ms. Montez's application materials for the past two years.  Indeed, Ms. Montez has no idea what information could have been be missing from her application during the many months and years she has waited for a permanent modification and repeatedly sent documentation to Chase.

171.    Rather, the "missing" or "incomplete" document explanation appears to be a pretext for the denials and delays in processing her application, which enabled Chase to collect scores of documents, waste her time, subject her to unnecessary stress, and reap thousands of dollars from her over the course of many frustrating months.  Further, Chase's excuses for lost or missing documentation appear to be a symptom of Chase's incompetence in managing borrower documents and may stem from Chase's intentional destruction of borrower loan files and records.

172.    Throughout this process, Chase has made a habit of sending Ms. Montez confusing and poorly explained documentation regarding her debt and the fees Chase is charging.  For example, in a June 1, 2009 letter, Chase claimed that Ms. Montez owed $248.57 in late charges, and $60.85 in "Outstanding Fees."  By August 31, 2009 Ms. Montez supposedly owed $339.76 in "Late Charges," $82.55 in "Other Outstanding Fees," along with a $30.00 "Payoff Statement Fee" and a $45.00 "Reconveyance Fee."  *See* Exs. 6 & 8.  Ms. Montez was typically told by Chase employees to ignore these letters (which she did, as at that time she had no reason to believe that Chase was misleading her), and no clear explanation of these fees was ever given to Ms. Montez.  On information and belief, Chase's representations that it would not charge her any fees for a modification were false and misleading.  Moreover, Chase charged and collected fees that it was not entitled to collect and/or that were unreasonable or excessive.

173.    Furthermore, Chase's assessment of Ms. Montez's debt varied wildly.  From June 1, 2009 to July 13, 2009, the amount Ms. Montez was supposedly behind jumped from $4,909.52

(which included the fees described above) to $8,464.29—an increase in arrearage of $3,554.77. *See* Exs. 6 & 7.  In a period of less than one month, Ms. Montez's supposed arrearage jumped by over one and a half monthly payments.  By the time Chase offered Ms. Montez an unreasonable final modification, in September 2010, Chase was claiming Ms. Montez had accumulated at least $17,000 of additional debt, which they added to the principal balance of Ms. Montez's loan.  *See* Ex. 32.  As described *supra* ¶ 41, this additional principal increases Chase's servicing pool and therefore its servicing revenue.  It will also grossly inflate the amount of interest Chase will be able to collect from Ms. Montez.

174.    On information and belief, Chase has misapplied and mismanaged Ms. Montez's payments, utilizing "suspense" accounts and other mechanisms to increase its own profits and delay crediting Ms. Montez's account with the payments she was making.

175.    Ms. Montez has been promised a timely review of her modification application and been led to believe that she would receive an affordable modification if she met Chase's demands.  Chase has provided neither timely review nor an affordable solution, breaking these promises.

176.    Ms. Montez has not been given any explanation as to why she did not receive a permanent modification years ago.  Instead Chase has collected payments from her unlawfully and in direct contravention of Chase's election to begin foreclosure proceedings by sending a default notice.  Accordingly, payments made to Chase as a result of its loan modification scheme were improperly collected.

177.    Chase's forbearance/modification offer packages were mechanisms of its unfair and deceptive business practices.  Ms. Montez relied on these offer packages, and performed, to her detriment, for over two years, only to face more debt now than she had before she sought a modification.

178.    Had Ms. Montez known that the process for obtaining a modification would have stretched past two years, she may have pursued other options, including selling her house.  Now, however, because she has poured thousands more dollars into her home—even as her budget has tightened—and because she has had her credit score wrecked, her options are limited.  She can

(a) refuse to make payments altogether, unless and until Chase modifies her loan, increasing the risk that she would lose her home, including the thousands of dollars she has poured into it since the beginning of the modification process; or (b) continue making payments as directed by Chase, risking the loss of thousands of more dollars, and perhaps the eventual loss of her home despite such payments. She is at the complete mercy of Chase, who is profiting off of her misfortune.

179.    Furthermore, had Ms. Montez known that Chase did not intend to modify her loan in an affordable or timely manner, and would continue pursuing foreclosure, Ms. Montez would never have paid Chase or provided any other consideration in exchange for promises to modify her loan and forbear its foreclosure proceedings.

180.    Ms. Montez's experiences illustrate painfully well Chase's pattern of deceptive, misleading, unfair, fraudulent, unlawful business practices that have been experienced by all members of the proposed Class of California mortgagors Plaintiffs seek to represent. While the timing and sequence of phone calls, emails, letters, and numerous forbearance/modification offer packages and other promises may vary slightly among Class members, the underlying conduct is the same. Chase has devised a fraudulent scheme to drag out the mortgage modification process to maximize its profits. This unlawful conduct preys on the most vulnerable homeowners in their time of greatest stress, anxiety and desperation. The chasm between Chase's authority to make loan modifications and "permanent workout solutions" succeed and mortgagors' paltry bargaining power couldn't be greater.

**J.    Plaintiff Daniel Ware's Attempts to Secure a Loan Modification Were Thwarted by Chase.** [17]

181.    Plaintiff Daniel Ware purchased his home in Visalia, California in 2004. Chase

---

[17] Mr. Ware does not concede the accuracy of the representations made by Chase with respect to the number of missed payments, the monetary figures, or purportedly missing documentation presented in any of Chase's documents described herein. Moreover, Mr. Ware does not have complete records at this time, and Chase's records have proven unreliable, contradictory, and arbitrary. Accordingly, Mr. Ware does not concede that he missed any particular payments, owed any particular debt, or failed to send any paperwork to Chase during the time period covered by this Amended Complaint. His allegations are based on the best records currently available to him and will be amended as necessary.

became the servicer in the fall of 2008 when it acquired the servicing portfolio of the bankrupt Washington Mutual.

182.    Mr. Ware works for the California Department of Corrections.  In early 2009, the State of California cut the pay of thousands of California state employees, including Mr. Ware. Following this pay cut, Mr. Ware began to have difficulty making his mortgage payment, and in May and June of 2009, Mr. Ware was unable to make his mortgage payments.

183.    In June 2009, Mr. Ware called Chase several times to inquire about a modification.  After several attempts to apply for a modification, he was able to complete an over-the-phone modification application with a Chase representative.

**1.     The Runaround.**

184.    In July 2009, Mr. Ware was told by a Chase representative that he had been approved for a trial modification to begin in August of 2009.  He was told that his payment would be $1,488.00 for three months, and that after completion of this trial period, he *would be given a final modification.*

185.    In August of 2009, Mr. Ware called Chase in order to make his payment.  He was instructed to pay $1,488.00, pursuant to the trial modification.  He would continue to make modified payments of $1,488.00 on or about the first of each month for 17 months, until February 2011, when Chase refused to accept his payment.

186.    In a letter dated September 2, 2009, over a month after he originally began his trial period and after Mr. Ware had already made two of the three trial period payments he had been told he needed to make, Chase informed Mr. Ware that he may qualify for a HAMP modification.  On information and belief, this "Trial Period Cover Letter" stated in the first paragraph that "[i]f you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, *we will modify your mortgage loan and you can avoid foreclosure.*"  *See* Ex. 39 (italics added).

187.    The Trial Period Cover Letter employs clearly contractual terms at the outset: "*To accept this offer,* and see if you qualify for a Home Affordable Modification, send the 5 items listed below to JPMORGAN CHASE BANK, NA, SUCCESSOR TO WASHINGTON

MUTUAL BANK, no later than OCTOBER 02, 2009." *Id.* at 2 (italics added).  It continues, "[i]f the trial period payments are made in amounts *different* from the amount stated, your loan may not be modified," thus clearly implying that if trial period payments *are* made in amounts the same as listed in the TPP, the loan *will* be modified. *Id.* at 2 (italics added).

188.     Enclosed with the Trial Period Cover Letter was a "Home Affordable Modification Trial Period Plan," ("TPP") which informed Mr. Ware that if (1) his representations about his financial state continue be true, and (2) he complies with the terms of the of the trial period plan, and (3) he provides all required documentations, and (4) the Lender determines he/she qualifies, then "the Lender will send [him] a Modification Agreement for [his] signature which will modify [his] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date." *See* Ex. 40. (emphasis added).

189.     The "Trial Period Cover Letter" contains assurances that there "are no fees under the Home Affordable Modification program" and that "[i]f you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period." *See* Ex. 39 (emphasis added).  On information and belief, Chase charged and collected fees in connection with its mortgage modification scheme.

190.     The TPP also states that "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the offer or will send me a written notice that I do not qualify for the Offer." *See* Ex. 40.  The TPP further required Mr. Ware to make payments of $1,488.00 beginning on September 1, 2009— *several days before the letter and TPP were received.*  Since Mr. Ware had been making his trial payments pursuant to the verbal modification before receiving the written modification, he had already made his September payment.  Otherwise, the terms of the written contract would have been impossible to meet.

191.     Included with the TPP were four payment coupons for temporary payments of $1,488.00.  *See* Ex. 40, at 4.

192.     Mr. Ware signed the TPP and sent it to Chase along with all of the required documentation, including a Hardship Affidavit and a 4506-T tax request form.  *See* Ex. 41.

193.    In early October, after making his third TPP payment, Mr. Ware received two separate letters from Chase stating that "YOUR MODIFICATION IS AT RISK" and that Chase was missing required documents.  The letters—which were identical, and dated six days apart—stated, "Our records reflect that you have not provided some or all of the documents listed below," and listed, among others, the IRS Form 4506-T and the Hardship Affidavit.  *See* Exs. 42, 43 (also noting "JPMorgan Chase Bank, NA, successor to Washington Mutual Bank is attempting to collect a debt, and any information obtained will be used for that purpose").  Although he had already sent Chase each of the documents requested when he had completed his TPP, Mr. Ware complied with the letter and again sent to Chase all of the documentation outlined in the identical letters.

194.    For the next six months, Mr. Ware continued to make his payments of $1,488.00.  He would call each month to ask how much he should pay, and was consistently told by Chase representatives to make the modified payment of $1488.00.  When he inquired about the loan modification, he was told that Chase was months behind in finalizing modifications and that he had to be patient.  He was told on multiple occasions that his final modification was complete and it was just a matter of just a little more time until he received it.  He was never told that his modification application was denied.  He was continually assured that his application would be processed in a timely manner

195.    In a letter dated April 21, 2010, after Mr. Ware had completed his TPP and made six additional modified payments, Chase informed Mr. Ware that he did not qualify for a modification through the Making Home Affordable program because "your current monthly housing expense… is less than or equal to 31% of your income."  *See* Ex. 44.  In fact, his *unmodified* housing expense was greater than 31% of his income—which is why he had been seeking a modification in the first place.  It is unclear what information Chase was using when calculating his housing expense, and when Mr. Ware called Chase to discuss the calculation he was told to resubmit his paperwork and to continue making his modified payments.

196.    On information and belief, Chase's calculation of Mr. Ware's income was incorrect, misinformed, and incompetently performed.

197.    On or about May 1, 2010, Mr. Ware called Chase and asked what amount he should pay for his mortgage payment.  He was instructed to make the modified payment of $1,488.00.

198.    In May of 2010, Mr. Ware received a letter stating that he had been denied because he had not sent in all of the required documents.  Among the documents Chase claimed to be missing was a 4506-T form, which he had in fact sent several times.  Following receipt of this letter, Mr. Ware contacted Chase and was told that he should resubmit his documents.  He was not told that he had been denied.

199.    Around the same time that he received the letter telling him he had been denied because Chase was missing documentation, Mr. Ware received a letter from Chase stating that "we have reviewed your property information and have determined that you may be eligible to restructure the current terms of your mortgage."  *See* Ex.  45.

200.    In June 2010, Mr. Ware was again instructed by Chase representatives to pay the modified amount of $1,488.00.  He was further instructed to resubmit his entire modification application.  He did so despite the fact that he had already provided Chase with all of the documentation necessary to complete his modification.

201.    Throughout the rest of 2010, Mr. Ware was told by Chase representatives each month to make the modified payments of $1,488.00.  On instructions from Chase, he frequently resubmitted documentation, nearly all of which he had already submitted in one form or another.

202.    In two consecutive letters, dated December 27 and December 28, 2010, Chase claimed first that Mr. Ware's modification was in jeopardy because Chase had not "received all the documents necessary to complete your request for a modification," and then that the modification had been denied because Mr. Ware "did not provide [Chase] with the documents [it] requested."  *See* Exs. 46, 47 (both also noting that Chase is a "debt collector").  The second letter stated that "[a] notice which listed the specific documents we needed and the time frame required to provide them was sent to you," apparently referring to the letter from the day before.  *See* Ex. 47.  The first letter, however, stated that "[w]e must receive the documents listed below within thirty (30) days of the date of this letter or you risk losing eligibility for a modification."

1   *See* Ex. 46.   Among the documents Chase claimed it needed were a Request for Modification

2   and Affidavit ("RMA"), and a 4506-T form.  Mr. Ware had previously sent each of these

3   documents no less than four times.  When Mr. Ware contacted Chase to find out what was going

4   on, he was told that all of his documents were in order, and that the letters had been sent in error.

5   He was told to keep paying $1,488.00 per month, and he was assured that he would receive a

6   timely and affordable modification in short order.

7        203.    In January 2011, Chase sent Mr. Ware two more letters claiming that it was

8   missing documents necessary for his modification.  *See* Exs. 48, 49 (both also noting that Chase

9   is a "debt collector").  Despite the apparent meaningless nature of these form letters, which

10  Chase seemed to send out arbitrarily, Mr. Ware contacted Chase and was again told that Chase

11  had all of his documents and that there was nothing to worry about.

12       204.    In February 2011, Mr. Ware called Chase to make his payments, as he had for the

13  previous 17 months.  However, unlike the prior months, Mr. Ware was not instructed to pay the

14  modified amount but was instead told that he would *not* be allowed to make his mortgage

15  payment because he had been denied for his modification *on August 9, 2009*—some 18 months

16  earlier.

17       205.    When Mr. Ware asked why Chase had not told him this in August 2009, before he

18  paid thousands of dollars pursuant to the forbearance/modification offer package offered by

19  Chase, the Chase representative said that the other Chase employees did not know how to do

20  their jobs, and that was not her fault.  Mr. Ware was told by this same representative that he

21  owed thousands of dollars because, according to the Chase representative, he had not been

22  paying his mortgage for over a year, but she refused to give him a definite figure for the amount

23  he supposedly owed.  As this was clearly not true, Mr. Ware tried desperately to get in touch

24  with Kenya Henry, his "specialist."  Mr. Ware made every effort to make his February 2011

25  payment.  He was repeatedly transferred between different Chase employees, and at one point he

26  was told that he couldn't make a payment because the system was "down," due to a severe

27  storm.

28       206.    The next day, Mr. Ware sent Chase a letter in desperation, outlining his

1    frustrations.  *See* Ex. 50.  He provided proof that he had sent Chase everything it needed to

2    process his modification, and requested that Chase contact him.  He never received a response to

3    that letter. Mr. Ware also contacted the Office of the Comptroller of the Currency and filed a

4    complaint.

5            **2.     The Process Continues.**

6            207.    On or about March 1, 2011, Mr. Ware again called Chase to make his payment.

7    He was unsure at that time whether or not he would be able to pay or even be able to keep his

8    home.  He was told to pay $1,972.00, an amount that, according to a Chase representative,

9    included fees, although the representative he was speaking with refused to explain to him what

10   the fees were for.  He was also told by a Chase representative that he should have been allowed

11   to make his payment the previous month.  Although Mr. Ware did not want to pay Chase's fees,

12   he felt he had no other choice, as refusing to pay could lead to a foreclosure.  As such, Mr. Ware

13   paid the requested $1,972.00 in March.

14           208.    In two separate letters dated March 9, 2011, Chase simultaneously informed Mr.

15   Ware that he had "been approved for a Mortgage Modification" *and* that "we are unable to offer

16   you a mortgage modification through the Home Affordable Modification Program at this time."

17   *See* Exs. 51, 52 (both also noting that Chase is a "debt collector").  The contradictory nature of

18   these letters notwithstanding, the "Modification" Chase offered Mr. Ware demanded payments

19   of $2,121.80, over $100 *more* than his original mortgage payment and over $600 more than his

20   temporary payment had been.

21           209.    In the first sentence of the document, Chase stated "[y]ou have been approved for

22   a Mortgage Modification from Chase."  While this clearly indicates that the modification being

23   offered was final, the rest of the document indicates just the opposite—that this was yet another

24   trial modification.  In fact, throughout the rest of the document Chase referred to the plan it was

25   offering Mr. Ware as a "Chase Trial Period Plan (TPP)" and it is labeled "CHAMP" at the

26   bottom of the page.  *See* Ex. 52.  It stated that the "final modified payment should be close to

27   your trial payment" and promised: "After successful completion of the TPP, we *will* send you a

28   Modification Agreement for your signature which *will* modify the Loan as necessary to reflect

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 53

this new payment amount as well as any other changes to the terms of your Loan." *Id.*  The document further assured that "if you complete the TPP," such compliance will result in a "permanent Modification Agreement." *Id.*  Evidently, although Mr. Ware had been "approved for a Mortgage Modification from Chase," he had several more hoops to jump through before the modification would become permanent.

210.    Although the "Chase Trial Period Plan" Chase offered Mr. Ware in March is *less* affordable than his original payment, Mr. Ware felt that he had no choice but to go along with Chase's request, as a refusal to do so would greatly increase his chances of a foreclosure.  As such, he has continued to make his payments each month, pursuant to this second modification plan, despite the increased burden on his income.

211.    On March 25, 2011, Mr. Ware faxed to Chase a note asking Kenya Henry, who he had yet to speak to, to return his calls.  He did not receive a response from Ms. Henry.  *See* Ex. 53.

212.    On March 30, 2011, Mr. Ware made a payment of $2,121.80 by phone for the month of April as requested by the "Chase Trial Period Plan" that Chase offered Mr. Ware.  *See* Ex. 52.

213.    In a letter dated March 29, 2011, Mr. Ware received a letter saying that he was denied a HAMP modification because his "current monthly housing expense . . . is less than or equal to 31% of [his] gross monthly income," and offered "other loan workout options" if he called Chase.  *See* Ex. 54.

214.    Mr. Ware attempted to call, email, and fax his "specialist" Kenya Henry numerous times, but was unsuccessful.  Another Chase representative assured him that she would leave an email for Ms. Henry to contact Mr. Ware.  He received no response.

215.    In a letter dated April 11, 2011, Chase invited Mr. Ware to seek a short sale or deed in lieu.  *See* Ex. 55 (also noting that Chase is a "debt collector").  In letters dated April 23, April 29, and May 16, Chase informed Mr. Ware that it was "working" on his "issue," apparently referring the complaint he had previously filed with the OCC in February. *See* Exs. 56, 57, 58.

216.    Chase has accepted Mr. Ware's payments for April, May, and June of 2011 in the

1    amount of $2,121.80, as outlined in the "Chase Trial Period Plan." Thus he has completed the

2    terms of the TPP. As of this filing, he has yet to hear from Chase regarding a final modification.

3        217.    Confusingly, in the spring of 2011, Chase was apparently evaluating Mr. Ware

4    simultaneously under HAMP and a Chase proprietary program, and sending him contradictory

5    correspondence relating to both of these tracks.

6        218.    Mr. Ware's repeated requests for a statement indicating how much money Chase

7    claims he now owes have been refused. On information and belief, Chase has failed to keep

8    accurate records of Mr. Ware's account, has mishandled his documents, and has miscalculated

9    his debt.

10        **3.    Chase Has Profited from Mr. Ware's Misfortune, Compliance, and Desire to
           Keep His House.**

11

12        219.    Mr. Ware fell behind on his mortgage payments on account of an unforeseen drop

13    in income in his job working for the financially-strapped State of California. He approached

14    Chase as a responsible borrower who wished to stay in his home and continue making payments,

15    and the original modification he was granted by Chase allowed him to do exactly that. Instead of

16    honoring its contract with Mr. Ware, however, Chase has reneged on the original agreement and

17    forced Mr. Ware into a newer and unaffordable modification plan—one with greater monthly

18    payments than he was required to pay before applying for a modification. Just as in the case of

19    Dianna Montez, Chase has used its upper hand to force Mr. Ware into an impossible situation.

20        220.    It has been almost two years since Mr. Ware applied for a modification. Today he

21    is unsure whether or not he will be able to keep his home. If the current—more expensive—

22    modification is made permanent (if indeed there is such a thing as a permanent modification), it

23    is likely that Mr. Ware will be unable to continue making his monthly payments because they are

24    unaffordable at this elevated level. Chase's actions have destroyed Mr. Ware's credit and cost

25    him a great deal of time and money.

26        221.    Throughout the two-year process, Chase has repeatedly claimed that it was

27    missing documents that Mr. Ware had previously sent numerous times. While he was frequently

28    told by Chase representatives that these letters were sent in error, he was also frequently told by

AMENDED CLASS ACTION COMPLAINT                    (Case No. 11cv0530) Page - 55

1  Chase representatives that more documentation was in fact needed.  On every occasion when a

2  Chase representative requested documentation, Mr. Ware promptly sent to Chase everything it

3  needed.

4       222.   Indeed, the "missing" or "incomplete" document explanation frequently offered

5  by Chase appears to be a pretext for the denials and delays in processing Mr. Ware's application,

6  which enabled Chase to collect scores of documents, waste his time, subject him to unnecessary

7  stress, and reap thousands of dollars from him over the course of many frustrating months.

8  Further, Chase's excuses for lost or missing documentation appear to be a symptom of Chase's

9  incompetence in managing borrower documents and may stem from Chase's intentional

10  destruction of borrower loan files and records.

11      223.   On information and belief, Chase has misapplied and mismanaged Mr. Ware's

12  payments, utilizing "suspense" accounts and other mechanisms to increase its own profits and

13  delay crediting Mr. Ware's account with the payments he was making.

14      224.   Mr. Ware has been promised a timely review of his modification application and

15  been led to believe that he would receive an affordable modification if he met Chase's demands.

16  Chase has provided neither timely review nor an affordable solution, breaking these promises.

17      225.   Mr. Ware has not been given any explanation as to why he did not receive a

18  permanent modification years ago.  Instead Chase has collected payments from him unlawfully

19  and in direct contravention of Chase's election to begin foreclosure proceedings by sending a

20  default notice.  Accordingly, payments made to Chase as a result of its loan modification scheme

21  were improperly collected.

22      226.   Chase's forbearance/modification offer packages were mechanisms of its unfair

23  and deceptive business practices.  Mr. Ware relied on these offer packages, and performed, to his

24  detriment, for two years, only to face more debt now than he had before he sought a

25  modification.

26      227.   Had Mr. Ware known that Chase did not intend to modify his loan or process his

27  application in a timely manner, and would continue pursuing foreclosure, Mr. Ware would never

28  have paid Chase or provided any other consideration in exchange for promises to modify his loan

AMENDED CLASS ACTION COMPLAINT                    (Case No. 11cv0530) Page - 56

1    and forbear its foreclosure proceedings.

2        228.    Mr. Ware's experiences illustrate painfully well Chase's pattern of deceptive,

3    misleading, unfair, fraudulent, unlawful business practices that have been experienced by all

4    members of the proposed Class of California mortgagors Plaintiffs seek to represent.  While the

5    timing and sequence of phone calls, emails, letters, and numerous forbearance/modification offer

6    packages and other promises may vary slightly among Class members, the underlying conduct is

7    the same.  Chase has devised a fraudulent scheme to drag out the mortgage modification process

8    to maximize its profits.  This unlawful conduct preys on the most vulnerable homeowners in

9    their time of greatest stress, anxiety and desperation.  The chasm between Chase's authority to

10   make loan modifications and "permanent workout solutions" succeed and mortgagors' paltry

11   bargaining power couldn't be greater.

12   **K.    Plaintiff Michael Sabouhi's Attempts to Obtain a Modification From Chase Cost
         Him His Home. [18]**

13       229.    Plaintiff Michael Sabouhi purchased his home in Rancho Cucamonga, California

14   in 2002.  At the time, he was employed by Chase as a loan originator.

15       230.    In 2008, Mr. Sabouhi lost his job at Chase as a result of the changing conditions

16   in the mortgage market.  At that time he was able to continue making payments from his savings,

17   his 401(k) and with the support of his and his wife's parents.  In 2009 he began to work on and

18   off as a construction and painting contractor.  This was not a reliable source of income, however.

19       231.    Throughout 2009, Mr. Sabouhi struggled to make his payments.  In October, he

20   contacted Chase to inquire about a modification, and was told that since he was at that time

21   unemployed he was ineligible.  He was told that neither his unemployment insurance nor the

22   support he was receiving from his parents could be counted toward his income.  He was also told

23

24   ─────────────────
     [18] Mr. Sabouhi does not concede the accuracy of the representations made by Chase with respect
25   to the number of missed payments, the monetary figures, or purportedly missing documentation
     presented in any of Chase's documents described herein.  Moreover, Mr. Sabouhi does not
26   have complete records at this time, and Chase's records have proven unreliable, contradictory,
     and arbitrary.  Accordingly, Mr. Sabouhi does not concede that he missed any particular
27   payments, owed any particular debt, or failed to send any paperwork to Chase during the time
     period covered by this Amended Complaint.  His allegations are based on the best records
28   currently available to him and will be amended as necessary.

AMENDED CLASS ACTION COMPLAINT                           (Case No. 11cv0530) Page - 57

1    that to even be considered for a modification, he would have to be three months behind.

2         **1.      The Runaround.**

3         232.     In late 2009, Mr. Sabouhi again contacted Chase to find about his options.  He

4    was told that the guidelines for modifications had changed and that he may now be eligible for a

5    modification based on his unemployment insurance and his parents' monetary support.  He was

6    again told that he would have to be three full months behind in order to qualify.  Although he

7    was uncomfortable intentionally missing payments, Mr. Sabouhi followed Chase's instructions

8    because he sincerely believed that Chase wanted to help him to keep his home.

9         233.      Pursuant to his previous conversations with Chase, Mr. Sabouhi did not make

10   any payments in January, February, or March of 2010.

11        234.     In March 2010, Mr. Sabouhi contacted Chase and was told that he would be put

12   on a "Reduced Payment Plan."  The plan was explained to him over the phone, and it would

13   consist of three months of temporarily reduced payments.  Following completion of this plan,

14   Mr. Sabouhi would be able to apply for a "Loan Modification."

15        235.     In April 2010, Mr. Sabouhi made his first payment pursuant to the Reduced

16   Payment Plan of approximately $900.00.  Along with that reduced payment, Mr. Sabouhi paid an

17   additional $1,100.00 as a showing of good faith and to make up for some of the payments Chase

18   had instructed him to miss.

19        236.     In May 2010, Mr. Sabouhi called Chase to make his payment.  Along with the

20   approximately $900.00 reduced payment required under the Reduced Payment Plan, he paid an

21   additional $500.00 as a showing of good faith and to make up for some of the payments Chase

22   had instructed him to miss.

23        237.     As his previous two payments had been larger than the payments required under

24   the plan, Mr. Sabouhi was instructed by a Chase representative not to make his third payment

25   under the Reduced Payment Plan.   The Chase representative explained that Mr. Sabouhi's third

26   payment was covered by the previous two and unnecessary.

27        238.     In July 2010, Mr. Sabouhi received a notification that his home was to be sold at a

28   foreclosure auction on in August 2010.  Upon receipt of this notice, Mr. Sabouhi immediately

1   contacted Chase.  He was told by a Chase representative that by law, his house *could not be sold*

2   as long as he was under consideration for a modification, and that, because he was currently "in a

3   modification," he did not need to worry about the upcoming sale date.  The Chase representative

4   told him that the sale date could be put on hold and instructed Mr. Sabouhi to call him back in a

5   few days to confirm that the sale was on hold.  Mr. Sabouhi followed up several days later and

6   was told that the sale was on hold.

7         239.    Mr. Sabouhi told the Chase representative that he could come up with the funds to

8   bring the mortgage current if necessary.  Surprisingly, he was instructed *not to pay*, as doing so

9   would ruin his chance at a modification.  Additionally, he was told that if he was denied for a

10   modification, he could bring the loan current at that point, and if he received a permanent

11   modification, his missed payments may be added to the end of the modified loan.  In either

12   event, the Chase representative told him, it would be in his best interest *not* to pay anything to

13   bring his mortgage current before a decision on his pending mortgage modification application.

14   Accordingly, Mr. Sabouhi did not make a payment in July or August of 2010.

15         240.    In a letter dated July 27, 2010 Chase requested documentation from Mr. Sabouhi.

16   The letter began by thanking Mr. Sabouhi for his request "for a mortgage modification through

17   the Making Home Affordable (MHA") Program.  The letter also stated in the first paragraph,

18   "[a]t Chase, we will do everything we can to make your mortgage payment affordable and *help*

19   *you keep your home*."  *See* Ex. 59 (emphasis added).  The letter requested that Mr. Sabouhi fill

20   out a modification application and send documents in the FedEx envelope provided before

21   August 11, 2010.  The letter also advertised "[f]or faster service, you can FAX your information

22   using the Fax Cover Sheet found at the back of this package."  *Id.*  On information and belief,

23   Chase's fax system was backlogged and inadequate to handle borrower documentation, much

24   less capable of providing "faster service."

25         241.    Despite the fact that Mr. Sabouhi had already been in the modification process

26   and had been making reduced temporary payments for some time, the letter went on to say

27         If you qualify, we will set up a Trial Period Plan with lower monthly payments –
         and work with you to modify your mortgage loan permanently. We will also see if

28

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 59

you might qualify for other special assistance programs that we can offer, such as a refinance, even if you don't qualify for a modification.

*Id.* The letter also stated that upon receipt of the documentation, Chase would send Mr. Sabouhi a confirmation within ten days.

242.   In early August 2010, Mr. Sabouhi sent to Chase all the requested documentation necessary to complete his application, with the exception of a form regarding his unemployment, which the State of California had not yet sent to him.  He was expecting that document soon and was told by Chase representatives that he could send it to them as soon as he received it.  Among the documents he sent to Chase was a signed hardship affidavit which required him to agree to several conditions, including

I understand that while my request is being evaluated, the Servicer may suspend any scheduled foreclosure sale, but may continue to send legal notices related to foreclosure.  Any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended *if* I fail to comply with the terms and conditions of the Making Home Affordable program…

*See* Ex. 60 (emphasis added).

243.   Starting on September 13, 2010, Mr. Sabouhi sent to Chase at least five complete modification packets.  By that time he had received the missing form from the State of California, and when he contacted Chase to inform Chase that he had received it and would be forwarding it to them, he was told to send not only that form, but the entire application packet he had sent previously.  He faxed the entire packet to them several times, but each time Chase lost or destroyed it, claiming to have no record of it.

244.   On Tuesday, September 21, 2010, Mr. Sabouhi contacted Chase one more time to confirm that his packages had been received.  He was told that Chase now had all of his documents on file, but that it did not matter because his house had already been sold at a foreclosure auction.

245.   Later that week, Mr. Sabouhi received a notice dated September 21, 2010 from the "Law Offices of Glenn H. Wechsler" that his home had been sold.  *See* Ex. 61.

## 2.   The Foreclosure.

246.   By September 13, 2010, Chase had, without sufficient notification or warning to

1    Mr. Sabouhi—and in direct contravention of Chase's assurances to Mr. Sabouhi that Chase

2    *would not* and *could not* sell his house while he was under consideration for a modification—

3    sold his home to Fannie Mae.  The foreclosure sale had occurred just over one month after the

4    July 27, 2010 letter in which Chase stated "we will do everything we can to make your mortgage

5    payment affordable and help you keep your home."  *See* Ex. 59.  Mr. Sabouhi never received any

6    notification from Chase or the trustee that the sale would occur on September 13, 2010.  Mr.

7    Sabouhi's home was sold while he was in good faith pursuing a loan modification from Chase,

8    after he had relied on multiple assurances by Chase representatives that (a) his loan modification

9    would be processed in a timely manner, (b) that as long as he was under consideration for a

10   modification, his house could not be sold in a foreclosure action, and (c) that he should not bring

11   his loan current to maintain his chances of receiving an affordable loan modification.

12        247.    Shortly after learning his home had been sold, Mr. Sabouhi contacted Chase in

13   order to prove to skeptical family members that he had originally been instructed to skip

14   payments, and had been repeatedly instructed not to bring the loan current.  Mr. Sabouhi reached

15   a Chase representative, who opened Mr. Sabouhi's file.  While on speaker phone, Mr. Sabouhi

16   asked if he could bring his loan current, and the Chase representative—apparently unaware that

17   the home had already been sold—again told him that he should *not* bring his loan current while it

18   was under consideration for a modification because it would cause the underwriters to deny the

19   modification.  Mr. Sabouhi then informed the Chase representative that his house had been sold,

20   which was news to the person on the other end of the line who was looking at Mr. Sabouhi's loan

21   file on a computer screen.

22        248.    After learning that his home had been sold, Mr. Sabouhi also contacted Chase to

23   attempt to have the sale rescinded.  He explained that he could bring the loan current and that he

24   would do so if given the chance.  He was told by Chase representatives that in order to get his

25   home back, he had to contact Fannie Mae, the new owner of the home.  When he contacted

26   Fannie Mae, Mr. Sabouhi was told that Fannie Mae had no power to rescind the transaction,

27   since they had nothing to do with his mortgage, and he was directed to contact Chase.

28        249.    Mr. Sabouhi pursued a rescission for several months, as his eviction hearing

AMENDED CLASS ACTION COMPLAINT                              (Case No. 11cv0530) Page - 61

approached.  At one point, he spoke to a Chase manager named "Courtney Kendal."  She told Mr. Sabouhi that Chase should be able to help him, and told him that she would call him back in an hour.  When she called back, she stated that he didn't qualify for a rescission, because he had never been in a modification, because he supposedly had not sent Chase everything Chase needed to process a modification.  Ms. Kendall stated that Mr. Sabouhi had failed to send his 2008 tax forms.  When he pointed out that these had never been requested, she stated that he had failed to send everything before September 12, 2010, an apparently arbitrary date, which happened to fall the day before the foreclosure sale of which Mr. Sabouhi had received no adequate notification.  Finally she stated that Mr. Sabouhi hadn't made a payment in six months prior to the foreclosure, which was not only false (he had made at least three months worth of payments in April and May, and had repeatedly offered to bring his loan current), but was only remotely plausible because he had been *instructed by Chase to miss payments*.

250.     Having failed to obtain a rescission from Chase, Mr. Sabouhi contacted his Senator, Dianne Feinstein in October of 2010.  *See* Exs. 62, 63.  She forwarded his complaint to the OCC, which was also unable to rescind his foreclosure.

251.     In a letter dated November 9, 2010, Chase informed Mr. Sabouhi that "we have not received all documents necessary to complete your request for a modification of the above-referenced loan."  *See* Ex. 64 (also noting that "Chase Home Finance LLC is attempting to collect a debt, and any information obtained will be used for that purpose.").  Incredibly, Chase was requesting more documentation to process Mr. Sabouhi's modification, despite the fact that Chase had sold his house out from under him almost two months earlier.  The letter clearly demonstrates that Mr. Sabouhi had been in the modification process when his home was sold, as the modification department at Chase was still processing his file—albeit apparently oblivious to the fact that Chase had sold the house.

252.     Chase was clearly unable to function or communicate critical information internally months after selling Mr. Sabouhi's home.  In a letter dated December 27, 2010, Chase informed Mr. Sabouhi that "[w]e have determined that you do not qualify for a modification through the federal government's Home Affordable Modification Program (HAMP) at this

time." The letter went on to state that "[w]e are unable to complete your evaluation for a HAMP modification due to your unemployment status." *See* Ex. 65 (also noting that Chase is a "debt collector"). More than three months after the house had been sold, Chase's loss mitigation and/or mortgage modification department was, apparently, unaware that Chase had taken Mr. Sabouhi's home away from him, and was still processing his modification. Furthermore, the letter stated that the denial was because he was unemployed—a fact Chase had been aware of over a year earlier, when Chase representatives had told Mr. Sabouhi that the guidelines had changed, and had encouraged him to miss several payments to qualify for a modification. Tragically, this same letter stated:

> If you want to keep the property:
>
> You will need to pay off your past due balance and *bring your account current*, or refinance your loan with another bank.

*Id*. (emphasis added). Had Chase sent this letter to Mr. Sabouhi before selling his house, he would have brought the loan current and might still be living in his home today.

253.    In a letter dated January 21, 2011, Chase wrote Mr. Sabouhi to let him know that "[w]e strive to give you excellent service. This includes letting you know what to do if you have any problems with your mortgage account." *See* Ex. 66. Mr. Sabouhi received this letter less than ten days before his eviction hearing and long after his house had been sold.

254.    Likewise, in a recent conversation with a Chase representative, Mr. Sabouhi was told that he had been sent a letter dated September 13, 2010 which stated that Chase needed more documentation and that he had 30 days to send the requested documentation. Although Mr. Sabouhi never received this letter, this is further evidence that he was still actively being considered for a modification, even on the very day his home was sold.

255.    Just days ago, Chase sent Mr. Sabouhi a letter informing him that Chase would be force-placing insurance on his home because his homeowners insurance had lapsed. Again, Chase's deficient systems and practices were apparent to Mr. Sabouhi, who remains astonished at Chase's incompetence.

### 3.     The Aftermath.

256.     On February 1, 2011, Mr. Sabouhi's eviction hearing was held in the County of San Bernadino Superior Court.  Although the judge was sympathetic, stating that Mr. Sabouhi's home clearly should not have been sold while he was seeking a modification, the judge did not have the authority to rescind the foreclosure.  He did, however, give the Sabouhis two weeks to move out, and denied Fannie Mae's request that Mr. Sabouhi and his family pay Fannie Mae $50 per day for the time spent in the house after the sale had been completed—approximately $7,000.00.

257.     In mid-February 2011, Mr. Sabouhi, his wife, and their two children moved out of their home of over eight years.  They currently reside with Mr. Sabouhi's parents.

### 4.     Chase Has Profited from Mr. Sabouhi's Misfortune, Compliance, and Desire to Keep His House.

258.     Mr. Sabouhi approached Chase as a responsible homeowner who wished to keep his home.  He was *instructed* by Chase representatives to fall behind in order to obtain a modification.  Worried that missing payments would hurt his chances of receiving a modification and put him in danger of losing his home, Mr. Sabouhi repeatedly told Chase representatives that he could bring his loan current at any time—and offered to do so multiple times—but was repeatedly instructed not to do so.  Furthermore, Mr. Sabouhi was repeatedly told by Chase representatives that as long as he was in the modification process, he *could not lose his home*.  Yet, as the letters received since the foreclosure sale clearly show, Mr. Sabouhi was still in the modification process when Chase sold his home.  Chase's actions have not only resulted in Mr. Sabouhi and his family losing their home, but Chase has destroyed Mr. Sabouhi's credit and cost him a great deal of time and money.

259.     Chase repeatedly lost documents that Mr. Sabouhi sent to Chase, requesting duplicate materials over and over again.  Indeed, the "missing" or "incomplete" document explanation frequently offered by Chase appears to be a pretext for the denials and delays in processing Mr. Sabouhi's application, which enabled Chase to collect scores of documents, waste his time, subject him to unnecessary stress, and reap thousands of dollars from him over

1   the course of many frustrating months.  Further, Chase's excuses for lost or missing

2   documentation appear to be a symptom of Chase's incompetence in managing borrower

3   documents and may stem from Chase's intentional destruction of borrower loan files and

4   records.

5          260.    On information and belief, Chase has misapplied and mismanaged Mr. Sabouhi's

6   payments, utilizing "suspense" accounts and other mechanisms to increase its own profits and

7   delay crediting Mr. Sabouhi's account with the payments he was making.

8          261.    Mr. Sabouhi has been promised a timely review of his modification application

9   and been led to believe that he would receive an affordable modification if he met Chase's

10  demands.  Chase has provided neither timely review nor an affordable solution, breaking these

11  promises.

12         262.    Mr. Sabouhi has not been given any explanation as to why he did not receive a

13  permanent modification years ago.  Instead Chase has collected payments from him unlawfully

14  and in direct contravention of Chase's election to foreclose on him and sell his house.

15  Accordingly, payments made to Chase as a result of its loan modification scheme were

16  improperly collected.

17         263.    Chase's forbearance/modification offer packages were mechanisms of its unfair

18  and deceptive business practices.  Mr. Sabouhi relied on these offer packages, and performed, to

19  his detriment, for over a year, only to learn that he had paid thousands of dollars in good faith to

20  Chase just before Chase *sold* his house without adequately disclosing its intentions and contrary

21  to many assurances that no such thing would occur.

22         264.    Had Chase never instructed Mr. Sabouhi to fall behind, Mr. Sabouhi could have

23  kept his home.  In fact, even when his home was sold, Mr. Sabouhi was capable of bringing the

24  mortgage loan current if necessary.  Chase, however, repeatedly instructed Mr. Sabouhi that it

25  was in his best interests to stay behind.  In the end, Chase apparently had no intention of helping

26  Mr. Sabouhi keep his home, but in fact wanted the very opposite.  It was in Chase's best interest

27  for Mr. Sabouhi to stay behind, so that Chase could take his house (along with any equity he had

28  in it and excessive fees and interest that Chase had tacked onto Mr. Sabouhi's account).

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 65

265.     Furthermore, had Mr. Sabouhi known that Chase did not intend to modify his loan or process his application in a timely manner, and would continue pursuing foreclosure, eventually taking his house while his modification was pending, Mr. Sabouhi would never have paid Chase or provided any other consideration in exchange for promises to modify his loan and forbear its foreclosure proceedings.

266.     Mr. Sabouhi's experiences illustrate painfully well Chase's pattern of deceptive, misleading, unfair, fraudulent, unlawful business practices that have been experienced by all members of the proposed Class of California mortgagors Plaintiffs seek to represent.  While the timing and sequence of phone calls, emails, letters, and numerous forbearance/modification offer packages and other promises may vary slightly among Class members, the underlying conduct is the same.  Chase has devised a fraudulent scheme to drag out the mortgage modification process to maximize its profits.  This unlawful conduct preys on the most vulnerable homeowners in their time of greatest stress, anxiety and desperation.  The chasm between Chase's authority to make loan modifications and "permanent workout solutions" succeed and mortgagors' paltry bargaining power couldn't be greater.

## V.     CLASS ACTION ALLEGATIONS

267.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, under Federal Rule of Civil Procedure 23.  The Class that Plaintiffs seek to represent is defined as follows:

> All mortgagors in the State of California whose home mortgage loans are serviced by Chase Home Finance LLC or JPMorgan Chase Bank, N.A. and who (a) have attempted to obtain permanent loan modifications from Chase Home Finance LLC or JPMorgan Chase Bank, N.A.; and (b) have made payments pursuant to a Forbearance Plan, a Repayment Plan, a Reduced Payment Plan, a Home Affordable Modification Program ("HAMP") Trial Period Plan ("TPP"), a "HAMP" or "CHAMP" Loan Modification Agreement, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification.

268.     Excluded from the proposed Classes are (i) Chase Home Finance LLC, any entity in which Chase Home Finance LLC has a controlling interest, and Chase Home Finance LLC's officers, directors, legal representatives, predecessors, successors, and assigns; (ii) JPMorgan Chase Bank, N.A., any entity in which JPMorgan Chase Bank, N.A. has a controlling interest,

1    and JPMorgan Chase Bank, N.A.'s officers, directors, legal representatives, predecessors,

2    successors, and assigns; (iii) the judicial officers to whom this case is assigned; and (iv) any

3    member of the immediate families of excluded persons.

4        269.    Plaintiffs reserve the right to modify or amend the Class definition at or before the

5    time Plaintiffs briefs the issue of class certification.

6        270.    **Numerosity/Impracticability of Joinder:**  The proposed Class consists of

7    hundreds if not thousands of persons throughout the State of California, making individual

8    joinder of all proposed members of the Class impractical.  The precise number of members can

9    be ascertained through discovery, which will include Defendants' records, information that was

10   or should have been reported to the State of California by Defendants, and similar sources.

11       271.    **Commonality and Predominance:**  All members of the proposed Class share a

12   united interest in the fair, just, and consistent determination of the questions of law and fact

13   necessary to the adjudication of Defendants' liability, which predominate over questions

14   affecting only individual members.  All members of the proposed Class share a common interest

15   in the determination of all factual and legal issues pertinent to Defendants' liability.  All

16   members of the proposed Class also share a common interest in the disgorgement and restitution

17   of revenue unjustly obtained by Defendants.

18       272.    Plaintiffs' causes of action are set forth more fully below.  In summary, Plaintiffs

19   seek to represent a class for claims relating to violation of California Business & Professions

20   Code, § 17200, *et seq*., (California Unfair Competition Law ("UCL")); violation of the Rosenthal

21   Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788.2(c); violation

22   of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.; breach of

23   contract; breach of the duty of good faith and fair dealing; promissory estoppel; and unjust

24   enrichment.

25       273.    The key common liability questions include:

26           A.     Whether and when Defendants engaged in a pattern or practice of bad

27   faith negotiations with mortgagors seeking home mortgage loan modifications;

28           B.     Whether and when Defendants knew or should have known that

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 67

mortgagors would be damaged and/or Defendants would be enriched by Defendants' loan modification practices;

      C.     Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiffs and members of the Class regarding their home mortgage loan modification practices;

      D.     Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiffs and the Class regarding fees charged to mortgagors engaged in performance pursuant to Defendants' forbearance/modification offer packages, including the components thereof in the form of a Forbearance Plan, a Repayment Plan, a Reduced Payment Plan, a Home Affordable Modification Program ("HAMP") Trial Period Plan ("TPP"), a "HAMP" or "CHAMP" Loan Modification Agreement, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, or fees otherwise charged to mortgagor accounts;

      E.     Whether Defendants omitted and concealed material facts in communications and disclosures to Plaintiffs and the Class regarding the status of their loan modification applications;

      F.     Whether Defendants requested and accepted payments under forbearance/modification offer packages, including the components thereof in the form of a Forbearance Plan, a Repayment Plan, a Reduced Payment Plan, a Home Affordable Modification Program ("HAMP") Trial Period Plan ("TPP"), a "HAMP" or "CHAMP" Loan Modification Agreement, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, as a condition for promised permanent loan modifications, without any intention to timely and permanently modify the loans, or any reasonable basis to believe that the loans would be timely and permanently modified, and without taking diligent or reasonable steps to implement timely permanent loan modifications;

      G.     Whether Defendants misrepresented to mortgagors seeking modifications

the terms of and the balances of the loans being serviced, including arrearages, interest owed, and fees;

H.      Whether Defendants improperly applied mortgage payments to accounts, failed to acknowledge receipt of payments, and/or held mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

I.      Whether Defendants improperly initiated, caused to be initiated, or pursued existing foreclosure proceedings against mortgagors who were attempting to obtain home loan modifications;

J.      Whether Defendants routinely mishandled, "lost," or destroyed documents that mortgagors mailed, faxed, or emailed to Chase at Defendants' request;

K.      Whether Defendants' conduct violated California's Unfair Competition Laws;

L.      Whether Defendants' conduct violated the Rosenthal Fair Debt Collection Practices Act;

M.      Whether Defendants' conduct violated the Consumers Legal Remedies Act;

N.      Whether Defendants routinely breached contracts with mortgagors;

O.      Whether Defendants routinely breached Chase's contract with the Federal National Mortgage Association ("Fannie Mae"), under which Plaintiffs and the members of the Class are intended beneficiaries;

P.      Whether Defendants promised permanent home mortgage loan modifications to mortgagors, inducing their reasonable and detrimental reliance;

Q.      Whether Defendants were unjustly enriched at the expense of Plaintiffs and the proposed Class Members;

R.      Whether Defendants' practices warrant equitable, injunctive, and/or monetary relief; and

S.      Whether a class, and/or other subclasses, is superior, within the

1   requirements of Rule 23(b)(3), on Plaintiffs' claims.

2   274.   The proposed Classes are also united on fundamental questions regarding their

3   members' entitlement to damages and equitable relief, including:

4           A.      Whether members of the proposed Class are entitled to damages and/or

5   equitable relief based on their payments to Defendants and related harm and costs

6   incurred as a result of doing business with Defendants;

7           B.      If members of the proposed Class are so entitled, what is the appropriate

8   scope, extent and measure of damages and equitable relief that should be awarded;

9           C.      Whether the degree of reprehensibility of Defendants' conduct warrants

10  the imposition of punitive or exemplary damages under applicable, controlling authority;

11  and

12          D.      Whether members of the proposed Class are entitled to attorneys' fees,

13  pre- and post-judgment interest, and costs of suit.

14  275.   **Typicality:**  Plaintiffs' claims and defenses are typical of the claims and defenses

15  of the proposed Class because Defendants uniformly misrepresented their intent with respect to

16  home mortgage loan modifications, as well as fees charged to mortgagors, the status of loan

17  modification applications, and the balances of the loans being serviced.  Defendants uniformly

18  and actively suppressed, concealed, and failed to disclose the material risks associated with their

19  protracted loan modifications and foreclosure proceedings.  Defendants' uniform conduct

20  deprived Plaintiffs and all members of the proposed Class of their ability to make an informed

21  decision about whether to negotiate with Defendants, seek permanent loan modifications from

22  Defendants, or pursue other alternatives instead.  Plaintiffs, like all members of the Class,

23  requested and/or applied for permanent loan modifications with Chase, sent documentation

24  requested by Chase, made payments pursuant to forbearance/modification offer packages,

25  including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced

26  Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"),

27  "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification

28  plan, or any other plan offered by Defendants as a means to permanent home loan modification,

AMENDED CLASS ACTION COMPLAINT                                    (Case No. 11cv0530) Page - 70

1   and suffered losses due to Defendants' misconduct.  Plaintiffs, like all members of the Class,

2   have experienced these injuries and remain exposed to the likelihood of further illegal conduct

3   by Defendants; nor have their ongoing injuries been remedied or compensated.

4         276.  **Adequacy:**  Plaintiffs and their counsel will fairly and adequately assert and

5   protect the interests of all members of the proposed Class.  Plaintiffs are committed to the

6   vigorous prosecution of this action and have retained counsel who are competent and

7   experienced in complex class action litigation, including consumer litigation.  Plaintiffs have no

8   interests adverse to those of any absent members of the Class with respect to the key common

9   issues of Defendants' home mortgage loan modification practices, fees, deficient disclosures, and

10   breaches.

11         277.  Class certification is proper under Fed. R. Civ. P. 23(b)(1)(A), because the

12   prosecution of separate actions by individual Class Members would create a risk of inconsistent

13   or varying adjudications with respect to individual members of the Classes and establish

14   incompatible standards of conduct for Defendants.

15         278.  Class certification is proper under Fed. R. Civ. P. 23(b)(1)(B) because the

16   prosecution of separate actions by individual Class Members would create a risk of adjudications

17   with respect to individual Class Members which would, as a practical matter, be dispositive of

18   the interest of the other members not parties to these adjudications and/or substantially impair

19   their ability to protect these interests.

20         279.  Class certification is proper under Fed. R. Civ. P. 23(b)(3) because common

21   issues of law and fact predominate over any questions affecting only individual members of the

22   Class, and a class action is superior to other available methods for the fair and efficient

23   adjudication of this controversy.

24         280.  Class adjudication is superior to individual litigation, which would foreclose the

25   ability of most members of the proposed Class to litigate their claims, impose an undue burden

26   on the courts, and result in inconsistent determination of common issues.  The Court may employ

27   issue certification under Rule 23(c)(4)(B) to address any variation of law, fact, or interest from

28   the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment

which would require reversion to repetitive and piecemeal individual litigation.

281.   The need for Class-wide notice presents no barrier to certification because notice can be effectively disseminated to the proposed Classes by techniques commonly used in consumer class actions.  Notice may be provided to proposed Class Members under the requirements of Fed. R. Civ. P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first class mail that this Court determines best comports with modern Fed. R. Civ. P. 23(c)(2) class notice form, content, and dissemination techniques, as used in other consumer cases and as recommended by the Manual for Complex Litigation, 4th and the Federal Judicial Center.

## VI.   CAUSES OF ACTION

282.   Plaintiffs bring each of the following Causes of Action on their own behalf and on behalf of each member of the Class described above, against Defendant Chase Home Finance LLC and Defendant JPMorgan Chase Bank, N.A.  When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Complaint, as necessary.

### COUNT 1

### ("Unlawful" Business Practices in Violation of the Unfair Competition Law ("UCL") Bus. & Prof. Code §§ 17200, *et seq.*)

283.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

284.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

285.   A business act or practice is "unlawful" if it violates any established state or federal law.

286.   Defendants have violated, and continue to violate the "unlawful" prong of the UCL by breaching Chase's agreement with Fannie Mae of which the Plaintiffs and Class are intended beneficiaries.  Defendants further violate the unlawful prong of the UCL by violating the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.2(c).  Defendants

further violate the unlawful prong of the UCL by violating the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*. Defendants have also breached direct contracts with Plaintiffs and the proposed Class and have breached their duties of good faith and fair dealing, as well as engaged in other common law violations (promissory estoppel and unjust enrichment). Defendants further violate the unlawful prong of the UCL by violating the Consent Orders issued by the OCC and the Federal Reserve, discussed *supra*, in numerous ways and by continuing to engage in the practices that are prohibited by the Orders and/or failing to implement the changes demanded by regulators. Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq*.

287.    As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs and the other members of the Class have been injured. They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices. They are threatened with additional harm as a direct and proximate result of Defendants' violations of the UCL. By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes. Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

288.    Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

289.    Through their unlawful acts and practices, Defendants have obtained, and continue to unfairly obtain, money from Plaintiffs and members of the Class that far exceeds and is separate from their debt obligations under their existing mortgages. The named Plaintiffs' excessive payments and additional debt incurred have been directly caused by their reliance on

Defendants' representations described herein.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all Class members, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  In addition, Plaintiffs request that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiffs and the Class in the course of its scheme.  Otherwise, Plaintiffs and the class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT 2**

**("Unfair" Business Practices in Violation of the Unfair Competition Law ("UCL")
Bus. & Prof. Code §§ 17200, *et seq*.)**

290.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

291.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

292.    A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

293.    Defendants have and continue to violate the "unfair" prong of the UCL by inviting Plaintiffs and Class members to participate in loan modification programs, and by taking their trial payments without the intention of permanently modifying their loans.  Among other things, Chase Home Finance LLC and JPMorgan Chase Bank, N.A., have, in bad faith, failed to grant promised permanent loan modifications to qualifying applicants following such applicants' compliant participation in temporary payment plans or other temporary modification agreements; failed to take reasonable steps to work with eligible mortgagors to establish permanent modifications; misrepresented the status of loan modification applications; repeatedly requested duplicative financial information; erected artificial obstacles in the modification evaluation process to obstruct, delay, and/or prevent permanent loan modifications; failed to keep accurate

records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed; failed to keep accurate records of applicants' scores on standard NPV tests; failed to provide account information requested by mortgagors; failed to provide adequate explanations of fees charged to mortgagors; charged excessive, unlawful, and unreasonable fees; inexplicably and arbitrarily increased mortgagor debt obligations; failed to properly apply mortgagor payments in whole or in part; rejected payments entirely without justification; caused improper interest and other fees to accrue; breached modification agreements, and unlawfully proceeded with foreclosures based on mortgagors' failure to meet impossible and shifting demands.[19]

294.    The gravity of the harm to members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for engaging in such deceptive acts and practices.

295.    By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

296.    As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs and the other members of the Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the UCL.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

297.    Plaintiff Michael Sabouhi and Members of the Class have been further harmed by

---

[19] Plaintiffs do not seek to state a claim asserting a private right of action under HAMP.  Rather, Plaintiffs' causes of action reference the relevant terms of the HAMP in conjunction with other underlying claims, *e.g.*, UCL violations.

the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

298.    Through its unfair acts and practices, Defendants have obtained, and continue to unfairly obtain, money from members of the Class that far exceeds and is separate from their debt obligations under their existing mortgages.  The named Plaintiffs' excessive payments and additional debt incurred have been directly caused by their reliance on Defendants' representations described herein.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all Class members, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  In addition, Plaintiffs request that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiffs and the Class in the course of its scheme.  Otherwise, Plaintiffs and the class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### COUNT 3

### ("Fraudulent" Business Practices in Violation of the Unfair Competition Law ("UCL") Bus. & Prof. Code §§ 17200, *et seq.*)

299.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

300.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

301.    A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

302.    Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the public.  Specifically, Defendants invited Plaintiffs to participate in a loan modification program, promising that if Plaintiffs complied with the terms of the various payment plans and otherwise qualified, Chase would permanently modify their loan or make

1   available an alternative "permanent workout solution," enabling them to avoid foreclosure.

2   Plaintiffs relied on these representations in forgoing other options and instead entering the trial

3   program and making trial payments and have suffered monetary loss as a result.  These

4   statements not only deceived Plaintiffs but are also likely to deceive a reasonable, similarly

5   situated person into believing the same.

6          303.    As a result of the conduct described above, Chase has been, and will continue to

7   be, unjustly enriched at the expense of Plaintiffs and members of the proposed class.

8          304.    As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs

9   and the other members of the Class have been injured.  They have suffered financial harm, as

10  well as undue psychological stress and damaged credit, while enduring Defendants' unlawful

11  practices.  They are threatened with additional harm as a direct and proximate result of

12  Defendants' violations of the UCL.  By making payments under temporary modification

13  programs and by continuing to make mortgage payments, Plaintiffs and members of the Class

14  forgo other remedies that might be pursued to save their homes and their precious cash resources,

15  such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal

16  with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time

17  and effort to meet Defendants' demands.

18         305.    Plaintiff Michael Sabouhi and Members of the Class have been further harmed by

19  the foreclosure of their homes after making payments under temporary modification programs

20  that they would not have made had they known that Defendants would refuse to permanently

21  modify their loans and/or foreclose in any event.

22         306.    Through its unfair acts and practices, Chase has improperly obtained, and

23  continues to improperly obtain, money from members of the class that far exceeds and is

24  separate from their debt obligations under their existing mortgages.  The named Plaintiffs'

25  excessive payments and additional debt incurred have been directly caused by their reliance on

26  Defendants' representations described herein.  As such, Plaintiffs request that this Court cause

27  Defendants to restore this money to Plaintiffs and all Class members, and to enjoin Defendants

28  from continuing to violate the Unfair Competition Law as discussed herein.  In addition,

AMENDED CLASS ACTION COMPLAINT                              (Case No. 11cv0530) Page - 77

Plaintiffs request that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiffs and the Class in the course of its scheme.  Otherwise, the Plaintiffs and the Class may be irreparably harmed and/or denied an effective and complete remedy.

**COUNT 4**

**(Unfair Debt Collection Practices
Cal. Civ. Code §§ 1788, *et seq.*)**

307.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

308.    Defendants are "debt collectors" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act").  *See* Cal. Civ. Code §1788.2(c).

309.    Defendants' communications with Plaintiffs about their loan modification applications routinely state that Chase is "attempting to collect a debt" or that it is a "debt collector."  *See* Exs. 13, 19, 23, 30, 35, 37, 43, 46, 47, 48, 49, 51, 52, 55, 64, 65.

310.    Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' and the Class's mortgage debt, as alleged herein.  *See* Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. §1692(e).  Specifically, Defendants invited Plaintiffs to participate in a loan modification program, promising that if Plaintiffs complied with the terms of the various payment plans and otherwise qualified, Chase would permanently modify their loan or make available an alternative "permanent workout solution," enabling them to avoid foreclosure.  Plaintiffs relied on these representations in forgoing other options and instead entering the trial program and making trial payments and have suffered monetary loss as a result.  These statements not only deceived Plaintiffs but are also likely to deceive the least sophisticated debtor and/or any reasonable, similarly situated person into believing the same.

311.    The Rosenthal Act allows for class actions to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA").  *See* Cal. Civ. Code § 1788.17; *Gonzales v. Arrow Financial Services*, LLC, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

312.    As a direct and proximate result of Defendants' violations of the Rosenthal Act, Plaintiffs and the other members of the Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the Rosenthal Act.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

313.    Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

314.    Plaintiffs and members of the Class have been damaged and are entitled to all of the damages, remedies, and penalties available under the Rosenthal Act, including attorneys' fees and costs.  Through their unfair acts and deceptive practices, Defendants have improperly obtained, and continue to improperly obtain, money from Plaintiffs and members of the Class.  As such, Plaintiffs seek the following remedies as provided for in Civil Code § 1788.30:

A.    actual damages pursuant to Civil Code § 1788.30(a);

B.    a penalty in such amount as the court may allow pursuant to Civil Code § 1788.30(b);

C.    attorneys' fees and costs pursuant to Civil Code § 1788.30(c); and

D.    any other relief which the Court deems proper.

### COUNT 5

**(Violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*)**

315.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

316.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq*. (the "CLRA").  By legislative mandate, "[t]his title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  Cal. Civ. Code § 1760.

317.    Plaintiffs and each member of the proposed Class are "consumers" within the meaning of Civil Code § 1761(d).

318.    Defendants' loan modification programs are goods and/or services within the meaning of Civil Code § 1761(a) and (b), respectively.

319.    Defendants violated and continues to violate the CLRA in at least the following respects:

A.    In violation of Civil Code § 1770(a)(2) by misrepresenting the source, sponsorship, approval, or certification of goods or services;

B.    In violation of Civil Code § 1770(a)(5) by representing that goods or services have characteristics which they do not have;

C.    In violation of Civil Code § 1770(a)(7) by representing that goods or services are of a particular standard or quality if they are of another; and/or

D.    In violation of Civil Code § 1770(a)(9) by advertising goods or services with intent not to sell them as advertised;

E.    In violation of Civil Code § 1770(a)(14) by representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

F.    In violation of Civil Code § 1770(a)(17) by representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction; and/or

G.    In violation of Civil Code § 1770(a)(18) by misrepresenting the authority

1

2

of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer.

3

320.    Defendant's practices which violated the CLRA are exemplified by:

4

A.    engaging in bad faith as to home mortgage loan modification negotiations;

5

B.    instructing mortgagors to stop making mortgage payments under the false

6

7

pretense that doing so will not hurt credit scores and is necessary for them to attain a loan

modification;

8

9

C.    presenting mortgagors with packages of information, documents, and

10

promises that offer to (a) forbear on foreclosure proceedings, and (b) provide mortgagors

11

with an opportunity to obtain a permanent loan modification ("forbearance/modification

12

offer packages");

13

D.    leading mortgagors to reasonably believe that Defendants will

14

permanently modify their mortgage loans if they submit requested documentation and

15

make payments pursuant to forbearance/modification offer packages, including the

16

components thereof in the form of Forbearance Plans, Repayment Plans, Reduced

17

Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans

18

("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary

19

modification plan, or any other plan offered by Defendants as a means to permanent

20

home loan modification;

21

E.    inducing mortgagors' reasonable reliance on Defendants to modify their

22

mortgage loans upon successful completion of performance pursuant to

23

forbearance/modification offer packages, including the components thereof in the form of

24

Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable

25

Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP"

26

Loan Modification Agreements, any Chase proprietary modification plan, or any other

27

plan offered by Defendants as a means to permanent home loan modification;

28

F.      breaching forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification;

G.      failing to grant promised permanent HAMP or non-HAMP loan modifications following temporary modified payment plans and acceptance of forbearance/modification offer packages by mortgagors;

H.      failing to take reasonable steps to work with eligible mortgagors to establish permanent HAMP or non-HAMP modifications;

I.      steering mortgagors into temporary modified payment plans with illusory promises to modify—increasing profits to Chase through a pattern and practice that is driven by employee bonus incentives rather than genuine efforts to move mortgagors into timely permanent mortgage modifications;

J.      leading mortgagors to reasonably believe that Chase will permanently modify their mortgage loans if they submit requested documentation, make payments pursuant to forbearance/modification offer packages, and/or successfully complete those plans;

K.      misrepresenting the status of loan modification applications;

L.      misrepresenting the status of mortgagor accounts;

M.      repeatedly requesting duplicative financial information or other documentation;

N.      erecting artificial obstacles in the evaluation process to obstruct, delay, and/or prevent permanent loan modifications;

O.      failing to retain, employ, and supervise adequately trained staff;

P.      failing to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

Q.     failing to properly calculate Net Present Value ("NPV") test scores;

R.     failing to keep accurate records of HAMP applicants' scores on NPV tests;

S.     failing or refusing to provide account information requested by mortgagors;

T.     failing or refusing to provide adequate explanations of fees charged to mortgagors;

U.     charging excessive, unlawful, and unreasonable fees and/or interest;

V.     failing to properly disclose and/or concealing fees and other charges;

W.     inexplicably or arbitrarily increasing mortgagor debt obligations;

X.     failing to properly apply mortgagor payments in whole or in part;

Y.     rejecting payments or refuses to withdraw payments without justification or explanation;

Z.     causing improper interest and other fees to accrue; and

AA.    unlawfully proceeds with foreclosures based on mortgagors' failure to meet impossible and shifting demands.

321.   Defendants accomplish the foregoing through the use of forbearance/modification offer packages, consisting of two parts: (1) _verbal_ promises of an eventual permanent modification, promises that Chase will timely review and process loan modification applications, assurances of forbearance, solicitations to seek a modification, and representations that certain _written_ materials are _part_ of the modification process; and (2) _written_ materials that engage mortgagors in Chase's scheme while reinforcing their reliance on the verbal part of the packages. Plaintiffs and members of the proposed Class routinely receive one or more documents as part of Chase's forbearance/modification offer package.  Described more fully _supra_, these standard form written materials include:

A.     Forbearance Plans;

B.     Repayment Plans;

C.     Reduced Payment Plans

D.      Trial Period Plans (TPPs);

E.      Trial Period Cover Letters;

F.      "HAMP or "CHAMP" Loan Modification Agreements; and/or

G.      Other Proprietary (non-HAMP) Modifications offered by Chase.

322.    Defendants further accomplish the foregoing through the use of a protracted process, "lost" documents, unexplained and/or unreasonable fees and interest, and ignoring the good faith performance and compliance of mortgagors who have experienced hardship and default, as described more fully *supra*.

323.    Defendants' unfair or deceptive acts or practices have been undertaken as part of a generalized course of conduct, pattern, and practice affecting numerous mortgagors in California.

324.    Plaintiffs and members of the Class justifiably relied on Defendants' representations regarding the loan modification process, Defendants' handling of mortgagor documents, and mortgagors' ability to qualify for such modifications.  Defendants' failure to properly and timely afford modifications resulted in damages to Plaintiffs and members of the Class.

325.    Had Plaintiffs and the other members of the Class known that they would pay excessive, unlawful, or unreasonable fees, would accrue needless additional debt, may never obtain a mortgage loan modification from Defendants, and could face foreclosure in any event following a protracted and illusory modification process, they would have pursued other options to save their homes and allocate their precious financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

326.    Had Defendants not engaged in the unfair or deceptive conduct described above, the Plaintiffs and the other members of the Class would have pursued other options to save their homes and allocate their precious financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

AMENDED CLASS ACTION COMPLAINT                          (Case No. 11cv0530) Page - 84

327.     As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and the other members of the Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the CLRA.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

328.     Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

329.     Plaintiffs and members of the Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the CLRA, including attorneys' fees and costs.  Through their unfair acts and deceptive practices, Defendants have improperly obtained, and continue to improperly obtain, money from Plaintiffs and members of the Class.  As such, Plaintiffs request that this Court grant the relief enumerated below.

330.     Plaintiffs and members of the Class request that this Court enjoin Defendants from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code § 1780(a)(2).  Unless Defendants are permanently enjoined from continuing to engage in such violations of the CLRA, Plaintiffs and members of the Class will continue to be damaged by Defendants' acts and practices and may be irreparably harmed and/or denied an effective and complete remedy if such relief is not granted.

331.     Pursuant to Civil Code § 1782, in conjunction with the filing of this action, Plaintiffs notified Defendants in writing of the particular violations of Civil Code § 1770 and demanded that Defendants rectify the problems associated with their illegal behavior detailed

1   above.

2       332.    Upon the expiration of 30 days, if Defendants do not meet Plaintiffs' demand,

3   Plaintiffs will amend their Complaint to request the following additional remedies as provided

4   for in Civil Code 1780:

5           A.     actual damages, punitive damages and/or restitution pursuant to Civil

6   Code § 1780(a);

7           B.     an order enjoining the methods, acts and/or practices, as outlined above,

8   which are in violation of Civil Code § 1770;

9           C.     court costs and attorneys' fees pursuant to Civil Code § 1780(e); and

10          D.     any other relief which the Court deems proper.

11                                    **COUNT 6**

12          **(Breach of Contract / Breach of the Duty of Good Faith and Fair
            Dealing (Direct Contracts))**

13

14      333.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

15  set forth herein.

16      334.    Defendants routinely presented Plaintiffs and the proposed Class with

17  forbearance/modification offer packages.  The forbearance/modification offer packages consist

18  of two parts: (1) verbal promises of an eventual permanent modification, promises that Chase

19  will timely review and process loan modification applications, assurances of forbearance,

20  solicitations to seek a modification, and representations that certain written materials are *part* of

21  the modification process; and (2) written materials that engage mortgagors in Chase's scheme

22  while reinforcing their reliance on the verbal part of the packages.  Plaintiffs and members of the

23  proposed Class routinely receive one or more documents as part of Chase's

24  forbearance/modification offer package.  The written portion of the forbearance/modification

25  offer package includes one or more of the following, described in more detail *supra*:

26  Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification

27  Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification

28  Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants

as a means to permanent home loan modification.

335.    These forbearance/modification offer packages, pursuant to which Plaintiffs and members of the Class made payments and gave other valuable consideration, constitute valid offers.

336.    Moreover, even taking the written materials alone, Chase made valid offers to Plaintiffs and members of the Class.  The Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, and other written agreements/plans used by Defendants promise permanent modifications and provide definite terms, clearly inviting acceptance by signature and/or performance.

337.    By executing the Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification and returning them to Defendants, along with supporting documentation requested by Defendants and "down payments" or "initial payments" Plaintiffs and members of the Class accepted Defendants' offers.  Acceptance by performance was proper because Defendants invited acceptance by performance and solicited from Plaintiffs and members of the Class applications for loan modifications.  Plaintiffs and members of the Class accepted these offers by performance— completion of the tasks outlined in the forbearance/modification offer packages.

338.    For example, the HAMP modification offer letter includes this unequivocal invitation to accept by performance: "To accept this offer, and see if you qualify for a Home Affordable Modification, send the 5 items listed below to CHASE HOME FINANCE, LLC…" *See* Ex. 8.  Plaintiffs and members of the Class who applied for HAMP modifications properly accepted Chase's offers by sending each of the 5 items listed.

339.    Alternatively, by executing the Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification

plan, or any other plan offered by Defendants as a means to permanent home loan modification and returning them to Defendants, along with supporting documentation requested by Defendants and all of the payments set forth in those documents, Plaintiffs and members of the Class accepted Defendants' offers.  Acceptance by performance was proper because Defendants invited acceptance by performance and solicited from Plaintiffs and members of the Class applications for loan modifications.  Plaintiffs and members of the Class accepted these offers by performance—completion of the tasks outlined in the forbearance/modification offer packages.

340.   Alternatively, return of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification by Plaintiffs and members of the Class to Defendants constitute valid offers.  Acceptance of these offers occurred when Defendants accepted payments from Plaintiffs and members of the Class as specified in these documents, continued to engage Plaintiffs and members of the Class in modification discussions and/or continued to request documentation from Plaintiffs and members of the Class.

341.   In addition, by accepting "continuation payments" or any payments beyond those explicitly set forth in Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, Defendants accepted valid offers by Plaintiffs and members of the Class.

342.   The payments made by Plaintiffs and members of the class pursuant to forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, constitute consideration.  By making these

payments, Plaintiffs and the members of the Class gave up the ability to pursue other means of saving their homes from foreclosure and allocating their precious financial resources.

343.    The documentation of current income, legal representations about current personal circumstances, and other provision of requested information to Defendants by Plaintiffs and members of the Class constitute consideration.  By undertaking these measures, Plaintiffs and members of the class spent valuable time and effort that could have otherwise been spent on other endeavors.

344.    Plaintiffs and members of the Class thereby formed valid contracts with Defendants, the terms of which were definite: that Defendants would in good faith consider Plaintiffs and members of the Class for permanent loan modifications; that Defendants would do so in a timely manner; that Defendants would forbear their foreclosure activities; that Defendants would process mortgagors' applications and review all documents that mortgagors sent to Defendants; that the temporary payments made by Plaintiffs and the Class would resemble permanent modification payment amounts; that Defendants would properly evaluate eligibility criteria; that Defendants would timely modify loans for eligible borrowers; that Defendants would properly apply payments; that Defendants would not charge unreasonable or unexplained fees; that Plaintiffs would send in documentation requested by Defendants; and that Plaintiffs would continue making mortgage payments as directed.  With regards to HAMP modifications, the terms also include a promise by Defendants to evaluate the applications of Plaintiffs and the members of the Class pursuant to HAMP guidelines, which provide detailed instructions for evaluating a borrower's application, as set forth in more detail *supra*.

345.    To the extent that contracts with Plaintiffs and members of the Class are subject to conditions subsequent, providing Defendants with the opportunity to review the documentation submitted by Plaintiffs and the Class, this condition is waived by Defendants, *inter alia*, when Defendants mislead Plaintiffs and members of the Class to reasonably believe that their permanent modifications are forthcoming (and that Plaintiffs do in fact qualify) and/or Defendants are estopped from asserting it as a defense to Plaintiffs' claims, *inter alia*, because of Defendants' breaches, their acceptance of substantial performance, and their other unfair or

deceptive business practices.

346.   Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

A.   misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

B.   failing to offer Plaintiffs and the Class timely, affordable, and permanent loan modifications, including but not limited to modifications under HAMP, under Chase's proprietary modification programs, or other available options;

C.   requesting and accepting payments under forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, without any intention to timely and permanently modify the loans, or any reasonable basis to believe that the loans would be timely permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications;

D.   collecting unreasonable and/or inadequately disclosed fees, interest, or other charges;

E.   misrepresenting the terms of and the balances of the loans being serviced;

F.   improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

G.   pursuing foreclosure (either by initiating or continuing existing proceedings) against mortgagors in a temporary modification program and/or who have received forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home

Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification and are performing pursuant thereto;

H.      failing to provide written notices required by HAMP;

I.      failing to provide explanations of fees assessed to mortgagors assessed under temporary modification programs;

J.      failing to retain, employ, and supervise adequately trained staff;

K.      misrepresenting the status of mortgagor accounts;

L.      repeatedly requesting duplicative financial information or other documentation;

M.      failing to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

N.      failing to properly calculate Net Present Value ("NPV") test scores;

O.      failing to keep accurate records of HAMP applicants' scores on NPV tests;

P.      rejecting payments or refusing to withdraw payments without justification or explanation; and/or

Q.      deliberately acting to delay, prolong, or otherwise frustrate the loan modification process, including but not limited to routinely demanding information already in Defendants' files, making inaccurate calculations and determinations of the eligibility of Plaintiffs and members of the Class for loan modifications, and failing to follow through on written and implied promises.

347.     Plaintiffs and members of the Class have demonstrated their willingness to perform under the contracts.

348.     Plaintiffs and members of the Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, and they are threatened with additional harm as a direct and proximate result of Defendants' breaches.

349.     By making payments under temporary modification programs and by continuing

to make mortgage payments thereafter, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

350.     Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

### COUNT 7

### (Breach of Contract / Breach of the Duty of Good Faith and Fair Dealing (Third Party Beneficiary Theory))

351.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

352.     Chase's Servicer Participation Agreement ("SPA") for the Home Affordable Modification Program, as well as the explicitly incorporated HAMP program documentation, constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Chase has undertaken duties to act for the benefit of Plaintiffs and the Class.

353.     By entering into the SPA and accepting valuable consideration from the U.S. Treasury, Chase covenanted to administer its contractual obligations with principles of good faith and fair dealing.

354.     Defendants have breached these contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting payments and fees.

355.     Defendants have breached these contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory or down payments, as well as "continuation payments" beyond the terms of temporary payment plans.

356.    Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

A.    misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

B.    failing to offer Plaintiffs and the Class timely, affordable, and permanent loan modifications, including but not limited to modifications under HAMP;

C.    requesting and accepting payments under forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, without any intention to timely and permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications;

D.    collecting unreasonable and/or inadequately disclosed fees, interest, or other charges;

E.    misrepresenting the terms of and the balances of the loans being serviced;

F.    improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

G.    pursuing foreclosure (either by initiating or continuing existing proceedings) against mortgagors in a temporary modification program and/or who have received forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or

any other plan offered by Defendants as a means to permanent home loan modification and are performing pursuant thereto;

        H.    failing to provide written notices required by HAMP;

        I.    failing to provide explanations of fees assessed to mortgagors assessed under temporary modification programs;

        J.    failing to retain, employ, and supervise adequately trained staff;

        K.    misrepresenting the status of mortgagor accounts;

        L.    repeatedly requesting duplicative financial information or other documentation;

        M.    failing to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

        N.    failing to properly calculate Net Present Value ("NPV") test scores;

        O.    failing to keep accurate records of HAMP applicants' scores on NPV tests;

        P.    rejecting payments or refusing to withdraw payments without justification or explanation; and/or

        Q.    deliberately acting to delay, prolong, or otherwise frustrate the loan modification process, including but not limited to routinely demanding information already in Defendants' files, making inaccurate calculations and determinations of the eligibility of Plaintiffs and members of the Class for loan modifications, and failing to follow through on written and implied promises.

357.    Plaintiffs and members of the Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, and they are threatened with additional harm as a direct and proximate result of Defendants' breaches.

358.    By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants'

demands.

359.    Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

## COUNT 8

### (Promissory Estoppel)

360.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

361.    Defendants made representations to Plaintiffs and members of the Class that if they performed under forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, that they would receive a permanent loan modification.

362.    Defendants intended to induce Plaintiffs and members of the Class to rely on these representations and make both down payments and subsequent monthly payments under the Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification.

363.    Plaintiffs and members of the Class did in fact reasonably rely on Defendants' representations, by submitting payments, as well as documentation requested by Defendants.

364.    Reliance by Plaintiffs and members of the Class was reasonable.

365.     Reliance by Plaintiffs and members of the Class was to their detriment.  Plaintiffs and members of the Class have lost opportunities to fund other strategies to deal with their

default and avoid foreclosure, such as restructuring their debt under the bankruptcy code, or pursuing other options to deal with their defaults, such as selling or renting the homes, have faced financial harm, as well as undue psychological stress and damaged credit, and have given up valuable time and effort to meet Defendants' demands.

366.   Some members of the Class have yet to receive permanent loan modifications, and Plaintiffs' experiences demonstrate the uncertainty and continued misrepresentations by Chase even after supposedly permanent loan modifications are granted.  For Plaintiffs and the Class who relied to their detriment on Chase's promises to modify, even a belated permanent modification does not cure their losses.

367.   Plaintiff Michael Sabouhi and Members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

## COUNT 9

### (Unjust Enrichment)

368.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

369.   At all times relevant hereto, Defendants serviced residential mortgage loans in California.

370.   Plaintiffs and the members of the Class conferred upon Defendants, without knowledge of the unlawful or deceptive pattern and practice in which Defendants were engaged, mortgage payments, including fees, interest, and other charges, benefits that were non-gratuitous. These benefits were beyond that to which Defendants are or were entitled.  Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and the members of the Class even though Plaintiffs and the members of the Class were not receiving the quality of or fairness in mortgage loan servicing that had been represented by Defendants, or that reasonable mortgagors would have expected.  Defendants induced mortgagors, including Plaintiffs and members of the

Class, to continue making mortgage payments and to continue negotiating for permanent modifications that Defendants had no intention granting.  Accordingly, Defendants made promises of permanent loan modifications that were illusory.  Further, Defendants have prolonged modification processes to generate revenue for themselves, and delayed foreclosures until the time at which such action would produce optimum, or at least increased, profits to Defendants.  Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and the members of the Class under these circumstances is unjust and inequitable.

371.     Accordingly, Plaintiffs and the members of the Class are entitled to, and hereby seek, disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, in a manner established by the Court and available under applicable law.

372.     Plaintiffs and the members of the proposed Class are entitled to the imposition of a constructive trust upon Defendants such that Defendants' enrichment, benefit and ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit of Plaintiffs and members of the proposed Class.

## VII.   PRAYER FOR RELIEF

373.     WHEREFORE, Plaintiff, for herself and all others similarly situated, respectfully requests that this Court enter a judgment against Chase Home Finance LLC and JPMorgan Chase Bank, N.A. and in favor of Plaintiffs and the Class, and grant the following relief:

A.     Determine that this action may be maintained as a class action, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate; that the Court designate and appoint the named Plaintiffs to serve as Class Representative, designate and appoint the undersigned counsel and Keller Rohrback L.L.P. as Class Counsel, and designate and appoint Keller Rohrback L.L.P. as Lead Class Counsel;

B.     Enjoin Defendants from engaging in fraudulent, unlawful, or unfair business practices in the course of servicing residential mortgage loans;

C.     Enjoin Defendants from ignoring or failing to process loan modification applications and instead proceeding with non-modification procedures that are premised

upon their deceptive, fraudulent, unlawful, misleading, or unfair business practices in the course of servicing residential mortgage loans;

D.     Declare the conduct of Defendants as alleged herein to be an unlawful violation of the UCL;

E.     Declare the conduct of Defendants as alleged herein to be an unlawful violation of the Rosenthal Act;

F.     Declare the conduct of Defendants as alleged herein to be an unlawful violation of the Consumers Legal Remedies Act;

G.     Require Defendants to submit to outside audits and oversight, paid for by Defendants, on a regular basis to ensure that their mortgage loan modification procedures are fair and reasonable, and that mortgagors receive adequate disclosures;

H.     Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties with respect to loan modifications, including under HAMP;

I.     Award damages to Plaintiffs and members of the Class for all payments made pursuant to Defendants' unlawful practices, including but not limited to payments made pursuant to Defendants' forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, as well as unreasonable fees, interest, or other charges paid;

J.     Require Defendants to adjust the accounts of Plaintiffs and members of the Class to eliminate any accrued fees, interest, or other charges that were unlawfully assessed and currently constitute debts owed by Plaintiffs and members of the Class;

K.     Declare the acts and practices of Defendants described above to constitute breach of contract and a breach of the duty of good faith and fair dealing;

L.     Order specific performance of Defendants' contractual obligations to

Plaintiffs and the members of the Class, together with other relief required under contract;

M.   Order specific performance of Chase's contractual obligations to the Federal National Mortgage Association ("Fannie Mae") under the SPA, for which Plaintiffs and the members of the Class are intended beneficiaries, together with other relief required under contract;

N.   Require Defendants to provide Plaintiffs and members of the Class with a detailed accounting, including but not limited to: NPV calculations related to their Chase home mortgage(s); all documents required to be maintained under HAMP related to mortgage modification applications; and a statement itemizing all account activity, including but not limited to fees, interest, costs, principal and interest payments (whether applied or held in "suspense"), escrow payments, insurance payments, tax payments, as well as any other charges assessed;

O.   Require Defendants to review and process all applications for residential loan modifications in a timely manner and without the delay and increased expense routinely imposed by Defendants on Plaintiffs and members of the Class;

P.   Require Defendants to underwrite permanent modifications for all eligible members of the Class who are currently still in their homes but have yet to receive a permanent modification under contract or under the doctrine of promissory estoppel;

Q.   Require Defendants to underwrite new loans for all eligible members of the Class whose homes were sold in foreclosure sales under contract or under the doctrine of promissory estoppel;

R.   Require Defendants to permanently modify loan terms pursuant to the HAMP guidelines or other applicable standards and properly apply all excess payments made by Plaintiffs and the Class following their compliance with Defendants' forbearance/modification offer packages pursuant to the terms of the permanent modification requested herein, thereby restoring Plaintiffs and the Class to the positions they would have been in had Defendants not engaged in deceptive, unlawful, misleading

or unfair business practices;

S.      Require Defendants to underwrite loans for Plaintiffs and the Class whose homes were sold in foreclosure sales and properly apply all excess payments made by Plaintiffs and the Class following their compliance with Defendants' forbearance/modification offer packages, thereby restoring Plaintiffs and the Class to the positions they would have been in had Defendants not engaged in deceptive, unlawful, misleading or unfair business practices;

T.      Require Defendants to disgorge, to Plaintiffs and members of the Class, all revenue earned as a result of their unlawful acts and practices and protracted loan modification scheme;

U.      Award costs to Plaintiffs and members of the Class for any fees or expenses incurred in wiring payments to Defendants under any temporary provisional modification plan or for any payments that were improperly rejected by Defendants;

V.      Grant Plaintiffs and members of the Class awards of actual, statutory, and/or compensatory, damages in such amount to be determined at trial and as provided by applicable law, to include but not be limited to payments made pursuant to Defendants' forbearance/modification offer packages, including the components thereof in the form of Forbearance Plans, Repayment Plans, Reduced Payment Plans, Home Affordable Modification Program ("HAMP") Trial Period Plans ("TPP"), "HAMP" or "CHAMP" Loan Modification Agreements, any Chase proprietary modification plan, or any other plan offered by Defendants as a means to permanent home loan modification, as well as associated fees, interest, or other charges;

W.      Grant Plaintiffs and members of the Class awards of punitive and/or exemplary damages as provided by applicable law, including due to Defendants' oppressive, fraudulent, and/or malicious conduct in servicing mortgage loans;

X.      Grant Class Members their costs of suit, including reasonable attorneys' fees, costs, and expenses as provided by law;

Y.      Grant Class Members both pre-judgment and post-judgment interest as

provided by law;

Z.     Determine that Defendants are jointly and severally liable for the conduct alleged herein; and

AA.    Grant Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 2nd day of June, 2011.

KELLER ROHRBACK L.L.P.

By: s/ Sharon T. Hritz
    Sharon T. Hritz (265105)
    KELLER ROHRBACK L.L.P.
    1129 State Street, Suite 8
    Santa Barbara, CA  93101
    Tel:  (805) 456-1496
    Fax:   (805) 456-1497
    Email: shritz@kellerrohrback.com

    Lynn Lincoln Sarko
    Gretchen Freeman Cappio
    Gretchen S. Obrist
    KELLER ROHRBACK, L.L.P.
    1201 Third Ave., Suite 3200
    Seattle, WA  98101
    Tel: (206) 623-1900
    Fax: (206) 623-3384
    Email:  lsarko@kellerrohrback.com
        gcappio@kellerrohrback.com
        gobrist@kellerrohrback.com

    Michael D. Braun (167416)
    BRAUN LAW GROUP, P.C.
    10680 West Pico Boulevard, Suite 280
    Los Angeles, CA 90064
    Tel:  (310) 836-6000
    Fax:  (310) 836-6010
    E-mail: service@braunlawgroup.com

*Attorneys for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on June 2, 2011, I caused the foregoing document to be filed with the

3

Clerk of the Court via the CM/ECF system, which will send notice of such filing to the following

4

persons:

5

Gregory P. Dresser and Kimberly R. Gosling.

6

There are no non-CM/ECF participants.

7

DATED this 2nd day of June, 2011.

8

s/Sharon T. Hritz

9

Sharon T. Hritz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28